## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| WAYNE J. HALL, REINA HERNANDEZ, and FLORIDALMA PORTILLO, individually and on behalf of all others similarly situated, | CIVIL ACTION NO.: 19-cv-893 |
| Plaintiffs, |  |
| v. | CLASS ACTION COMPLAINT |
| NASSAU COUNTY, DEPARTMENT OF ASSESSMENT OF NASSAU COUNTY, ASSESSMENT REVIEW COMMISSION OF NASSAU COUNTY, and DOES 1-25, | JURY TRIAL DEMANDED |
| Defendants. |  |

Plaintiffs Wayne J. Hall, Reina Hernandez, and Floridalma Portillo (collectively, "Plaintiffs"), individually and on behalf of all other persons similarly situated, through their undersigned attorneys, bring this class action against Defendants Nassau County (the "County"), Department of Assessment of Nassau County ("DOA"), Assessment Review Commission of Nassau County ("ARC"), and DOES 1-25 (collectively, "Defendants") and each of them based on personal knowledge as to allegations concerning Plaintiffs and as to all other matters, information and belief based on the investigation of counsel, including government resources and news articles.[1]

---

[1] U.S. Census Bureau, http://www.census.gov; Matt Clark, *Separate & Unequal*, NEWSDAY, Parts I-III (Feb. 2 & 17, 2017), https://projects.newsday.com/long-island/nassau-county-property-taxes ("Newsday study"); Carrie Solages, *March 26 tax vote will have lasting impact on Nassau*, LI HERALD (Mar. 22, 2018), http://www.liherald.com/stories/march-26-tax-vote-will-have-lasting-impact-on-nassau,101396; Kristin Thorne, *Nassau County homeowners to face property tax reassessment*, ABC 7 (Mar. 27, 2018), https://abc7ny.com/realestate/nassau-county-homeowners-to-face-property-tax-reassessment/3269681; Jeanne Sahadi, *Highest property taxes*

Plaintiffs believe that additional substantial evidence supports the allegations herein and will be discovered after a reasonable opportunity for discovery. Some facts supporting the allegations herein are known only to Defendants or are exclusively within their control.

## I. INTRODUCTION

1.      This class action seeks declaratory, monetary, and limited, injunctive relief on behalf of owners of residential property in nonwhite communities[2] in Nassau County, New York (collectively with Plaintiffs, and as further defined below, the "Class") against Defendants, who

---

in America, CNN MONEY (Nov. 25, 2013), https://money.cnn.com/2013/11/25/pf/taxes/property-taxes/index.html; Tonya Moreno, Highest and Lowest Property Taxes by State and County, THE BALANCE (Jan. 25, 2019), https://www.thebalance.com/highest-and-lowest-property-taxes-by-county-3193292; NASSAU CTY., MANGANO ASSESSMENT REFORMS SETTLE CLAIMS BEFORE DEMANDING PAYMENT, https://archive.nassaucountyny.gov/agencies/Comptroller/George MaragosAssessmentReports.htm; NASSAU CTY. OFFICE OF COMPTROLLER, LIMITED REVIEW OF DEPT. OF ASSESSMENT (Oct. 3, 2011), https://archive.nassaucountyny.gov/agencies/Comptroller/ GeorgeMaragosAssessment.htm (follow "Limited Review of the Department of Assessment" hyperlink); NASSAU CTY. OFFICE OF HOUS. & CMTY. DEV., ANALYSIS OF IMPEDIMENTS AND FAIR HOUSING PLAN (Aug. 12, 2016), https://www.nassaucountyny.gov/DocumentCenter/View/16865 ("County Report"); Matt Clark, Questions raised over Nassau County assessment fix, NEWSDAY (Mar. 24, 2018), https://www.newsday.com/long-island/nassau/nassau-county-assessment-reassessment-1.17651603; Kristin Thorne, Nassau County homeowners to face property tax reassessment, ABC 7 (Mar. 27, 2018), https://abc7ny.com/realestate/nassau-county-homeowners-to-face-property-tax-reassessment/3269681; Nassau County admits acting tax assessor is not qualified for job, NEWS 12 LONG ISLAND (May 4, 2018), http://longisland.news12.com/story/36255879/ nassau-county-admits-acting-tax-assessor-is-not-qualified-for-job; The Editorial Board, Uneven burden of assessments, NEWSDAY (July 22, 2018), https://www.newsday.com/opinion/editorial/ nassau-county-assessments-1.19978103; David Winzelberg, Curran makes changes to Nassau's crippled assessment system, LONG ISLAND BUSINESS NEWS (Sept. 26, 2018), https://libn.com/2018/09/26/curran-makes-changes-to-nassaus-crippled-assessment-system; Nassau County's Property Assessment Woes May Be Coming To An End, CBS NEW YORK (Sept. 27, 2018), https://newyork.cbslocal.com/2018/09/27/nassau-property-assessments-rate; The Editorial Board, Nassau's assessment fix won't be painless, NEWSDAY (Sept. 30, 2018), https://www.newsday.com/opinion/editorial/nassau-s-assessment-fix-won-t-be-painless-1.21301363; Sticker Shock: Nassau County Residents Getting Letters on New Assessments, CBS NEW YORK (Oct. 30, 2018), https://newyork.cbslocal.com/2018/10/30/property-assessment-rate.

[2] As used herein, "nonwhite community" means a "census tract," as defined by the U.S. Census Bureau, in which most residents are nonwhite in a given year. "White community" means a census tract in which most residents are white in a given year.

in 2010, imposed irrational and discriminatory policies and procedures in their property tax system that have shifted more than $1.7 billion in property taxes from wealthier, white communities in Nassau County to lower income, nonwhite communities.

2.      This complaint does not seek to restrain current tax collection or reassessment of property in Nassau County.  Rather, it seeks to hasten reform and an award of damages for discriminatory practices that have harmed the Class.

3.      This discrimination, inequity, and irrationality in the County's property tax system is nothing new.  It has been the subject of litigation and court admonishment over the course of at least sixty years.  *See, e.g.*, *Coleman v. Seldin*, Index No. 30380-97, 181 Misc.2d 219 (N.Y. Sup. Ct. Nassau Cty. 1999) (citing cases).  The County's property tax assessment system continues to be an engine of inequity, irrationality, and discrimination because the local political and judicial systems have failed to adequately address it.

4.      In 2000, a consent order binding the County imposed certain practices to ensure accurate and fair property assessments and undo the alleged discrimination.  Those practices were enormously successful according to the County's own reassessment contractor, reducing the average overassessment of nonwhite school districts from 27% to 5% or less.

5.      However, as of January 2010, Defendants abandoned those proven methods. They reverted to policies and practices regarding property tax assessments (collectively, the "Anti-*Coleman* Policies" or "Policies") that led to the constitutional challenges in *Coleman* and other cases.  *See, e.g.*, *Chasalow v. Bd. of Assessors of Cty. of Nassau*, 202 A.D.2d 499, 502 (2d Dept. 1994) (warning that the kinds of policies that Defendants again implemented, as alleged below, create "disparate [ ] assessment[s]" and "raise[] the spectre [sic] that continued constitutional challenges to assessments in Nassau County will be forthcoming").

6.    Defendants knew to a "statistical certainty" that the Policies would be discriminatory, irrational, inequitable, and far removed from current market value. Specifically, Defendants knew and intended that the burden would primarily affect nonwhite, elderly, disabled, and lower-income property owners, the kinds of people who are statistically least able to bear greater financial burdens.

7.    Defendants' intent materialized. From 2010 through 2016, property taxes on 61% of the County's residential and commercial properties increased by only $466, or 5%, on average. However, the average increase for the other 39% of County properties was *six times* that amount: $2,748, or 35.7%. Most properties in nonwhite communities comprise that 39%.

8.    The aggregate shift in the property tax burden has exceeded $1.7 billion since February 2, 2017. The shift from 61% of properties to 39% is grossly disproportionate. Worse, the shift was irrational. It forced lower-income communities to subsidize the property taxes of wealthy communities and had no scientific basis. Even worse, the shift was discriminatory: Defendants shifted that tax burden from white communities to nonwhite communities.

9.    The property tax system was a broad perversion of the entire process that deteriorated the tax base by $37 billion and imposed on the Class a hugely disproportionate share of municipal expenses.

10.    The County even admitted it, stating in March 2018, "We've seen an unfair shift in the tax burden" because properties "sink further and further away from fair market value."

11.    Admitting that the property tax system was "[in]defensible," the County endeavored to change it: "For the first time in many years, we will have a defensible tax roll." It initiated a new property tax system, including annual reassessments to "reflect fair market

value."  Upon information and belief, the new system includes sufficiently reduced assessments such that all residential property appreciation would be taxed.[3]

12.     However, the new property tax system provides only prospective relief.  While future property taxes would be equitable, the Class will not be fully compensated for the grossly disproportionate taxes that Defendants imposed in prior years.  Thus, the new program unlawfully perpetuates and compounds the Class's harms.

13.     Furthermore, that prospective relief is only temporary – subject to political whims.  It is likely that the current property tax plan, like the *Coleman* consent order, would arouse anger that yields another regressive property tax system.

14.     The beneficiaries of the Anti-*Coleman* Policies have political allies.  Remarkably, some County legislators are "adamantly opposed" to the current plan.  The ongoing opposition to fair, scientific, and nondiscriminatory County property taxes underscores the inadequacy of past efforts to ensure lawful a property tax system and the uncertainty that the current one will endure.

15.     This putative class action is brought for damages, restitution, and related legal and equitable relief pursuant to: Title VIII of the Civil Rights Act of 1968, as amended, 42 U.S.C. § 3601 *et seq.* ("Fair Housing Act"); and 42 U.S.C. § 1983 for violations of 42 U.S.C. § 1981 and the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution, U.S. CONST. amend. XIV, § 1, cls. 3-4.

## II.  PARTIES

16.     Plaintiff Wayne J. Hall is nonwhite resident of New York who has owned residential property in a nonwhite community in the Village of Hempstead since before 2010.

---

[3] To the extent that this is not the case or is later changed, Plaintiffs reserve their right to challenge that insufficiency or change.

17.    Plaintiff Reina Hernandez is a nonwhite resident of New York who has owned residential property in a nonwhite community in the Village of Hempstead since before 2010.

18.    Plaintiff Floridalma Portillo is a nonwhite resident of New York who has owned residential property in a nonwhite community in the Village of Hempstead since before 2010.

19.    Defendant Nassau County is a political subdivision of the State of New York, bound by the terms of the Nassau County Charter.

20.    Defendant Department of Assessment of Nassau County ("DOA") is an administrative agency of Nassau County that is responsible for developing fair and equitable assessments for all residential and commercial properties in Nassau County on an annual basis.

21.    Defendant Assessment Review Commission of Nassau County ("ARC") is an independent agency of Nassau County, separate from DOA, that is responsible for annually reviewing all applications for assessment corrections filed in Nassau County.  ARC's mission is to review the valuation set by the Department of Assessment and to reduce the assessment if the valuation is excessive.  ARC also manages the County's online appeal system "Assessment Review On the Web," or "AROW."

22.    Defendants Does 1-25 are governmental entities of the County and private entities that contracted with a Defendant.  Upon information and belief, Does 1-25 engaged in the unlawful conduct alleged herein.  Plaintiffs do not know the true names or total number of Does 1-25 and therefore, sue those Defendants by such names.  Plaintiffs will amend their Complaint to state the true names of Does 1-25 after identifying their names.

### III.   JURISDICTION AND VENUE

23.    This Court has jurisdiction over this matter pursuant to 42 U.S.C. § 3613(a) and 28 U.S.C. § 1343.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the events or omissions giving rise to these claims occurred in this District, and the properties that are the subject of the action are situated in this District.

## IV.  SUBSTANTIVE ALLEGATIONS

**A.  Background**

25.     Nassau County's property taxes rank per homeowner among the very highest in the United States.  In 2013 and 2019, it had the second-highest property taxes per homeowner.

26.     County properties have approximately 424,000 owners and 380,000 homes.

27.     Historically, residential properties in the County have been assessed at only a small fraction of their full market value: 0.25%.  For example, a $500,000 home would be assessed at a tax value of $1,250.

28.     Assessments were not based on current market value but rather, on decades-old building costs and land valuations.

29.     That assessment process failed to recognize that high-priced properties increased in value exponentially faster than less expensive properties.

30.     This generally inequitable assessment process produced significant, racially disparate impacts on County residents, which the County intended.

31.     The disparate treatment in property taxation between the wealthy and lower-income communities, and between whites and nonwhites, pervades the United States.  The U.S. Department of Justice conducted a study in the late 1990s that revealed that properties of nonwhite owners were assessed 27% higher than white owners on average.  This inequity has persisted nationwide since before the 1970s.  *See* Stephen Berry, A Federal Forum for Broad Constitutional Deprivation by Property Tax Assessment, 65 Cal. L. Rev. 828 n.1 (July 1977)

(citing authorities) ("Econometric analysis 'confirms that wealthier, upper-class communities are assessed at a lower rate than lower income communities.'").  This decades-old trend highlights the ineffectiveness of state courts to address grossly unfair and discriminatory property taxes.

**B.   The *Coleman* Litigation**

32.    In 1997, the New York Civil Liberties Union filed a lawsuit against the County, its Board of Assessors, and the board's members individually, challenging these racial disparities on behalf of minority homeowners in order to invalidate the property tax assessment system and achieve a more equitable one.  *See Coleman*, 181 Misc.2d 219.

33.    That lawsuit was based on some of the same misconduct at issue in this action, namely the use of outdated property assessments and discriminatory, unequal tax burdens.

34.    *Coleman* involved claims under (a) Title VI of the Civil Rights Act of 1964, which bars municipalities receiving federal funds from operating a system that has the effect of racial discrimination, (b) the Fair Housing Act, which bars racial discrimination in housing, and (c) section 603 of the Nassau County Charter, which requires the County to base its assessment system on "uniform, equitable and scientific principles."

35.    In denying the motion to dismiss, the court chastised the County, providing a history of litigation against it for similar, discriminatory, property tax assessments and discussing the County's persistent failures to take adequate, corrective action.

> **PRIOR NOTICE**
>
> [N]otice that [the County's] current practice of assessment has or may have a disparate impact on minority communities. . . was first provided in 1964 . . . , but no revaluation was ordered in the ensuing 35 years. . . . The Court has difficulty distinguishing th[at] illegal reassessment . . .  and that practiced by [the] County today . . . which results in a claim of discrimination between owners of similarly situated properties . . . .

*Coleman*, 181 Misc.2d at 231-32.

36.    As a result, the court, *sua sponte*, put the County on notice:

> [I]nsofar as the County is *now on notice* of the likely disparate impact of its assessment practices, *what in the past may have been viewed as "unintentional" discrimination may now be fairly considered intentional. The County's continued failure to act in reliance on "unintentional" discriminatory results can no longer act as a shield for the County's practices.*

*Id.* at 233 (emphases added).

37.    In 2000, the lawsuit was settled by a consent order ("Consent Order") that required the County to take specific actions from 2003 through 2006 to undo the discriminatory inequities in its property assessment system.

38.    The Consent Order mandated, *inter alia*, that the County: implement a revaluation that results in zero percent variation in the ratio of assessed value to market value among school districts; reduce the number of under-assessed properties by 10% each year; and establish that the latest sales price for a parcel is the presumptive minimum fair market value of that property.

39.    The Consent Order made clear that reassessment was a mandate for the County, that the process must establish the "fair market value" and account for real-time changes in value for all properties, and that the system must be "fair, nondiscriminatory, scientific, and equitable."

40.    The Consent Order recognized that it may take time to fully implement its terms but insisted that the new tax system reflect "zero tolerance" of unfairness, discrimination, and inequity by the end of the Consent Order's term in 2006.

41.    To comply with the Consent Order, the County implemented new policies for property tax assessment and taxation, for example, to annually update and revise tax assessments to more accurately reflect actual market value.

42.     Those new policies brought the County into compliance with industry standards for tax fairness and accuracy, established by the International Association of Assessing Officers (the "IAAO").

43.     For example, IAAO guidelines require assessor appraisals to be within 10% of current market value.  Following the County's implementation of the provisions of the Consent Decree, the median County property was appraised at 90.8% of its value.

44.     IAAO standards also establish 15% as a maximum error rate for inaccurate assessments.  Following the implementation of the provisions of the Consent Decree, the County's error rate was 7.6%.

45.     The new tax assessment policies also closed racial disparities in the County's tax system.  Within one year of the first reassessment under the Consent Order, the overassessment of properties in predominantly nonwhite school districts fell from 27% to 5% or less.

46.     Accordingly, the County knows how to ensure fair, nondiscriminatory, and accurate property tax assessments, as well as unfair, discriminatory, and inaccurate ones.

**C.     Community Backlash**

47.     The reduction in the racialized tax disparity was achieved in part by increasing the assessed value of undervalued properties in white communities and decreasing the assessed value of the overvalued properties in nonwhite communities.

48.     In addition, property values in the County were increasing substantially during this period, especially in wealthier communities, which appreciate faster than other communities.

49.     As a result, many property owners, particularly those in white communities, experienced increased assessments and the concomitant property tax increases.

50.    In response to these tax increases, many white residents filed challenges to their new assessments through the County's administrative residential tax appeal process, managed by ARC.

51.    In the two years following the initial 2003 reassessment mandated under the Consent Order, the number of tax appeals filed more than doubled, from 56,755 to 125,731.

52.    Attorneys and specialized representatives bringing these appeals typically base their fee on a percentage of the tax reduction that they secure for their clients.  Thus, it is more lucrative to represent owners of high-value properties.

53.    These tax appeals pose unique financial risk to the County.  Under a state law known as the "County Guaranty," a successful tax appeal would require the County to refund not only the collected taxes but also, any taxes collected by any other governmental entity (e.g., schools) that relied on the challenged assessment.

54.    Between 2006 and 2009, ARC heard taxpayers' assessment challenges.  A taxpayer who disagreed with the resolution at ARC could appeal to the courts.

55.    Most appeals during this period were denied.  Only 36.9% resulted in a reduced assessment.  Appeals heard in small claims court resulted in just a 6.2% reduction on average.  In cases that ARC settled, tax assessments were reduced by 10.1% on average.

56.    The high rate of denials of appeals, and the low reductions that were awarded underscore the accuracy of the assessments performed in compliance with the Consent Order.

**D.    The Anti-*Coleman* Policies**

57.    The increased assessment accuracy meant that properties in wealthy communities were taxed more, and properties in lower-income communities were taxed less.  As a result, property taxes became a hot-button issue for wealthier, white voters in the 2009 election for Nassau County Executive.

58.    Tax appeal firms in the County also opposed the Consent Order practices.  Those firms are compensated based on the amount of the assessment reduction that they obtain.  The more valuable the property and the greater the reduction, the larger the compensation to the firms.  They profit most from wealthier, white clients because they own the more valuable properties and file most of the assessment grievances.  However, due to the accuracy of the County's assessments, the high denial rate of assessment challenges, and the small reductions that were awarded pursuant to the Consent Order practices, income to tax appeal firms dropped.

59.    Before the 2009 election, the seven largest residential tax appeal firms created a political action committee, called Committee for Fair Property Taxes ("CFPT").

60.    Since 2006, those seven firms, their officers, and the CFPT contributed $1.8 million to various political organizations, including $330,300 directly to then-candidate Ed Mangano's campaign for Nassau County Executive.

61.    Then-candidate Mangano appealed to the wealthier, white constituency by promising to undo the Consent Order requirements that ended the racially discriminatory, unscientific, irrational, and inequitable tax assessments.  He was elected in November 2009 and took office on January 1, 2010.

62.    These influences undermine the rationality of the ensuing Policies.  That January, Defendants began implementing the Anti-*Coleman* Policies.  The Policies included a moratorium

on property tax assessments (the "Freeze") and a policy to settle assessment challenges for a reduced assessment without scientific scrutiny ("Settlement Policy").

63.    Despite the proven accuracy pursuant to the Consent Order, the County falsely claimed, through its Executive, "We inherited an assessment system that was dysfunctional in every way.  For the first time ever, Nassau County is settling tax grievances prior to demanding payment from our homeowners.  These steps are transforming the broken property tax assessment system that left Nassau County in a fiscal mess."  One part is true: he certainly transformed the system.

64.    The County falsely continued, "[P]rior to the steps taken by th[is] Administration, the accuracy of the County property assessment was not the fair market value and prior year errors were repeated year after year. At the same time the County Attorney's office was understaffed and mismanaged to the point that it could not adequately defend the County."  In fact, in enacting the new Policies, the County terminated swaths of employees and undid the fairness and accuracy pursuant to the Consent Order.

65.    This disinformation campaign by the County, though its officials, led the predominantly unsophisticated Class to believe that their sharp increases in property taxes were lawful.  As a result, they did not realize that they had valid claims as alleged herein.  These actions by Defendants constitute fraudulent concealment and equitable estoppel.

66.    Defendants had opposed similar proposals for several years, in part because the policies would recreate the racial disparities and inequities that led to *Coleman*.  However, in 2010, after $1.8 million in donations from the County's tax grievance industry and facing dissatisfaction from those with higher reassessments, the Mangano Administration determined

that it would be politically expedient to shift the tax burden away from their voting base to disenfranchised constituencies and keep the grievance industry thriving.

### 1.  The Freeze

67.    The Freeze, beginning on January 7, 2010, ended the annual property assessments that the Consent Order required for the purposes of reflecting fair market value, ending racially discriminatory assessments, and accounting for the County's rapidly changing real estate market. Defendants imposed the Freeze even though assessment freezes were a cause of the discriminatory inequities involved in *Coleman*.

68.    The Freeze applied to each property unless its owner filed a challenge to the assessment or the property was damaged or renovated.

69.    Assessment freezes do not account for changes in property value.  Properties in wealthier communities appreciate faster than those in less affluent communities.  That is particularly true in Nassau County, where the wealthier communities are white, and the less affluent communities are nonwhite.

70.    The County predetermines the amount of property tax revenue needed for its budget.  That revenue is divided pro rata among properties based on property value.  Therefore, the owner of a more expensive property pays a larger proportion of the total property tax revenue than the owner of a less expensive property.  Over time, as the expensive properties appreciate faster, their owners pay increasingly larger proportions of the total property tax revenue.

71.    When assessments are frozen, all property owners continue to pay the same proportion of the property tax revenue each year even if certain properties appreciated faster than others.  As a result, properties that appreciate faster are undertaxed and those that appreciate slower are overtaxed.  That outcome is not only inequitable, irrational, and unscientific but also,

discriminatory based on race, income, disability, and age. Properties that appreciate slower are disproportionately owned by nonwhite, disabled, lower-income, and elderly persons and are disproportionately located in nonwhite communities.

72.     Defendants admit that reduced taxes for some results in increased taxes for others. On their website, the FAQ page regarding property assessments states, "If ARC reduces my assessment does the County lose revenue? No. A reduction based on your administrative appeal does not cost the County anything." The County does not lose revenue by reducing an assessment because the amount of the reduction is shifted onto all other properties.

73.     The outdated values benefit the owners of wealthier properties, which are in white communities, because the appreciated value is disregarded from their tax burden. In effect, the appreciation is tax-free. As a result, that avoided tax increase is borne by the owners of less expensive properties. In other words, assessment freezes shift the tax burden from the wealthy to the less affluent. In Nassau County especially, that translates to a shift in tax burden from mostly whites to mostly nonwhites.

74.     Moreover, the amount of that tax shift increases with each successive year because properties in wealthy communities appreciate faster. Thus, the longer the freeze, and the greater the difference in appreciation rates, the greater the inequity of the property tax.

75.     Then-candidate Mangano promised that the Freeze would endure for only two years. Upon taking office in January 2010, Defendants implemented the Freeze and extended it to four years. It remained in place until new leadership in January 2018, i.e., for seven years.

76.     During those years, property appreciation was especially significant in white communities. That disproportionate, relevant appreciation through the seven years exacerbated the inequities and discriminatory impact of the Freeze.

77.     Consequently, once again, properties in wealthier, white communities became substantially undertaxed, and properties in nonwhite, lower-income communities were overtaxed.

**2.  The Settlement Policy**

78.     Defendants also created the "Residential Assessment Reform Team," comprised of major political donors, including the owners of some of the largest residential tax appeal firms that contributed to Mr. Mangano's campaign, all of whom lacked relevant government tax assessment and policy experience.  That action violated state law requiring a bipartisan mix of members in that body.  *See* RPTL § 523-B(2)(a).

79.     That self-interested inexperienced team prepared a report of recommendations that, on information and belief, were based on unsubstantiated claims.

80.     The Settlement Policy, effective in or around October 2011, was one such recommendation.  Rather than spending resources to defend assessment challenges, Defendants would routinely negotiate and settle claims at deeply discounted assessment rates.  The routine reductions would translate into routine compensation to tax appeals firms.

81.     Upon information and belief, the reductions uniform, predetermined, unscientific, and unrelated to market value.  The public cannot be sure because Defendants have refused to disclose this information pursuant to a FOIL request from Newsday.  That is because the Settlement Policy also provided for confidentiality to protect the settlement negotiations of assessment challenges and how Defendants determined the reductions that they offered.

82.     To the extent that any reductions were not predetermined, Defendants' decision to hide that information prejudiced County property owners.  The secrecy deprived those owners of the ability to determine whether to pursue a grievance and the positions to take in such a proceeding to increase the likelihood of obtaining a reduction.   This secrecy was

disproportionately adverse to Class members, who are disproportionately less likely to take the chance of losing a grievance proceeding and retaining a tax firm.

83.    County officials have refused to disclose the rates offered or considered, the identities of the people who participated in or authorized the negotiations, and how final determinations were reached.

84.    In response to a public records request seeking that information, the County initially claimed that no such records existed.  Later, the County conceded that they do exist but are not subject to disclosure.  To date, upon information and belief, Defendants still refuse to publicly disclose that information.

85.    Grievance procedure was inadequate to remedy the excessive taxes imposed on Class members.  The only remedy was an assessment reduction, but (1) obtaining that remedy was not certain, (2) the reductions were not scientific, (3) the reductions did not account for the disregarded appreciation of the properties in white communities, and (4) complete relief was impossible because it was limited to the filer.  Taxpayers' property tax burdens are relative to each other, so complete relief required corrected assessments for all other properties in the filer's property class.  However, that relief was not available, so complete remedy via grievance procedure was impossible.

86.    As expected and intended, the Settlement Policy, independent of the Freeze, caused grossly unscientific, irrational, and racially discriminatory property assessments.

87.    Defendants reduced assessments based merely on whether the property owner filed a challenge, and the reductions were enormous.  The average assessment rate for appealed properties was determined to be 0.17%, according to the most recent tax bills as of February

2017. That is nearly one-third (32%) lower than the 0.25% rate applied to properties with unchallenged assessments.

88.     The owners of 61% of County properties filed assessment challenges. Because mostly wealthy property owners file challenges, a disproportionately large share of the wealthiest 61% of County properties received those one-third reductions of their assessments. That one-third shifted to the owners of the other 39% of properties, mostly located in lower-income communities. In other words, approximately one-third of property taxes on the 61% highest-valued County properties shifted to a little more than half as many property owners of the 39% least-valued County properties – just from the Settlement Policy alone. The resulting assessments were completely divorced from market value and fairness.

89.     The negotiated assessment rates for appeals became so low that a $1,000,000 home reduced on appeal for the 2017 tax year was assessed the same tax as a property with an unchallenged assessment and a property value frozen at $680,000 in 2012. The two properties, if in the same school district and town, would pay the same amount in taxes according to the Newsday study.

90.     The grossly disproportionate tax shift caused by the Settlement Policy was also discriminatory. Defendants, to appease their donors and white voters, knew and intended that disproportionately more whites would challenge their assessments. Defendants also knew and intended that nonwhites and other marginalized groups, namely the elderly, disabled, and lower-income earners, would not file assessment challenges and thus, shoulder more of the tax burden.

91.     Worse, both Anti-*Coleman* Policies symbiotically exacerbated each other's effects. The Freeze policy, by having an exception for appealed assessments, incentivized the filing of appeals because the reduced assessment could be frozen.

92.     Even worse, Defendants allowed property owners to file repeated challenges to their assessments.  Many property owners filed grievances for consecutive years.  For example, Defendants reduced the assessments of 27,431 properties for six consecutive years.

93.     Over the course of six years, when most property values increased, 78% of the 858,000 grievances filed in Nassau County resulted in reductions, often in double-digit percentages.  These outcomes cannot be squared with those before the Anti-*Coleman* Policies, when most challenges were denied because the assessments were accurate due to compliance with the Consent Order.  The properties continued to appreciate, so their tax bills should have remained the same under the Freeze.  Yet, assessments were reduced by nearly one-third on average.  That outcome cannot be the result of a scientific, rational, and fair property tax system.

94.     As of February 2017, Defendants awarded 670,456 reductions that eliminated more than $37 billion in taxable market value, forcing governments to tax the remaining value at a higher rate to maintain budgets.

95.     This impact fell most significantly on residential properties, which constitute 91% of property in the County and approximately 75% of the total tax burden.

96.     The losses continue to accrue as the Class goes uncompensated.

**3.  Other Anti-*Coleman* Policies and Actions**

97.     Defendants made other substantial changes to the tax assessment and appeals processes that subverted the equity and fairness of property taxation in the County.

98.     In 2008, voters approved a referendum requiring that the County Tax Assessor have certain minimum education, certifications, direct experience, legislative approval, and a three-year term limit.  Moreover, the Nassau County Charter required each commissioner to "have at least five years' business experience in the field of real estate, real estate law, in a public

agency or in a municipal department and shall attend such training courses as shall be prescribed by the state Board of Equalization and Assessment."

99.    In 2011, Defendants circumvented that law and flouted its requirements by creating a new title for the same role: "acting assessor."  They appointed, without the requisite legislative approval, an individual to the position who lacked the requisite credentials.  *See* § 601(b) of the Nassau County Charter.  He served for nearly eight years, nearly triple the term limit, and never attended the training courses.

100.    In 2018, Defendants admitted that he was unqualified to hold the position.

101.    Following the implementation of the Anti-*Coleman* Policies, nearly one-third of the County employees associated with overseeing and implementing the former assessment and appeals policy were unlawfully terminated.

102.    The County replaced those employees with its longtime appraisal contractor – without the requisite competitive bidding or legislative approval.

103.    Defendants also fired all nine members of ARC, resulting in labor disputes, lawsuits, and more than $600,000 in settlement costs.

104.    In addition, Defendants intentionally misinformed County residents.  After implementing the Settlement Policy, Defendants posted an online video on AROW describing the online filing process – based on outdated information.  The website also misinformed people who input their information that their challenges would fail, so they never appealed.  Upon information and belief, Defendants took no adequate, if any, action to mitigate the misstatements.

105.    Furthermore, rather than counteract the known and intended unlikelihood of grievance filings by nonwhites and lower-income residents relative to whites and high-income residents, Defendants planned inadequate workshops for residents to veil discriminatory intent

and ensure a disparate impact.  Defendants failed to, upon information and belief: (a) adequately notify County residents of the workshops; (b) hold the workshops at times and locations to maximize attendance by nonwhite, working, disabled, and elderly residents; (c) provide workshops in languages other than English; and (d) hold a sufficient or proportional number of workshops in nonwhite communities.

106.   Many people – particularly those that could not afford legal counsel or understand English – remained misinformed and never filed.

107.   Moreover, the fact that Defendants held workshops shows that they knew that affirmative action was necessary to inform County residents of the changes to the property tax system.  Yet, rather than using the workshops to inform the public, Defendants used it "as a shield for the County's [discriminatory] practices." *Coleman*, 181 Misc.2d at 233.

108.   These actions rise to the level of egregious or conscience-shocking behavior.

**E.  Discriminatory Impact and Arbitrariness**

109.   As a result of Defendants' Anti-*Coleman* Policies and other violations of law, Defendants knowingly and intentionally over-assessed properties in lower-income and nonwhite communities by shifting more than $1.7 billion in property taxes from roughly the top 61% of properties based on market value, in white communities, to roughly the bottom 39% in nonwhite communities.   Thus, the lowest-income, nonwhite property owners were forced to pay the property taxes of twice as many of the wealthiest, white property owners.  This is completely antithetical to constitutional principles on equality and taxation.

110.   According to the February 2017 Newsday study, a 2012 Newsday analysis showed, *inter alia*, that far more property owners in wealthy, white communities appealed their assessments than in lower-income, nonwhite communities.  For example, 75% of property

owners in North Hills and Port Washington appealed their assessments, compared to only 15% in East Atlantic Beach, Roosevelt, Uniondale, and Glen Cove.

111.    The properties worth at least $1 million before their reassessments constitute just 10% of properties in the County.  Yet, they received nearly half the tax benefit.

112.    A "ratio study" is a standard analytical tool used to determine the fairness and accuracy of tax assessments by comparing assessed values to the sales prices of recently sold properties.

113.    Newsday conducted a ratio study that analyzed the assessments of 42,792 homes in the County.  The study also analyzed property assessments based on whether they were appealed and whether the properties were in white or nonwhite communities.

114.    The Newsday study found the most significant disparities between homes in nonwhite communities with unchallenged assessments and homes in white communities with challenged assessments.

115.    Homes in nonwhite communities with unchallenged assessments were assessed at values 27.2% higher than properties with appealed assessments in white communities.

116.    This racialized disparity is a complete reversal of the progress achieved through the implementation of the Consent Order and is nearly identical to the discriminatory disparities that existed before the *Coleman* litigation was filed.

117.    As a result, the County's racial disparities and assessment inaccuracies returned to pre-*Coleman* levels.

118.    In addition to the racial disparities, the new policies failed to comply with professional standards for fairness and accuracy.

119.    Contrary to the IAAO guidelines requiring assessor appraisals to be within 10% of actual property value, appraisals under the new policies from 2016 to 2017 were at 69.1% of fair market value.

120.    The County also exceeds the IAAO standards for the maximum error rate for inaccurate assessments and is more than double the rate from 2010-2011.

121.    There are also assessment industry standards to measure the regressivity of a tax. A tax is regressive when it imposes a harsher burden on the poor than the rich.  Tax regressivity measures the extent of that unfairness, for example, whether higher-value properties are under-assessed compared to lower value properties, which would cause those lower-valued properties to be overtaxed.

122.    Due to the changes to the County's tax assessment and appeals process, in an abandonment of the Consent Order's provisions, the County is now noncompliant with the two most widely accepted standards for regressivity.

123.    One regressivity standard recommends the ratio of assessment to property value for each property to be within 5% of each other, even if property values increase or even double.

124.    The County's implementation of the Consent Order reduced those levels to a rate of 3.5%, even as average property values doubled.

125.    After abandoning the Consent Order's provisions, the rate increased to 6.5%, exceeding the standard.

126.    The average tax bill for property owners who appealed their assessment over the last seven years has increased only $466, or 5%.

127.    In approximately 78% of all appeals filed during this period, owners successfully secured an assessment reduction.

128.    The average tax bill for owners who did not appeal went up by $2,748, or 35.7%.

129.    This shift, which the County knew and intended, favored wealthy, white property owners and disproportionately and adversely impacted lower-income, nonwhite property owners.

130.    Just 10% of the property owners who successfully appealed their assessments gained nearly $790 million in tax reductions – nearly half of the total benefits of the tax shift. Many of those persons, whose homes were valued at over $1 million before their appeals, now pay less property tax than they did seven years ago even though their properties have increased in value.

131.    The disparities created by these Policies are cumulative and exacerbated each year.  After six years, the median unappealed property tax bill was $8,959 higher than those of appealed properties.

132.    Because the County's Anti-*Coleman* Policies removed over $37 billion of market value from the County's tax roll, the overall property tax rate has increased, leading to the further over-assessment of properties in nonwhite communities.

133.    According to Newsday, overall, residential properties in nonwhite census tracts are assessed at values 12% higher than properties in white census tracts.

134.    This disparity exceeds the rate in the County prior to the Consent Order and is almost double the rate in just the year before the Anti-*Coleman* Policies took effect.  By this measure, the Anti-*Coleman* Policies did not just reverse but worsened the inequality at issue in *Coleman*.

135.    According to a subsequent Newsday article in September 2018, from 2010 to 2018, the median tax bill for properties with unchallenged assessments increased by $3,196, nearly five times the increase of $698 for properties with challenged assessments.

136.    In 2016, the Nassau County Office of Housing and Community Development published an "Analysis of Impediments and Fair Housing Plan" (the "County Report"), dated August 12, 2016, on behalf of Nassau County and the Nassau County Urban County Consortium.

137.    The County Report states: "Impediment #8: "High Construction Costs Area and High Property Tax Burden.  The impediment serves to 'minimize construction of affordable housing units.'"

138.    Under the heading "Actions Taken to Overcome Impediment" in the County Report, the fourth bullet point states: "Nassau County Reassesses all Real Property Taxes Annually Based on Fair Market Value."  That statement was untrue when it was made.

139.    As a result, Defendants created two separate and disproportionately unequal tax assessment systems for property owners: those in wealthy, white communities and those in lower-income, nonwhite communities.

140.    The overassessment of properties in lower-income and nonwhite communities forced many owners to cut back on other expenses and/or sell their homes, particularly the elderly and the disabled, who live on a fixed income.

141.    Meanwhile, the tax appeal firms reaped financial rewards.  They earned more than $500 million in estimated revenue from the Policies, mostly from their preferred clientele of wealthy, white property owners, approximately a one-third increase from the prior system.  The firms won 526,695 claims in the five years preceding 2017, nearly double the 292,062 claims that they won in the five years before the Policies began.

142.    These firms went from losing 63.1% of the assessment appeals that they filed before Anti-*Coleman* Policies, when assessments were accurate, to winning 78.1% during the implementation of the Policies, when accuracy was intentionally thwarted.

143.    In sum, Defendants caused "broad perversion of the entire process" that "result[ed] in a] deterioration of the tax base [of $37 billion] and imposition on [Plaintiffs] of a hugely disproportionate share of municipal expenses" that now exceeds $1.7 billion.  *Colella*, 95 N.Y.2d at 409 (quoting *Kerwick*, 52 N.Y.2d at 550).

**F.  Discriminatory Intent**

144.    Defendants intended the discriminatory effects based on race, disability, age, and wealth prior to and during the implementation of the Policies.

145.    Based on decades of prior experience, Defendants knew that these same or similar policies would create disparities to the detriment of marginalized and protected classes.

146.    Defendants also knew that the Anti-*Coleman* Policies were just like the ones challenged in *Coleman* and prior litigation.

147.    Furthermore, when the Freeze was proposed in 2007, Lee Kyriacou, the former head of New York's Office of Real Property Tax Services, criticized it as "highly imprudent if not illegal."

148.    Defendants had already opposed similar policies for several years because they would recreate racial disparities and inequities, like the ones at issue in *Coleman*.  They knew "of the likely disparate impact of [those] assessment practices."  *Coleman*, 181 Misc.2d at 233.

149.    Defendants knew of studies proving that the Policies would have a discriminatory effect on nonwhite, elderly, disabled, and lower-income property owners.

150.    Mr. Kyriacou's office conducted a study, prior to the implementation of the Policies, showing that "seniors and poorer areas complain less and therefore will end up being over-assessed."  His office also found that absent comprehensive, regular reassessments, "it is a

statistical certainty" that the County's Anti-*Coleman* Policies will produce disparate impacts on lower-wealth property owners.

151.    Defendants knew that wealthy and white property owners would make a disproportionate share of the assessment challenges and that most nonwhite, disabled, elderly, and lower-income property owners would never challenge their assessments.  Defendants knew that residents of lower-income and nonwhite communities are 30% less likely to formally complain or pursue an appeal of their tax assessment.

152.    Defendants reduced the assessments of those who filed a grievance to intentionally discriminate against nonwhites.  Defendants chose the filing of a grievance to serve as a proxy for race.

153.    Defendants intentionally refused to make adequate efforts, if any, to counteract that foreknown 30% unlikelihood.  They intended that unlikelihood to occur.

154.    Since *Coleman*, Defendants knew that their implementation of these practices would be "considered intentional."  *Coleman*, 181 Misc.2d at 233.  "The County's continued failure to act in reliance on 'unintentional' discriminatory results can no longer act as a shield for the County's practices."  *Id.*

155.    Also since *Coleman*, Defendants knew how to implement a fair, accurate, and nondiscriminatory property tax system.  They intentionally repealed those practices, policies, and procedures and intentionally replaced them with ones that they knew from experience, studies, and judges would be unfair, inaccurate, and discriminatory.

156.    Defendants intended to hide their discriminatory practices by providing for expansive confidentiality in connection with the Settlement Policy.  They did so because they

knew and intended the discrimination.  In so doing, Defendants concealed from Plaintiffs and Class members the fact that they had causes of action, also constituting fraudulent concealment.

157.    There is no lawful, rational basis to hide from the public the governmental workings pursuant to the Settlement Policy.

158.    In addition to foreknowledge and intent, Defendants knew of the discriminatory effects during the implementation of the Anti-*Coleman* Policies.  In 2010, the County Comptroller's office warned Defendants that the policy changes were unfairly shifting the tax burden onto lower-income and nonwhite property owners.  Defendants proceeded anyway – for seven more years – because they intended that result.  They intended to disregard the provisions in state court's Consent Order.

159.    In 2012, Newsday published a report on striking disparities in appeals rates based on race and income.  Yet, Defendants continued to implement their Policies for another six years.

160.    Defendants also disregarded the County Report, published in 2016.  The Report is an analysis of impediments ("AI") to compliance with "Fair Housing laws," including the Fair Housing Act.  The Number 1 impediment listed in the report is "Discrimination in the Nassau County Housing Market."  The 2016 report acknowledges that "low-income households of Long Island are disproportionately racial minorities."  Moreover, "research conducted for the 2010 AI" "evidence[d] [] overall discrimination . . . [that] resulted in an impediment to fair housing choice in Nassau County."  Despite its own research showing racial and income discrimination in violation of the Fair Housing Act since at least 2010, Defendants exacerbated that problem.

161.    The report proposes five "Actions to Overcome [the] Impediment": Affirmative Marketing Program; Nassau County Affordable Housing Study; Fair Housing Legislation; Fair

Housing Counseling and Enforcement; and Home Ownership Programs.  Defendants failed to take any of those actions that reversed the discriminatory trends.

162.    Worse, the County Report intentionally omitted (a) from its analysis, the role of the Anti-*Coleman* Policies and (b) from the list of "Actions to Overcome [the] Impediment," the repeal of those Policies.  The omissions were intentional because Defendants knew that those Policies were discriminatory in violation of the Fair Housing Act, evidenced by, *inter alia*, the discussion of *Coleman* in the 2011 "Limited Review of Department of Assessment" report prepared by the County's Office of the Comptroller.

163.    The statements therein demonstrate that Defendants understood the importance of annual reassessments reflecting market value.  Yet, Defendants intentionally refused to take any corrective action until new leadership took office in 2018, and even those efforts are inadequate.

164.    Defendants circumvented and violated their own laws and rules to get away with the implementation of the unlawful Freeze and Settlement Policy.

165.    Defendants intentionally caused the mismanagement of AROW, which misinformed proposed Class members on whether they could or should appeal their assessments.  Responsible management of AROW is one of the central missions of ARC.  In so doing, ARC also thwarted its own mission by reducing the appeals that it should have received and reviewed.

166.    DOA intentionally flouted its core mission to ensure "fair and equitable assessments for all residential and commercial [County] properties . . . on *an annual basis*" by failing to adequately, if at all, oppose the Policies and impose annual assessments.

167.    To veil their discriminatory intent, Defendants planned and executed intentionally inadequate workshops that failed to even partially counteract the Policies' discriminatory effects.

168.    That Defendants held workshops and provided information on AROW demonstrates that they knew the importance of informing the public of the Policies.    That Defendants (a) provided false information on their own Policies (b) on their own website that they are officially tasked with managing (c) for several years despite complaints and warnings highlights that these failures cannot be accidental.    Indeed, Defendants utterly failed to reduce the discriminatory effects.    This further concealed from Plaintiffs and Class members the fact that they had causes of action, compounding the fraudulent concealment and also constituting equitable estoppel.

169.    Defendants intentionally disregarded decades of prior experience, studies and warnings from state and local officials both before and during the implementation of the Policies – and even admonishments of state courts – because Defendants intended the discrimination.

170.    Remarkably, the County blamed its residents for failing to appeal their assessments – even though Defendants expected and intended that discriminatory result.    The County also cited its workshops and information on AROW even though they were inadequate and provided false information, which Defendants refused to correct throughout the implementation of the Policies.

**G.  Defendants' "Reforms" Continue the Discrimination**

171.    In 2018, under new leadership, the County finally acknowledged, "For the first time in many years, we will have a defensible tax roll" because it will "reflect fair market value." Also in 2018, the County admitted, "We've seen an unfair shift in the tax burden because those who grieve get relief and those who grieve often, they're often successful, they sink further and further away from fair market value."

172.    Defendants instituted reforms, effective in 2019, that upon information and belief, create a nondiscriminatory, scientific, equitable, and rational property tax system going forward. They require property reassessments in 2019 and subsequent, annual reassessments.

173.    Remarkably, some legislators are "adamantly opposed" to the plan, underscoring the allegiance to white and wealthy constituents over the dictates of the U.S. Constitution and other federal law.

174.    Moreover, due to the delayed effect in 2019, Defendants continued to implement the Anti-*Coleman* Policies throughout 2018 despite admitting that they were "[in]defensible" and caused "an unfair shift in the tax burden."  Defendants granted reductions to most of the more than 200,000 property owners who filed grievances, most of whom are white and wealthy.  That practice compounded the $1.7 billion tax shift that was reported nearly two years ago in February 2017.

175.    Defendants continue to misinform County residents about their intentionally unlawful property taxes throughout 2018.  Their FAQ page regarding property assessments states, "Is there a Residential Assessment Ratio for Nassau County?  This ratio is computed by New York State for each assessing jurisdiction including Nassau County."  The answer misinforms the public by omitting the full truth.  Defendants know that from 2010 through 2018, they intentionally failed to uniformly apply those ratios as required by law.  The Anti-*Coleman* Policies effectively caused different assessment ratios to be applied to similarly valued properties within the same residential property class.

176.    Furthermore, Defendants continually fail to take any action to fully compensate the Class for their prior, grossly disproportionate, property tax payments.  Thus, the reforms perpetuate and compound the losses already caused to the Class.

177.    In May 2018, Defendants considered a proposal to provide a five-year, partial tax exemption that would be granted to owners of homes built before the Freeze began in 2010, are assessed at a high level, and are worth up to $1 million.  However, given the massive disparity in the tax burden, the partial tax exemption would have to be enormous.  Moreover, tax exemptions fail to provide relief to Class members who have moved or will move out of the County.  Indeed, many were forced to move out due to the excessive property tax burden.  Despite that potential, partial solution, upon information and belief, the County has failed to make it into law.

178.    Now, County residents are again angry about rising property taxes, even though they are gradual.  This has recreated the political circumstances that motivated Defendants to disregard the lawful property tax practices in the Consent Order.  The Class needs adequate relief to compensate them and ensure that such justice will not again be reversed at race-based, political whims.

## V.    THE TAX INJUNCTION ACT OF 1937, 28 U.S.C. § 1341

179.    The Tax Injunction Act does not foreclose this Court from exercising jurisdiction over this action.

180.    Plaintiffs do not seek an immediate injunction to protect them from paying property taxes in order to challenge the lawfulness of property tax.

181.    Plaintiffs do not seek to restrain the assessment, levy, or collection of a real property tax.  To the contrary, they support Defendants' current property tax plan to the extent that it requires the levy and collection of a real property tax and annual property reassessments.

182.    Rather, Plaintiffs seek damages and/or changes to the current property tax system that would redistribute the tax burden (e.g., via tax exemptions and/or assessment ratios) to ensure complete relief to the Class and a scientific, equitable, and nondiscriminatory property tax.

183.    Plaintiffs also seek to permanently prevent Defendants from reimplementing the kinds of practices, policies, and procedures that are racially discriminatory in intent or effect.

184.    Plaintiffs do not contest the validity of or liability for a property tax but rather, the policies, procedures, and practices that Defendants implement in connection with that tax.

185.    The property tax system, including grievance procedure, was created and overseen by self-interested actors, such as Defendants and their appointees.

186.    The grievance procedure is unscientific, inequitable, procedurally unfair, incapable of according complete relief for the wrongs alleged herein.

187.    Defendants did not make grievance procedure equally available to all residential property owners, and they misinformed and continue to misinform the Class of their rights and the law with respect to property taxes and grievance proceedings.

188.    Defendants violated state and local procedural laws that were designed to maintain the integrity of the property tax system, such as the credential requirements for assessors, scientific and equitable property taxes, bipartisan constituency of the assessment review commission, and assessments at a uniform percentage of value for each property class. *See* Nassau County Charter §§ 601(b), 603; RPTL §§ 523-B(2)(a), 305(2).

189.    The Class does not challenge the tax but rather, the credits and other reductions via grievance proceedings, assessment freezes, and other policies and practices that Defendants have implemented to the benefit of whites and owners property in white communities. *See Hibbs v. Winn*, 542 U.S. 88 (2004).  The reductions and credits result from and cause violations of federal law pursuant to the Constitutional and statute.

190.    State law remedies have failed the Class, as demonstrated by, *inter alia*, the decades-long recurrence of a property tax system implemented by Defendants that is intentionally and effectively discriminatory, irrational, unscientific, and inequitable.

191.    The state courts have failed to permanently enjoin Defendants from implementing the kinds of discriminatory, property tax policies and procedures alleged herein, which Defendants have been employing for at least decades.

192.    Class-wide relief to the Class in state court is uncertain due to legal precedent that that prohibits class certification when plaintiffs sue the state or local government for conduct that applies to the entire class.  Class-wide relief is essential to redress the Class's harms because, *inter alia*, each property's tax burden is relative to the tax burden of all other properties in the same property class.  *See, e.g.*, Stephen Berry, *A Federal Forum for Broad Constitutional Deprivation by Property Tax Assessment*, 65 Cal. L. Rev. 828, 833 (1977), *available at* http://scholarship.law.berkeley.edu/californialawreview/vol65/iss4/3.

193.    Political pressure at the County level has and will continue to work against an enduring reform of the property tax and assessment system because a majority of those negatively affected constitute a majority of voters.

194.    The foregoing and other issues prevent the Class from having a plain, speedy, efficient, and certain remedy in state court.

195.    The Tax Injunction Act never deprived the federal courts of equity jurisdiction, which applies to this action.

196.    The County's property "tax" is not a tax.  It is or operates as a fee or penalty on those who are nonwhite, own a residence in a nonwhite community, are unable to afford a tax representative, or fail to file a grievance.

## VI.   CLASS ALLEGATIONS

197.   Plaintiffs bring this action individually on their own behalves and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of the "Class," defined as follows:

**The Class:**   All persons who owned residential property at any time from 2010 through the present that was located in a "census tract" (as defined by the U.S. Census Bureau) in Nassau County in which most residents were nonwhite during any year when said persons owned that property.

The Class excludes Defendants, any judge presiding over this action, such judge's family members, and all persons who properly execute and file a timely request for exclusion from the Class.

198.   Class-wide adjudication of Plaintiffs' claims is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

199.   The Class is so numerous that joinder of all members is impracticable.   Plaintiffs believe that there are at least tens of thousands of Class members and can ascertain the exact number only through appropriate discovery.   Class members can be identified from records maintained by Defendants, the Nassau County Clerk's Office, and Plaintiffs and notified of the pendency of this action by mail.

200.   Questions of law and fact are common to the Class and predominate over questions that solely affect individual Class members.   Those questions include, *inter alia*:

    a.    Whether Defendants violated 42 U.S.C. § 3604(b);

    b.    Whether Defendants violated 42 U.S.C. § 3605;

    c.    Whether Defendants violated 42 U.S.C. § 3617;

d.      Whether Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, U.S. CONST. amend. XIV, § 1, cl. 4 ("Equal Protection Clause") by causing the deprivation of equal protection rights;

e.      Whether Defendants violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, U.S. CONST. amend. XIV, § 1, cl. 3 ("Due Process Clause") by causing the deprivation of procedural due process rights;

f.      Whether Defendants violated the Due Process Clause by causing the deprivation of substantive due process rights;

g.      Whether Defendants violated 42 U.S.C. § 1981;

h.      Whether Defendants violated RPTL § 305;

i.      Whether Defendants violated RPTL § 523-B(2)(a);

j.      Whether Defendants violated Nassau County Charter § 601(b);

k.      Whether Defendants violated Nassau County Charter § 603;

l.      Whether Defendants' alleged conduct had a racially disparate impact;

m.      Whether Defendants' alleged conduct had a disparate impact based on whether the real property was located in a nonwhite community;

n.      Whether Defendants' alleged conduct had a disparate impact based on disability;

o.      Whether Defendants' alleged conduct had a discriminatory impact disparate on age;

p.      Whether Defendants intended any of the above-referenced disparate impacts;

q.     Whether Defendants' current property tax system corrects the inequities and inaccuracies of the prior system;

r.     Whether the Defendants' current property system accords full, prospective relief to the Class for the losses alleged herein;

s.     Whether Defendants offered predetermined assessment reductions to those who filed of grievances;

t.     Whether Defendants misinformed the Class by claiming that the property tax system pursuant to the *Coleman* Consent Order was inaccurate;

u.     Whether Defendants misinformed the Class that the Anti-*Coleman* Policies were fair, equitable, scientific, or lawful;

v.     Whether Defendants misinformed the Class by posting a video with outdated information on AROW;

w.     Whether Defendants misinformed the Class by telling its members via AROW that they had no valid claim to an assessment reduction;

x.     Whether Defendants took adequate, if any, action to lessen or eliminate the adverse impact of the foregoing misrepresentations;

y.     Whether Defendants took inadequate, if any, action to lessen or eliminate the racially disparate impact of their property tax system;

z.     Whether the purported workshops were inadequate to lessen or eliminate the disparate impacts of Defendants' property tax system;

aa.     Whether Defendants intended that the foregoing misinformation and actions would be false, misleading, or inadequate;

bb.    Whether any of the foregoing misinformation or inadequate actions deprived the Class of their rights to equal protection and substantive and procedural due process;

cc.    Whether one of the substantive due process rights that Defendants violated was the right to access legal proceedings;

dd.    Whether ARC failed to achieve its mission;

ee.    Whether DOA failed to achieve is mission;

ff.    Whether ARC and DOA's failures were intentional or unreasonable;

gg.    Whether Defendants provided for confidentiality over settlement negotiations of assessments grievances;

hh.    Whether Defendants intended the confidentiality to hide misconduct; and

ii.    Whether the filing of a grievance is an irrational basis for achieving a property tax system based on true market value.

201.    Plaintiffs are committed to prosecuting this action, are adequate representatives of the Class, have no interests that are adverse to the Class, and have retained competent counsel experienced in litigation of this nature.

202.    Plaintiffs' claims are typical of those of the other Class members as Defendants' alleged, wrongful conduct similarly affects all of them.

203.    Plaintiffs anticipate that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

204.    The damages suffered by individual Class members may be small compared to the expense and burden of individual litigation, making it impossible for members of the Class to individually redress the wrongs done to them.

205.    The prosecution of separate actions by individual members of the Class would create the risks of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for Defendants.

## VII.  CLAIMS FOR RELIEF AGAINST EACH AND ALL DEFENDANTS

### FIRST CAUSE OF ACTION

### Fair Housing Act, 42 U.S.C. § 3604(b)

206.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

207.    The Fair Housing Act prohibits discrimination in the provision of services or facilities relating to the use of a dwelling because of, *inter alia*, race, color, or national origin.

208.    Governments providing housing-related services must do so in a manner that does not discriminate based on race, color, or national origin.

209.    The Fair Housing Act prohibits intentionally discriminatory housing practices and housing practices that have an unjustified, disparate impact on members of a protected group.

210.    Defendants violated and continue to violate those requirements.

211.    Defendants have and continue to discriminate against property owners in nonwhite communities the provision of property tax assessment and appeal services by implementing property tax assessment and appeals procedures that unjustifiably and disproportionately increased the tax burden on nonwhite towns and communities.

212.    Defendants' appraisal practices for real property located in the majority white towns and neighborhoods did not result in such dramatic property tax increases.

213.    Defendants' unlawful and discriminatory assessment and appeals procedures forced African-American, Hispanic, and other nonwhite property owners to bear additional and

unnecessary financial sacrifices and risks to meet the discriminatory tax burden, putting those owners at risk of loss or forced sale of their property.

214.    Defendants' policies and practices continue to have a discriminatory effect on African-Americans, Hispanic, and other nonwhite homeowners in Nassau County.

215.    Defendants have no legally sufficient justification for engaging in the conduct that causes this discriminatory effect.

216.    Any legitimate, nondiscriminatory interests that Defendants could identify could have been achieved through other practices that have a less discriminatory effect on African-American, Hispanic, and other nonwhite homeowners.

217.    Defendants' tax assessment and appeals policies also intentionally discriminate against nonwhite property owners in the County.  Defendants adopted these policies despite foreknowledge and warnings of the discriminatory impacts on nonwhite property owners.

218.    The County adopted these practices intentionally and with reckless disregard for the discriminatory injuries that they would cause to Plaintiffs and putative Class members.

219.    Defendants, through their actions and the actions of their agents, are liable for violating the rights of Plaintiffs and putative Class members under the federal Fair Housing Act, 42 U.S.C. § 3604(b).

### SECOND CAUSE OF ACTION

### Fair Housing Act, 42 U.S.C. § 3605

220.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

221.    42 U.S.C. § 3605 prohibits discrimination in residential real estate related transactions because of race, color, or national origin.  This prohibition includes discriminatory appraisals of residential real property.

222.    Defendants have violated and continue to violate section 3605 by using unlawful and flawed appraisal procedures for land in the County that disproportionately increased the assessed value of real property in nonwhite towns and communities.

223.    Defendants' appraisal practices for real property located in the majority white towns and communities did not result in such dramatic property tax increases.

224.    Defendants' unlawful and flawed appraisal procedures have forced African-American, Hispanic, and other nonwhite property owners to make additional and unnecessary financial sacrifices and risks to meet the discriminatory tax burden, putting those owners at risk of loss of forced sale of their property.

225.    Defendants' conduct has had a discriminatory effect on African-Americans, Hispanic, and other nonwhite homeowners in Nassau County.

226.    Defendants have no legally sufficient justification for engaging in conduct that causes this discriminatory effect.

227.    Any legitimate, nondiscriminatory interests that Defendants could identify could have been achieved through other practices that have a less discriminatory effect on African-American, Hispanic, and other nonwhite homeowners.

228.    Defendants' tax assessment and appeals policies also intentionally discriminate against nonwhite property owners in the County.  Defendants adopted these Policies despite foreknowledge and warnings of the discriminatory impacts on nonwhite property owners.

229.    The County adopted these Policies and practices with the intent to cause, and in reckless disregard of causing, the discriminatory injuries afflicting Plaintiffs and Class members.

230.    Defendants, through their own and their agents' actions, are liable for violating the rights of Plaintiffs and the putative Class under the Fair Housing Act, 42 U.S.C. § 3605.

## THIRD CAUSE OF ACTION

### Fair Housing Act, 42 U.S.C. § 3617

231.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

232.    Under 42 U.S.C. § 3617, it is unlawful to "interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected" by the Fair Housing Act.

233.    Defendants have violated and continue to violate section 3617 by using unlawful and flawed appraisal procedures for land in the County that disproportionately increased the assessed value of real property in nonwhite towns and communities.

234.    Defendants' appraisal practices for real property located in majority white towns and communities have not resulted in such dramatic property tax increases.

235.    Defendants' unlawful and flawed appraisal procedures interfered with the fair housing rights of African-American, Hispanic, and other nonwhite property owners, forcing them to make additional and unnecessary financial sacrifices and risks to meet the discriminatory tax burden, and putting those owners at risk of loss of forced sale of their property.

236.    Defendants' conduct has a discriminatory effect on African-Americans, Hispanic, and other nonwhite homeowners in Nassau County.

237.    Defendants have no legally sufficient justification for engaging in the conduct that causes this discriminatory effect.

238.    Any legitimate, nondiscriminatory interests that Defendants could identify can be achieved through other practices that have a less discriminatory effect on African-American, Hispanic, and other nonwhite homeowners.

239.    Defendants' tax assessment and appeals policies also intentionally discriminate against nonwhite property owners in the County.  Defendants adopted these policies despite foreknowledge and warnings of the discriminatory impacts on nonwhite property owners.

240.    The County adopted these policies and practices intentionally and with reckless disregard for the discriminatory injuries that they would cause to Plaintiffs and the putative Class.

241.    Defendants, through their own and their agents' actions, are liable for violating the rights of Plaintiffs and Class members under the Fair Housing Act, 42 U.S.C. § 3617.

### FOURTH CAUSE OF ACTION

**Federal Equal Protection Clause and Due Process Clause – Suspect Classes of Persons**

242.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

243.    Plaintiffs and most Class members are nonwhites and members of protected classes of persons based on race.

244.    Under 42 U.S.C. § 1983:

Every person who, under color of any statute, ordinance, regulation, custom, or use, of any State . . . , subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

245.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution ("Due Process Clause") provides that no state shall "deprive any person of life, liberty, or property without due process of law."  U.S. CONST. amend. XIV, § 1, cl. 3.

246.    The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution ("Equal Protection Clause") provides, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1, cl. 4.

247.    Defendants violated those Equal Protection and Due Process Clauses in undertaking the actions alleged in this Complaint, which deprived the Class of their rights to equal protection and substantive and procedural due process.

248.    All of Defendants' actions alleged in this Complaint were undertaken under color of state law.

249.    Defendants implemented a property tax system that they knew would impose disproportionately more property taxes on nonwhites and disproportionately less property taxes on whites.  Defendants intended that discrimination before and throughout the implementation of their property tax system.  The intended discriminatory effects occurred.

250.    Defendants further violated equal protection and both substantive and procedural due process by taking actions that they knew would deter and prevent disproportionately more nonwhites than whites from accessing legal proceedings, specifically, tax grievance proceedings. Specifically, Defendants misinformed Class members via AROW that they would not receive reduced assessments from filing a grievance and posted a video with outdated information about grievance procedure.

251.    To the extent that Defendants also misinformed persons outside of the Class via AROW, Defendants knew and intended that disproportionately more whites would nevertheless retain a tax firm and proceed with filing a grievance and that disproportionately more nonwhites would not.

252.    Defendant took no adequate, if any, action to mitigate the misinformation.

253.    In addition, also with discriminatory purpose and effect, Defendants inadequately informed nonwhites about the Settlement Policy with respect to the purported workshops.

254. Defendants knew that by misinforming County residents that they had invalid claims, a disproportionately large share of whites would nevertheless file grievances and a disproportionately large share of nonwhites would not.

255. Defendants recklessly disregarded the foreknown, intended, and observed discriminatory effects of their policies and practices and continued to implement them.

256. Defendants have no legally sufficient justification under any applicable level of constitutional scrutiny for engaging in the conduct that causes this discriminatory effect.

257. Any compelling or necessary nondiscriminatory interests that Defendants could identify should have been achieved through more narrowly tailored practices that minimize the discriminatory effect on nonwhites.

258. Defendants have no necessary or compelling basis for over-assessing the properties of, and overtaxing, nonwhites individuals compared to whites.

259. Defendants have no necessary or compelling basis for deterring nonwhites from accessing grievance proceedings.

260. Moreover, Defendants inadequately reformed their property tax system such that it still fails to comply with the Equal Protection Clause.  Defendants knew and intended that the new system would continue to discriminate against nonwhites.

261. Defendants' actions violated equal protection and both substantive and procedural due process.  Those actions caused the Class to suffer damages that continue to accrue.

262. Accordingly, Defendants, through their own and their agents' actions, are liable under 42 U.S.C. § 1983 for violating Class members' rights under the Equal Protection Clause and Due Process Clause.

## FIFTH CAUSE OF ACTION

**Federal Equal Protection Clause and Due Process Clause – Other Classes of Persons**

263.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

264.    Plaintiffs and Class members belong to a class of persons who owned residential property in a nonwhite community in Nassau County.

265.    Defendants' application of their property tax system violates the Equal Protection Clause because they assess and tax different parcels of real property within the same property class at grossly different percentages of value and because they apply grossly different tax treatment to equally valuable properties.

266.    The disparate treatment is based on the arbitrary and irrational bases of (1) the assessment value when the Freeze took effect, (2) whether the property owner filed a grievance, and (3) the number of grievances that a property owner filed for a particular parcel of property.

267.    Defendants exacerbated the arbitrariness and irrationality of those bases – and violated the Due Process Clause – by intentionally and effectively misinforming County residents via AROW.  Defendants knew that by misinforming County residents that they had invalid claims, a disproportionately large share of whites would nevertheless file grievances and a disproportionately large share of nonwhites would not.

268.    In addition, Defendants inadequately informed nonwhites, the elderly, the disabled, lower-income individuals, and owners of property in nonwhite communities about the Settlement Policy and grievance procedure with the intent to create those effects.

269.    Moreover, those irrational bases, even if they could be rational, would have to be "applied even-handedly to all similarly situated property" in order to be constitutional. However, properties within the same class and properties with similar values have disparate

assessments and tax burdens that are far removed from fair market value.  They were not applied evenhandedly.

270.    Defendants intended that their property tax system would disproportionately impose the property tax burden on owners of property in nonwhite communities and individuals with lower income.  Their intended effects occurred.

271.    Effectively, owners of property in nonwhite and lower-income communities were forced to pay the property taxes from wealthier properties and white communities.  There is no rational basis for causing those effects, and doing so is not reasonably related to achieving a legitimate government purpose.

272.    Although New York law provides that "true market value" is the basis for assessment, *G.R.F., Inc. v. Bd. of Assessors*, 41 N.Y.2d 512, 515 (1977), the County's property tax system is not rationally related to achieving that goal.  To the contrary, the system impermissibly discriminates against similarly situated property owners within the same class based on factors that are impermissible under state law, such as those referenced above, in violation of the federal Equal Protection Clause.  Defendants knew and intended that foregoing the Consent Order's conditions and implementing the Anti-*Coleman* Policies would cause the County to fall out of compliance with the State of New York's adopted standards for fairness and accuracy of property assessments.

273.    The system also violates the state law requiring that "[a]ll real property in each assessing unit shall be assessed at a uniform percentage of value."  RPTL § 305(2).  That law provides that real property within each of County's four classes is "to be assessed at the same percentage of full value."  *41 Kew Gardens Rd. Assocs. v. Tyburski*, 70 N.Y.2d 325, 330 (1987). Defendants' property tax system does not uniformly assess parcels of real property within each

Class of residential property as required by law.  *See Matter of O'Shea*, 8 N.Y.3d at 256-61. That is because Defendants awarded assessment reductions to only those who challenged their assessments, *see Coleman*, 181 Misc.2d at 239; *Verga v. Clarkstown*, 137 A.D.2d 809 (2d Dept. 1988), *dismissed*, 72 N.Y.2d 1042, and without regard to market value, which is a *de jure* violation, *see Bauer v. Bd. of Assessment Review*, 114 Misc.2d 640, 643, 452 N.Y.S.2d 186 (Sup. Ct. Columbia Cty. 1982), *aff'd*, 91 A.D.2d 1097 (3d Dept. 1983) ("[A] method of assessment . . . [that] does not take into account the market value of the individual parcels being assessed, is clearly illegal and in contravention of the statute.").

274.    As a result of the property tax system, Defendants arbitrarily taxed residential properties using assessments that bear no rational relationship to fair market value and by disproportionately and grossly discriminating among properties of similar value.

275.    Defendants further violated the Equal Protection Clause by taking actions that they knew would deter and prevent disproportionately more owners of property in nonwhite communities than owners of property in white communities from accessing tax grievance proceedings.  Defendants intended that discrimination, and the discriminatory effects occurred.

276.    Defendants foreknew, intended, and observed the discriminatory and arbitrary means and results alleged herein before and throughout the implementation of the property tax system.

277.    Defendants have no legally sufficient justification under any applicable level of constitutional scrutiny for engaging in the conduct that causes this discriminatory effect.

278.    Any legitimate, nondiscriminatory interests that Defendants could identify could have been achieved through other practices that have a less discriminatory effect on owners of property in nonwhite communities.

279.     Moreover, Defendants inadequately reformed their property tax system such that it still fails to comply with the Equal Protection Clause.  Defendants knew and intended that the new system would continue to suffer from the same legal infirmities.

280.     Defendants' actions violated equal protection and both substantive and procedural due process.  Those actions caused the Class to suffer damages that continue to accrue.

281.     Accordingly, Defendants, through their own and their agents' actions, are liable under 42 U.S.C. § 1983 for violating Class members' rights under the Equal Protection Clause and Due Process Clause.

## SIXTH CAUSE OF ACTION

**Federal Equal Protection Clause and Due Process Clause – Selective Reassessment**

282.     Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

283.     "It is well settled that a system of selective reassessment that has no rational basis in law violates the equal protection provisions . . . ."  *Weiner v. Bd. of Assessors*, 69 A.D.3d 949, 950 (2d Dept. 2010) (quoting *Matter of Mundinger v. Assessor of City of Rye*, 187 A.D.2d 594, 595 (2d Dept. 1992)).  A rational basis, such as property improvements, is not inherently unconstitutional if "applied even-handedly to all similarly situated property."  *Weiner*, 69 A.D.3d at 950 (quoting *Matter of Stern v. Assessor of City of Rye*, 268 A.D.2d 482, 483 (2d Dept. 2000) (quoting *Allegheny Pittsburgh Coal Co. v. Comm'n of Webster Cty.*, 488 U.S. 336, 345 (1989))).

284.     Defendants' property tax system violated the Equal Protection Clause for having no rational basis for its selective reassessments and not evenhandedly applying its bases for selective reassessments.

285.     Defendants selectively assessed properties based solely on whether the owner file a grievance.  That is not a rational basis for property tax assessments because it disregards

market value and leaves reassessments up to the taxpayers rather than the assessor.  *See Weiner*, 69 A.D.3d at 950 (quoting *Matter of Stern*, 268 A.D.2d at 483).

286.    Defendants compounded the irrationality to that basis – and violated the Due Process Clause – by intentionally and effectively interfering with the rights and ability of certain persons to file grievances, specifically, nonwhite property owners and owners of property in nonwhite communities.  Defendants did so by intentionally misinforming and inadequately informing them about the Settlement Policy and their rights thereunder.

287.    There was also no rational basis for the reassessment procedure.  Neither the assessor nor fair market value had a role in determining whether to offer a reduction in settlement or the amount of the reductions.  Defendants predetermined the reduction amounts.

288.    Even if filing a grievance could be a rational basis, the rights to make such filings and to receive offers of reductions were not "applied even-handedly to all similarly situated property." *Weiner*, 69 A.D.3d at 950 (quoting *Matter of Stern*, 268 A.D.2d at 483).

289.    The reassessments were not evenhandedly applied to all similarly situated property because Defendants obstructed certain persons' access to filing grievances, specifically, nonwhites and owners of property in nonwhite communities.

290.    In addition, Defendants did not apply the selective reassessments evenhandedly. They offered reductions in only 78% of grievances.

291.    Furthermore, upon information and belief, Defendants offered different reduction rates to filers of grievances without regard to fair market value.

292.    As a result, the policies "imposed . . . a discriminatory tax burden not imposed on similarly-situated properties."

293.    Defendants' actions violated equal protection and both substantive and procedural due process.  Those actions caused the Class to suffer damages that continue to accrue.

294.    Accordingly, Defendants, through their own and their agents' actions, are liable under 42 U.S.C. § 1983 for violating Class members' rights under the Equal Protection Clause and Due Process Clause.

## SEVENTH CAUSE OF ACTION

### Federal Equal Protection Clause – Gross Disparities

295.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

296.    Defendants violated the Equal Protection Clause by creating "a system[ that] caused [] gross disparities in the tax burden imposed upon similarly situated taxpayers." *Chasalow v. Bd. of Assessors of Cty. of Nassau*, 202 A.D.2d 499, 500 (2d Dept. 1994). "[S]imilarly situated taxpayers [must] pay the same share of the tax burden."  *Foss v. City of Rochester*, 65 N.Y.2d 247, 254 (1985).

297.    "[R]eductions in assessed value achieved by means of judicial review might . . . creat[e] a disparate form of assessment" and "raise[s] the spectre [sic] that continued constitutional challenges to assessments in Nassau County will be forthcoming unless remedial action is taken." *Chasalow*, 202 A.D.2d at 502.

298.    Defendants flouted the *Chasalow* court's warnings by imposing the Settlement Policy, pursuant to which they offered "reductions in assessed value achieved by means of judicial review" via grievance proceedings.

299.    As predicted, that practice resulted in the alleged "gross disparities in the tax burden imposed upon similarly situated taxpayers" without regard to fair market value.  A shift

of more than $1.7 billion from the top 61% of properties based on fair market value to the bottom 39% certainly constitutes a gross disparity in the tax burden.

300.    Defendants' actions violated equal protection and both substantive and procedural due process.  Those actions caused the Class to suffer damages that continue to accrue.

301.    Accordingly, Defendants, through their own and their agents' actions, are liable under 42 U.S.C. § 1983 for violating Class members' rights under the Equal Protection Clause.

## EIGHTH CAUSE OF ACTION

**Federal Equal Protection Clause and Due Process Clause – Reclassification of Property**

302.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

303.    Any scheme for classifying and taxing property must "proceed upon a rational basis and may not resort to a classification that is palpably arbitrary.  [Rather, it] must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 527 (1959) (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)).

304.    Under New York law, the assessment and taxation of real property must reflect "fair and realistic value of the property involved so that all property owners contribute equitably to the public fisc."  *Allied Corp.*, 80 N.Y.2d at 356.  To be "acceptable," the methodology for valuation must be "fair and nondiscriminating."  *Id.*  The ultimate standard for real property taxation remains "true market value."  *G.R.F., Inc.*, 41 N.Y.2d at 515.

305.    Defendants' classifications violated the above tenants and thus, the Equal Protection Clause.  Defendants had no rational bases for the reclassifications and admitted that the property tax system was "[in]defensible" for its failure to "reflect fair market value."

306.    Defendants effectively reclassified the two classes of residential property in violation of those tenants and thus, the Equal Protection Clause.    Defendants effectively reclassified those classes via their property tax program.

307.    The Freeze was implemented when properties in white communities sharply appreciated and far outpaced any appreciation of other properties.    Thus, the Freeze created innumerable subclasses based on the ratio of the frozen assessed value to the current fair market value.    There was no rational basis for maintaining the Freeze during such sharp appreciation in absolute and relative terms.    In the face of warnings of ongoing discriminatory and arbitrary effects, continuing to maintain the Freeze was palpably arbitrary.

308.    Furthermore, the Freeze removed all appreciated value from the tax rolls.    As a result, owners of property in nonwhite communities, which appreciated at a much lower rate if at all, paid a larger share of the tax burden.    Thus, the Freeze was neither fairly nor substantially related to the legislative purpose of reflecting a "fair and realistic value of the property so that all property owners contribute equitably to the public fisc." *Allied Corp.*, 80 N.Y.2d at 356.

309.    The Settlement Policy multiplied the reclassifications based on whether a grievance was filed (61% of properties), the number of times a grievance was filed (varied among properties), whether the grievance was settled with a reduced assessment (78% of grievances), and the amount of each settlement reduction. The filing of a grievance is also not a rational basis for reclassifying property and palpably arbitrary.

310.    Moreover, Defendants destroyed any potential rationality to these bases – and violated the Due Process Clause – by intentionally and effectively deterring nonwhites and owners of property in nonwhite communities from filing grievances.

311.    Furthermore, upon information and belief, there was no rational basis for determining whether to offer an assessment reduction or the amount thereof.  The reductions were predetermined and not based on fair market value, i.e., lacked a rational basis and were palpably arbitrary.  Thus, the bases for these classifications and far removed from the purpose of reflecting a "fair and realistic value of the property so that all property owners contribute equitably to the public fisc." *Allied Corp.*, 80 N.Y.2d at 356.

312.    The reclassifications were not pursuant to a citywide reassessment but rather, to the taxpayers' decisions. *Matter of Karmel v. Assessor of City of White Plains*, 36 Misc.3d 845, 847, 950 N.Y.S.2d 674 (Sup. Ct. Westchester Cty. 2012).

313.    The reclassifications caused "gross disparities" within each class of residential property. *Chasalow*, 202 A.D.2d at 501 (citing *Allegheny Pittsburgh Coal*, 488 U.S. at 338).

314.    The reclassifications do not comply with New York's adopted standards for fairness and accuracy of property assessments. *Id.* at 502 (quoting 9 N.Y.C.R.R. § 185-4.2(b)).

315.    Defendants are now implementing a new property tax system that maintains these irrational classifications in the hopes that eventually, after gradual assessment changes, the assessments and taxes will reflect market value.

316.    Defendants' actions violated equal protection and both substantive and procedural due process.  Those actions caused the Class to suffer damages that continue to accrue.

317.    Accordingly, Defendants, through their own and their agents' actions, are liable under 42 U.S.C. § 1983 for violating Class members' rights under the Equal Protection Clause and Due Process Clause.

## NINTH CAUSE OF ACTION

### Federal Equal Protection Clause and Due Process Clause –
### Declaratory and Injunctive Relief

318.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

319.    A present an actual controversy between the parties exists, requiring this court to adjudicate their respective rights and duties.

320.    Defendants' prior and current property tax systems violate the Equal Protection and Due Process Clauses, 42 U.S.C. § 1981, and other law as alleged herein by creating and perpetuating the alleged wrongs.

321.    Defendants' recidivism in implementing unlawful, discriminatory, irrational, unscientific, and inequitable property tax systems requires permanent, injunctive relief.  Rather than assess properties based on market value as required by law, for decades, Defendants have repeatedly implemented property tax systems that are not rationally related to achieving that goal and that intentionally and effectively discriminate against protected persons under the U.S. Constitution, the Federal Housing Act, other applicable federal law.  As a result, similarly situated owners of properties within the same property class are treated differently based on unlawful and arbitrary factors, such as race, property location, and whether a grievance was filed.

322.    Despite the proven success of the *Coleman* Consent Order in creating a scientific, equitable, and nondiscriminatory property tax system, Defendants decided to abandon it after it was no longer binding on them.

323.    Defendants have misinformed and inadequately informed County residents, including the Class, as to the accuracy of the property assessments and the residents' rights regarding property taxes.

324. Defendants have deprived County residents, including the Class, of their right to access grievance proceedings.

325. Defendants created a property tax system to further private interests rather than the public interest.

326. The foregoing and other alleged actions by Defendants have prevented County residents, including the Class, from timely (if at all) learning of their rights, such as causes of action. As a result, over several decades, many residents have been unable to seek complete if any legal redress for the harm that Defendants have caused in their property tax systems.

327. For these reasons and others, Defendants must be permanently enjoined from engaging in the alleged unlawful conduct with respect to their property tax systems. Current and future County residents, including the Class, cannot rely on Defendants, without judicial intervention and oversight, to (a) adequately and accurately inform them of their property tax rights or (b) maintain a lawful, nondiscriminatory, scientific, rational, and equitable property tax system.

328. Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiffs seek the entry of a permanently effective order declaring that Defendants must, in perpetuity, (a) conduct annual, scientific assessments of all residential property, (b) resolve grievance proceedings based on scientific assessments, and (c) comply with the requirements of the *Coleman* Consent Order.

329. Such an order would not require Defendants to accept lower tax revenues. Plaintiffs do not seek any relief that would reduce the County's property tax revenue.

## TENTH CAUSE OF ACTION

### Federal Due Process Clause – Procedural Due Process

330.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

331.    A present and actual controversy between the parties exists, requiring this Court to adjudicate their respective rights and duties.

332.    The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution ("Due Process Clause") provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. CONST. amend. XIV, § 1.

333.    Under New York law, "property must be assessed at market value." *Allied Corp. v. Camillus*, 80 N.Y.2d 351, 356 (1992); *see also G.R.F., Inc.*, 41 N.Y.2d at 515.    The assessment and taxation of real property must reflect "fair and realistic value of the property involved so that all property owners contribute equitably to the public fisc." *Allied Corp.*, 80 N.Y.2d at 356.    To be "acceptable," the methodology for valuation must be "fair and nondiscriminating." *Id.*

334.    However, Defendants' methodologies were inconsistent, unfair, and discriminatory without any rational basis to true market value or any fair and realistic value of residential properties.

335.    Defendants flouted the law by creating a new position rather than filling a preexisting one, firing and replacing employees, hiring unqualified individuals, and appointing donors to advisory positions.

336.    Defendants assessed properties based arbitrarily on whether the owner filed a grievance.    Defendants arbitrarily offered assessment reductions, and at predetermined, arbitrary amounts, in settlement negotiations without any basis on real market value.    The Freeze

maintained assessments without regard to the faster appreciation of properties in white communities. Thus, Defendants assessed and taxed similar residential properties at arbitrary rates in violation of the federal Due Process Clause.

337.    Defendants have no legally sufficient justification under any applicable level of constitutional scrutiny for engaging in this conduct with the purpose and effect of discriminating against individuals based on race, location of real property, and income, discriminating among people who owned properties of similar value, and discriminating among property within the same class.

338.    Defendants' actions violated equal protection and both substantive and procedural due process.

339.    The interference with Class members' right to access legal proceedings deprived them of property: more than $1.7 billion in excessive property taxes. The damages continue to accrue.

340.    Accordingly, Defendants, through their own and their agents' actions, are liable under 42 U.S.C. § 1983 for violating Class members' rights under the Due Process Clause.

## ELEVENTH CAUSE OF ACTION

### 42 U.S.C. § 1981

341.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

342.    Under 42 U.S.C. § 1981:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like . . . taxes . . . of every kind, and to no other.

343.    Defendants violated 42 U.S.C. § 1981 by denying nonwhites the full and equal benefit of laws enjoyed by whites and by imposing unlike property taxes on nonwhites compared to whites through the conduct alleged in this Complaint.

344.    Defendants, *inter alia*, imposed policies that they knew and intended would be less beneficial to nonwhites and disproportionately benefit whites.  Defendants misinformed nonwhites via AROW with the purpose and effect of preventing them from enjoying the full and equal benefit of applicable laws.  Defendants refused to take other actions to adequately inform nonwhites so that they would not enjoy the full and equal benefit of all laws, such as the Settlement Policy.

345.    As a result, Defendants knowingly and intentionally imposed a disproportionately greater property tax burden on nonwhites than on whites.

346.    Defendants eventually admitted that the property tax system was not "defensible" yet continued to implement throughout 2018.  The new system, effective in 2019, still retains the legal infirmities that render its application a violation of 42 U.S.C. § 1981.

347.    Defendants' actions violated equal protection and both substantive and procedural due process.

348.    Defendants' misconduct has caused and will continue to cause the Class to suffer the losses alleged herein and more.

349.    Accordingly, Defendants, through their own and their agents' actions, are liable under 42 U.S.C. § 1983 for violating Class members' rights under 42 U.S.C. § 1981.

## TWELFTH CAUSE OF ACTION

### Sections 603 of the Nassau County Charter

350.    Plaintiffs reallege and incorporate by reference all of the foregoing allegations.

351.    Section 603 of the Nassau County Charter requires:

[T]he Assessor to adopt such rules and regulations as will establish an equitable and scientific system of assessing property for taxation.  The rules so adopted, and all amendments thereof, shall be published on the county web site and made available to any taxpayer of the County upon application to the Assessor.

352.    Defendants, in purpose and effect, violated that provision by (1) implementing the inequitable and unscientific Anti-*Coleman* Policies, (2) publishing misinformation on AROW, and (3) refusing to disclose information regarding the negotiation and settlement of assessment challenges.  *See also Coleman*, 181 Misc.2d at 240 (denying motion to dismiss this cause of action).

353.    Defendants admitted that their property tax system was not "defensible" because it was unscientific and inequitable.  Moreover, they continued to implement it throughout 2018 and created a system that they admit will continues to perpetuate the inequitable and unscientific effects.

354.    Defendants' violations of section 603 has caused and will continue to cause the Class to suffer the losses alleged herein and more.

355.    Accordingly, Defendants, through their own and their agents' actions, are liable to the Class for these violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

a.      Enter a declaratory judgment that since 2010, Defendants' (i) real property valuation and assessment laws, regulations, policies, and practices, (ii) the resulting real property taxation system, (iii) the real property taxes that have been and will be imposed and collected from the Class, and (iv) other actions alleged herein violated and continue to violate the Fair Housing Act, the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution, 42 U.S.C. § 1981, RPTL §§ 305 and 523-B(2)(a), and Nassau County Charter § 603;

b.      Enter a permanently effective, court-supervised order that requires Defendants to, in perpetuity, (i) conduct annual, scientific assessments of all residential property, (ii) resolve grievance proceedings based on scientific assessments, and (iii) comply with the requirements of the *Coleman* Consent Order;

c.      Issue a permanent injunction that restrains Defendants (and their agents, employees, and representatives, and any other persons acting directly or indirectly with Defendants), from unlawfully violating and interfering with Plaintiffs' and putative Class members' civil rights pursuant to 42 U.S.C. § 3601 *et seq.*, and directing Defendants to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future, including annual, scientific assessments and a redistribution of the property tax burden;

d.      Award compensatory damages in an amount to be determined by the jury that would fully compensate Plaintiffs and putative Class members for the losses that Defendants' alleged conduct caused;

e.    Award restitution in an amount to be determined by the jury that would fully compensate Plaintiffs and putative Class members for the losses that Defendants' alleged conduct caused;

f.    Award prejudgment and postjudgment interest on those compensatory damages;

g.    Award punitive damages to Plaintiffs and putative Class members in an amount to be determined by the jury that would punish Defendants for their willful, wanton, and reckless conduct alleged herein and that would effectively deter Defendants from engaging in similar conduct in the future;

h.    Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 and 3613(c)(2); and

i.    Order such other relief as this Court deems just and equitable.

### DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues in this case.


Dated: February 14, 2019
New York, New York

                                        **KIRBY McINERNEY LLP**


                                        By _____
                                        David A. Bishop, Esq.
                                        Ira M. Press, Esq.
                                        Seth M. Shapiro, Esq.
                                        825 Third Avenue, 16th Floor
                                        New York, NY 10022
                                        Telephone: (212) 371-6600
                                        Facsimile: (212) 751-2540
                                        E-mail: dbishop@kmllp.com
                                               ipress@kmllp.com
                                               sshapiro@kmllp.com