```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2
     ------------------------------x
 3                                        19-CV-893(LDH)
     HALL, et al.,
 4                                        United States Courthouse
              Plaintiff,                  Brooklyn, New York
 5
              - versus -                  September 12, 2019
 6                                        10:00 a.m.
     NASSAU COUNTY, et al.,
 7
              Defendants.
 8
     ------------------------------x
 9
          TRANSCRIPT OF CIVIL CAUSE FOR PREMOTION CONFERENCE
10             BEFORE THE HONORABLE LASHANN DEARCY HALL
                   UNITED STATES DISTRICT JUDGE
11

12   APPEARANCES

13   Attorney for Plaintiff:  KIRBY McINERNEY LLP
                              250 Park Avenue
14                            New York, New York 10177
                              BY:  ANDREW MCNEELA, ESQ.
15                                 DAVID BISHOP, ESQ.
                                   SETH SHAPIRO, ESQ.
16

17   Attorney for Defendant:  WOLF HALDENSTEIN ADLER
                              FREEMAN & HERZ LLP
18                            270 Madison Avenue
                              New York, New York 10016
19                            BY:  REGINA M. CALCATERRA, ESQ.
                                   DANIEL TEPPER, ESQ.
20                                 VERONICA BOSCO, ESQ.

21

     Court Reporter:          RIVKA TEICH CSR, RPR, RMR, FCRR
22                            Phone:  718-613-2268
                              Email:  RivkaTeich@gmail.com
23

     Proceedings recorded by mechanical stenography.  Transcript
24   produced by computer-aided transcription.

25
```

PREMOTION CONFERENCE

1          (In open court.)

2          THE COURTROOM DEPUTY:  All Rise.  Case 19-CV-893,

3    Hall V. Nassau County.

4          MR. McNEELA:  Andrew McNeela from Kirby McInerney,

5    representing the plaintiffs.  And I'm joined by partner, David

6    Bishop and my colleague, Seth Shapiro.

7          THE COURT:  Good morning.

8          MS. CALCATERRA:  Good morning, your Honor, Regina

9    Calcaterra from Wolf Haldenstein Adler Freeman & Herz,

10   representing the defendants, Nassau County, and two of its

11   municipal entities, the Department of Assessment and the

12   Assessment Review Commission.  I'm joined here by my two

13   colleagues, Dan Tepper, partner, and our associate Veronica

14   Bosco.

15         THE COURT:  Good morning to you all.  I'll start by

16   apologizing for the late start.

17         We're here for a premotion conference in connection

18   with the defendants' proposed motion to dismiss this complaint

19   which relates to a tax scheme.

20         As I understand it, certainly you all can correct me

21   if I'm wrong, in this case historically there was a tax scheme

22   that was once deemed to be discriminatory.  A consent decree

23   was put in place.  Pursuant to that consent decree certain

24   remedies were made to the tax scheme, which were deemed to

25   remedy the issues with respect to the discriminatory impact of

PREMOTION CONFERENCE

1   the scheme.  That scheme was then changed, I guess in recent

2   years, and now the plaintiffs maintain that the scheme has now

3   reverted back to one which has a discriminatory impact on

4   people of color based on the fact that those people are less

5   wealthy than their white counterparts in the county.

6           That's in broad strokes.

7           MR. McNEELA:  Correct.

8           THE COURT:  The defendants in this case, as I

9   understand it, are arguing that this Court is without the

10  authority to the entertain this claim for lack of subject

11  matter jurisdiction.

12          MS. CALCATERRA:  Yes, your Honor.

13          THE COURT:  I'll hear from you.

14          MS. CALCATERRA:  Thank you, your Honor.  The three

15  defendants that I represent is the county and two entities.

16  One of them is the Department of Assessment, that actually

17  determines what the tax assessment is for homeowner properties

18  in Nassau County which are deemed a term called class one

19  residential, but we'll call them home owner properties.

20          A homeowner who is appealing their taxes, they file

21  an appeal with the Assessment Review Commission, the third

22  defendant.

23          How you characterized this complaint is accurate.

24  And the plaintiffs are alleging that on behalf of the punitive

25  class that Nassau County's practices and grievance process

PREMOTION CONFERENCE

1  violates the Fair Housing Act and the due process and equal

2  protection rights, based upon the conduct that you have just

3  described.

4          And please note that the defendants deny any

5  wrongdoing in relation to the complaint.

6          THE COURT:  I'm curious, this is just out of

7  curiosity, is the tax scheme that's in place now, this

8  obviously is not a subject matter jurisdiction question, is

9  the tax scheme in place now reminiscent of the tax scheme that

10 was previously deemed to be discriminatory?

11         MS. CALCATERRA:  Well, I think better to refer to

12 the tax streak that they refer to during 2010-2017 because

13 there is a new administration in.  They changed -- moved to

14 change the tax scheme to where it's more equitable than it was

15 in the past to every homeowner.

16         THE COURT:  The tax scheme that was in place from

17 2010 to 2017 about which the plaintiffs complain, is one that

18 is reminiscent of the discriminatory tax scheme that was once

19 in place.

20         MS. CALCATERRA:  The alleged discriminatory tax

21 scheme.  The consent order negotiated between all the parties

22 at that time, where the USDOJ and the U.S. Attorney General

23 intervened, it clearly said after two-and-a-half years after

24 litigation and discovery that the Court found no

25 discriminatory intents on behalf of --

PREMOTION CONFERENCE

1    THE COURT:  Intent is not the question, it's impact.

2  Because I could care less, personally, whether or not the

3  intent was to discriminate against all of these poor brown and

4  black people.  My question is, is the tax scheme from 2010 to

5  2017 reminiscent of the one that has a discriminatory impact

6  of these poor folks of color.

7    MS. CALCATERRA:  It is reminiscent of that.

8  However, what the plaintiffs are alleging is that because

9  people -- two classifications that they use.  They use a white

10  census track and the non-white census track.  According to the

11  census, the definition of a white census track is when more

12  than 50 percent of the home owners or residences there are

13  white.  And they use the term minority census track for the

14  census track where over 50 percent of the residents there are

15  minorities as well.

16    But what we have in Nassau County is many people who

17  don't file for tax assessments.  It's not just those in

18  minority census tracks.  We have plenty of folks who don't

19  file minority census track.  We have white homeowners living

20  in a white census track as well that don't file.

21    The disparity between those who are able to get

22  refunds is basically based upon who is filing and who is not

23  filing.

24    What we're doing is the defendants are actually

25  seeking to file a motion to dismiss that is based upon two

PREMOTION CONFERENCE

1   threshold issue in Suffolk County jurisdiction.  One which is

2   standing --

3               THE COURT:  Let's do the other.

4               MS. CALCATERRA:  Subject TIA.

5               THE COURT:  Yes.

6               MS. CALCATERRA:  All right.  We believe the

7   complaint should be dismissed under Federal Rules of Civil

8   Procedure 12(b)(1) and 12(b)(6).  Because, among other

9   reasons, this Court lacks facially related subject matter

10  jurisdiction over this action under the Tax Injunction Act.

11              And this Court actually dealt with a similar issue

12  in U.S. V. Nassau.  What I'd like to do is walk the Court

13  through the history of the U.S. V. Nassau, Coleman case.  This

14  is relevant, so I put together a timeline.

15              In October 1997 plaintiffs filed in state Court and

16  the ACLU represented them.  The plaintiffs litigated this for

17  about two-and-a-half years.

18              THE COURT:  You're talking about the 2000 suit.

19              MS. CALCATERRA:  Yes, that resulted in the 2000

20  stipulation.

21              THE COURT:  Uh-huh.

22              MS. CALCATERRA:  Thank you.  It was first filed

23  October 1997.

24              THE COURT:  I see.

25              MS. CALCATERRA:  They litigated through motion

PREMOTION CONFERENCE

1    dismission process, shared in discovery.

2               Then in June 14, 1999, the federal Government,

3    USDOJ, filed a case in federal court called U.S. V Nassau that

4    this Court entered a ruling on, that was based upon the fact

5    pattern that the plaintiffs alleged in the state decision,

6    which is Coleman.  And then at that time, that was a 15 --

7    right after that was filed, then about six months later, the

8    State AG did not file a case.  They just intervened on the

9    state case, which was approved.

10              And the Court ultimately made a decision in U.S. V

11   Nassau in March 2000, which again is a similar fact pattern

12   here, where they spent -- a 15-and-a-half page ruling -- the

13   Court spent most of the time discussing the TIA.  It also said

14   that there is not an exception in TIA for Fair Housing

15   amendment claim.  And specifically noted that in 1998 when the

16   Fair Housing Act was amended, Congress spent a lot of time

17   updating the Fair Housing Act.  At that point they didn't make

18   an exception to the TIA.

19              Judge Spatt said that.  And he also stated that in

20   the Supreme Court case, McNeer, a case brought on a tax

21   assessment.  And the allegations in that particular case,

22   Section 1983, and the Supreme Court said that since state

23   courts have remedies and the TIA requires these type of cases

24   to be brought in Supreme Court, that even though it's a 1983

25   claim it should not be argued in federal court.

PREMOTION CONFERENCE

1          So it's a similar fact pattern here.  That's why

2     that particular decision is important to the relevance of

3     this.

4          Then right after the decision on that, which was

5     March 7, 2000, which denied the Department of Justice, or

6     dismissed it, dismissed the jurisdiction, USDOJ then

7     intervened on the case.  Then everyone looked about that, was

8     sitting down, drafting the settlement, negotiating a

9     settlement either way, and that was entered March 2000.

10          This particular case with U.S. V. Nassau was

11     reiterated in the later case in this particular court, by the

12     same Judge Spatt in the matter of Miller, where the same

13     issues came up related to the TIA.  So it was even mentioned

14     later.

15          The Miller case said as long as state provides

16     sufficient remedies, the taxpayer is prohibited from filing

17     suit in federal court.  That case is in our letter, Miller V.

18     New York Division of Tax Appeals.

19          So the other issue that is related to subject matter

20     jurisdiction to the TIA also has to do with the issue of

21     comity.  This Court again further lacks under the principals

22     of comity, which counsels federal courts to resist in engaging

23     in certain cases falling within their jurisdiction.

24          And in 2013 a case, 4K Group, which is also

25     referenced in our letter, was decided here in the Eastern

PREMOTION CONFERENCE

1  District of New York that stated the premise that the

2  principal of comity is more abrasive than the TIA comity,

3  exercise of lower federal courts jurisdictions over tax

4  matters if the TIA cannot reach.

5          Basically what it was doing was reenforcing the fact

6  that this particular case should not be in federal court it

7  should be in state court.  Interestingly enough, the

8  plaintiffs -- the Coleman stipulation over 70 times, they seem

9  to be very satisfied with the outcome of that case at the

10  time.  And that was all decided in state Court.  So there are

11  definitely state Court remedies that are efficient and speedy

12  for the plaintiffs.  And so that's why we're seeking a motion

13  to dismiss, specifically focusing on the standing and the

14  subject matter jurisdiction issues.

15          But if this Court is going to dismiss the case, or

16  thinking towards dismissing it, we recommend to the plaintiffs

17  that consider withdrawing your complaint and filing it in

18  state Court, so at least we can continue litigating the case

19  to a resolution that would be best for all parties.  Because

20  what we're doing is wasting also taxpayer money and resources

21  defending this case if it will be dismissed.

22          THE COURT:  They are disproportionally using

23  taxpayer money, if I were to believe the complaint.  Thank

24  you.

25          MS. CALCATERRA:  You're welcome.

PREMOTION CONFERENCE

1              THE COURT:  I ask the defendants to focus on the

2      subject matter jurisdiction issue not arbitrarily.

3              My job at the point of a motion to dismiss is not to

4      question the allegations but to except them as true.  If I

5      were accept these allegations as true, again I don't know if

6      they are true, if I were to accept the allegations as true,

7      I'll tell you this stinks.  But the fact that I might think it

8      stinks doesn't mean that I have the ability to preside over

9      this matter.

10             To be candid, I believe that they have a persuasive

11     argument on subject matter jurisdiction.  And short of the

12     last comment about the waste of taxpayer money, I do believe

13     the defendants' suggestion, if in fact they are correct on the

14     subject matter jurisdiction matter, that the plaintiffs pursue

15     this in state court so there can be a remedy to fix the

16     problem.  If a problem is determined to actually exist, it

17     might be the most prudent course.  Against that backdrop,

18     please proceed.

19             MR. McNEELA:  Sure, your Honor.  Let me see if I can

20     try to dispel any of the misgivings you might have about the

21     Court's jurisdiction to hear this case.

22             Very simply, I'll turn to the Tax Injunction Act

23     first.  As the Court is aware, we seek in large part

24     class-wide damages.  The Tax Injunction Act has nothing to do

25     with the assertion of monetary damages.  Clearly those claims

PREMOTION CONFERENCE

1   are not subject to an act that's focused exclusively on

2   injunctive relief.

3          With respect to the injunction that the plaintiffs

4   do bring, there was no discussion of the Supreme Court Hibbs

5   case, which post-dates the various decisions and Nassau County

6   decision that defense counsel mentioned.

7          In that case the Supreme Court made clear that the

8   Tax Injunction Act was primarily focused on actions where the

9   result of the injunction would be to prevent the municipality

10  from collecting the tax revenue it needs in order to fund its

11  operations.  That's the whole point.  We don't want challenges

12  where you have taxpayers who are trying to prevent the

13  municipality from funding its operations.

14         Here the injunctive relief that is sought would be

15  nothing.  It wouldn't take away one dollar from the tax

16  revenue hall that Nassau County is seeking.  We're seeking a

17  reapportionment on a non-discriminatory basis.

18         So the way it works there, as we note in the

19  complaint, is that the county sets a target, whether $15

20  billion or $5.  Then based on that necessary budget

21  requirement, it goes out and apportions taxes.  They can turn

22  around next year and say we need $100 trillion.  This lawsuit

23  will have nothing to do with that.  It will not detract one

24  iota, not a single dollar.

25         In Hibbs you have a case, Supreme Court case, where

PREMOTION CONFERENCE

1    there was an injunction sought with respect to a tax credit.

2    Another similarity there is that the tax credit involved a

3    religious institution, so subject to heightened scrutiny.

4    It's an implicated class, a protected class, which is also

5    implicated here.  And the Court found that because the

6    injunctive relief that was sought was not going to detract

7    from the coffers of the municipality at issue, that that Tax

8    Injunction Act did not bar it.

9             THE COURT:  Which?

10            MR. McNEELA:  The Hibbs decision, your Honor.

11            Turning to the issue of comity.  There is a Supreme

12   Court case that is instructive that both parties do site, the

13   Levin case.  What the Levin case held, is that the comity

14   concerns --

15            THE COURT:  Hold on, I don't have Hibbs in my

16   binder.  Kandice, print me Hibbs.

17            MR. McNEELA:  With respect to comity, the Supreme

18   Court in 11 case noted that comity is appropriate.  Because it

19   is a discretionary doctrine, it is not a requirement.  It's

20   appropriate in certain circumstances.

21            What the Court noted is that comity concerns are

22   significantly less in cases where the claims assert racial

23   classifications, a protected class, which by definition are

24   subject to heightened scrutiny.  Because the federal

25   Government's concern, in that regard in stamping out racial

PREMOTION CONFERENCE

1    discrimination will be viewed as trumping the state's concern

2    at having the first crack at resolving primarily state issues.

3           That's what we have here.  We do site to cases on a

4    motion to dismiss.  We can marshal others showing that there

5    are cases that say that comity concerns are trumped by federal

6    court jurisdiction over matters involving racial

7    discrimination.

8           I would do want to bring up that notably the Coleman

9    case itself, the 1999 case, it held at that time that the

10   county was now on notice that its practices had discriminatory

11   impact.  And it couldn't then in the future, to the extent it

12   revived these practices, claim it wasn't intentional

13   discrimination at that point.  Because the Court gave them,

14   said you now know the outcome of what you're doing.  If you do

15   it again, that's evidence of intentional discrimination.

16        THE COURT:  But that doesn't go to the issue of

17   subject matter jurisdiction.  Who resolves that issue of

18   discrimination, et cetera, is separate and apart from a

19   determination of whether the conduct was intentional or not.

20        MR. McNEELA:  Sure, but I do want to be clear about

21   the terms that we're using.  Comity is not a subject matter

22   jurisdictional concept; it's a matter of abstention.

23          There is no dispute that this matter has subject

24   matter jurisdiction over Fair Housing Act, Section 1983

25   claims.  The issue is whether in the matter of Court's

PREMOTION CONFERENCE

1    discretion --

2              THE COURT:  I'm sorry, you had moved to the comity

3    argument.  Go ahead.

4              MR. McNEELA:  So whether in the Court's discretion

5    it should voluntarily abdicate the jurisdiction that's been

6    conferred upon it in order to honor the state's interest.

7              But as for pointing out, as this report said, when

8    you have a protected class the federal Government's interest

9    or federal court's judiciary interest in seeing that these

10   sort of racial disparate treatment of folks is being remedied

11   appropriately.

12             And quite frankly, rather than showing that the

13   state Court is an effective place to seek remedy, Coleman

14   shows the opposite.  You had years and years of proceedings.

15   You had a consent decree that was entered into; soon after the

16   consent decree expires, the political winds change in Nassau

17   County.  They go back, they reinstitute the exact same type of

18   policies that merited Coleman in the first place.

19             THE COURT:  That wasn't by virtue of where the case

20   resided.  That could have happen if a consent decree was

21   issued out of a federal court, and it expired a ten-year mark.

22             The consequence of someone wanting to go back once

23   they are not obligated to behave in a particular way under a

24   consent decree, I don't see how that in any way has any

25   bearing on which court the consent decree was ordered out of.

PREMOTION CONFERENCE

1          MR. McNEELA:  Your Honor, it doesn't, and let me

2    explain why.

3              It doesn't insofar as we're not indicating that the

4    state court is in any way impartial or unbiased or anything

5    like that.  The point is that the federal Government's

6    interest in seeing that racial discriminatory practices are

7    stamped out is even more heightened here than normal given the

8    history of what is going on.

9          THE COURT:  I get your point now.  You're saying,

10   look, given their conduct, which you see is repeated and at

11   least intentional given the fact that they were on notice of

12   one Court's view of it, it is all the more reason why this

13   Court should not allow concerns of comity to prevent it from

14   moving point.

15         MR. McNEELA:  That's how I should have put it.

16         THE COURT:  It could have been me.  It took me a

17   minute to get it.  I got it.

18         MR. McNEELA:  Then I would also note that the Levin

19   decision, which both parties discuss regarding comity, points

20   out too that comity is more appropriate in cases where they

21   involve commercial matters.  Traditionally the states are

22   afforded wide latitude, commercial taxation matters within

23   their own graphical area, own competencies.

24             Here, this is not a commercial matter.  So it's

25   another factor that Levin points out against comity or doesn't

PREMOTION CONFERENCE

1    support comity.  And that other courts, and again we can

2    marshal the authority in our opposition to motion to dismiss,

3    have relied upon, in addition to the racial classification

4    issue.

5            THE COURT:  Do you see this case as

6    indistinguishable from the Bernard V. the Village of Spring

7    Value case decided by the Second Circuit in 1994?

8            MR. McNEELA:  That's a good question, your Honor.  I

9    unfortunately don't recall the Bernard case off the top of my

10   head.  I will note that both predate Levin and Hibbs.

11           THE COURT:  Fair enough.

12           MR. McNEELA:  Which I believe are at least, if

13   not -- they are guide posts, if not the North Star how this

14   analysis should breakdown.

15           But again, both Hibbs was cited by Levin to support

16   the idea that racial classifications -- Levin sites Hibbs on

17   this point -- that classification subject to heightened

18   scrutiny, there can't be any dispute that discrimination based

19   on race is subject to heightened scrutiny, that those sort of

20   cases, the traditional factors that animate comity are far

21   weaker and really don't apply in those circumstances.

22           I can address the case your Honor raised in a

23   letter, if the Court would like.

24           THE COURT:  No, it will come up in briefing.  What

25   is the defendants' response to the Hibbs case?

PREMOTION CONFERENCE

1           MS. CALCATERRA:  The Hibbs case, actually we see

2     that as a favorable ruling.  Because what the issue was there,

3     is there was a group of individuals that brought a lawsuit

4     against the state of Arizona.

5           THE COURT:  Can you slow down just a bit.

6           MS. CALCATERRA:  Yes, thank you for suggesting.

7           The case that was brought in the state of Arizona

8     based upon that tax credit, was based upon a law that about to

9     go into effect that would give individuals a tax credit if

10    they gave money to a not-for-profit entity and they ear-marked

11    that money to go to religious schools.

12          So someone would fill out their tax form and they

13    check the box off if they gave over $500 to this group.  And

14    even though this were giving it to a religious institution,

15    they were still going to get a tax credit for it.

16          What the Court said in Hibbs is that the TIA is

17    applicable when a Government issues a tax assessment, when

18    there is a certified assessment or certified tax that goes out

19    and they are relying upon that in their coffers, and then a

20    tax is levied, and somebody has to pay for it.

21          That is different than a tax credit.  A tax credit

22    is someone -- in the Hibbs case it was a five-to-four decision

23    and Justice Ginsburg wrote the decision -- which says, the

24    distinction there is when someone applies for a tax credit or

25    the forms, they are the ones determining whether it's a tax

PREMOTION CONFERENCE

1    credit.  That is not something that it going to effect the

2    flow of revenues in Government; versus when a Government

3    entity sends out a tax bill and they are actually relying upon

4    that.

5          So that distinction was made here and made in Hibbs,

6    which directly applies to this case.  Because in this

7    particular case, tax assessments are set out by Government

8    entities and they are relying upon that revenue to come in.

9          I do want to touch upon something that the plaintiff

10   said as far as this is not financially impacting the revenues

11   of Nassau County.

12         Nassau County has this unique burden, it's something

13   called the County Guarantee.  What it says is that Nassau

14   County sends out tax assessment bills for one tax bill that

15   covers the taxes for all of the school districts, and

16   municipalities, and the towns, and the hamlets.  So multiple

17   levels.

18         In Suffolk County, for example, there are ten towns

19   there.  The towns are the ones who send out the bill.  In

20   Nassau, the county sends out the bill.

21         There is a law called the County Guarantee that

22   applies to Nassau County that says, if they send out a tax

23   bill and they have to refund somebody for that tax bill, the

24   county cannot go back to the school districts, the hamlets,

25   the villages, or wherever the fire districts where this tax

PREMOTION CONFERENCE

1   went and get money back.  That the county is actually

2   responsible for the entire amount of that refund.

3           It's not as if they have $1.7 billion sitting around

4   that the plaintiffs believe that the district

5   disproportionately applied, because they asked for $1.7

6   billion in damages  That money that they are saying that could

7   be transferred over to the plaintiffs to pay for the recover

8   in this, is actually going to have a significant impact upon

9   the cash flow of Nassau County.

10          THE COURT:  Any time a county has to pay damages,

11   it's going to have an impact.  I guess I'm not following your

12   argument as to why it is that it makes the plaintiffs'

13   argument with respect to the relief sought in this case and

14   its implication with respect to a taxation scheme.  Yes, there

15   will be a consequence.  Any time a county has to come up with

16   money from its budget to pay damages in any case, it has an

17   impact on its budget.  That's effectively what you told me, it

18   will impact the budget.

19          MS. CALCATERRA:  Yes, but it goes back to what Hibbs

20   stated, that the TIA requires that federal courts don't have

21   jurisdiction.  If there are going to be changes in a

22   Government-issued tax assessment, which is what this is here,

23   and that those cases should be heard in state court.  And that

24   particular Hibbs case that --

25          THE COURT:  I have to stop you.  I want to make sure

PREMOTION CONFERENCE

1    I'm understanding.

2            You said those are straight damages, that's not a

3    change in the tax scheme, that might be damages that we would

4    receive because we're seeking certain damages not -- how about

5    you tell me.

6            MR. McNEELA:  Sure, your Honor.  I think there is

7    say confusion between what are monetary damages and then what

8    is prospective injunction relief.

9            We're not saying we should go into a time machine

10   and have a retroactive injunction, even if there was such a

11   thing possible in place.  There was a wrong in the past --

12           THE COURT:  Remedy it with money.

13           MR. McNEELA:  Right.  That's just a damages claim.

14           With respect to the injunctive relief, we're not

15   seeking any injunction right now.  When the case is over,

16   going forward, all we're saying is there has to be a

17   non-discriminatory reapportionment of how the taxes are

18   collected.  We don't care how much taxes you're charging as a

19   municipality, it has to be done in a fair, ethical and

20   non-discriminatory manner.

21           The past damages has nothing to do with the

22   prospective injunctive relief that is only what the tax

23   injunction cares about.

24           Thank you, your Honor.

25           THE COURT:  Give me a second.  By the way, I find

PREMOTION CONFERENCE

1   this case fascinating.  Give me a moment.

2           (Brief pause.)

3           THE COURT:  I have a basic question to the

4   plaintiffs that I'd like for to you answer for me so that I

5   can, I think, have a better understanding.

6           Am I to understand that the county determines that

7   the amount of monies that it may need, that's a fixed amount,

8   and then based on assessments they determine from where they

9   get that monies from each individual property owner.  So

10  you're saying, listen, I'm not asking you -- or, what we're

11  asking with respect to the injunction doesn't change the

12  overall assessment, in terms of the consequence to the county

13  in terms of monies it receives.  I'm just saying that if you

14  have ten people and you have to determine from whom you

15  collect that same sum total, what we want you to do is require

16  them to move things around differently.

17          MR. McNEELA:  That's correct, your Honor.  That's

18  exactly what we're alleging.

19          THE COURT:  I needed to take a minute to look

20  closely at Hibbs.  It was a quick read, I have to admit.

21  There are some aspects that, I agree with the defendants, make

22  it distinguishable from this case.  I think that what you

23  pointed out with respect to the assessment versus the credit

24  is an important one.  However, there is also language in there

25  that talks about the definition of an assessment, which is

PREMOTION CONFERENCE

1   also an important one.

2           I thought when I got on the bench today this was

3   going to be simple, I was going to tell you to move on.  I do

4   want briefing on this.  I'm not going to tell them to just

5   move on.

6           I am incredibly curious, intellectually, about the

7   issues that this case presents.

8           About this last question that I just asked you, what

9   is the consequence of that, right.  Because on one hand the

10  plaintiffs are complaining of the tax assessment that is being

11  levied against them, right, which would make it look, I think,

12  like a case that is implicated by the TIA.  But I see some

13  room for argument.

14          Out of curiosity, what is the defenses' argument --

15  I just for sake of argument, not as a suggestion to the

16  plaintiff in terms of the way they proceed.  I want to

17  understand, if there was no injunctive relief but only damages

18  for what they believed was the constitutional harm, that

19  doesn't change your assessment of the impact of the TIA,

20  right?

21          MS. CALCATERRA:  No, it doesn't, your Honor.

22          THE COURT:  Because you're saying the monies

23  nonetheless, it's effectively a tax refund, is that what

24  you're saying?

25          MS. CALCATERRA:  Yes.

PREMOTION CONFERENCE

1          THE COURT:  That would they typically go to a state

2     court and say I was over-taxed.  But a tax refund, right, in

3     the classic sense says that under your scheme I was somehow

4     over-taxed so I'm due a refund based on the scheme.

5          But here they are saying the scheme is problematic

6     and discriminatory.  So it's not a refund they are seeking,

7     it's damages for the constitutional harm which, is a little

8     different, isn't it?  Did I get that right?

9          MR. McNEELA:  Yes, your Honor.

10          We view the damages as just, it could be -- how they

11     fund, is their business.  The idea is, I understand why, from

12     an advocate's perspective, they can do a number of things to

13     raise the money.  We're not saying the monies from damages --

14     it's damages.  It's not a pure refund case.  Wherever they get

15     the money to pay, is their own business.

16          But they are trying, I would say, to shoe-horn what

17     is a damages case, or at least the damages claim, into the

18     TIA.

19          And the very reason why all these cases, your Honor,

20     talk about comity, is because they recognize that the Tax

21     Injunction Act is a very big stretch to say it say applies to

22     damages.  A lot of times courts, I'll be honest, some say it

23     doesn't apply at all, some say we're going to avoid this

24     issue; in addition, to the fact that the damages claims the

25     Supreme Court has never spoken about directly, I believe the

PREMOTION CONFERENCE

1    TIA.  But as I pointed out, there are innumerable reasons why

2    comity would not preclude the damages claim here for those

3    reasons.

4              MS. CALCATERRA:  Your Honor, I did want to mention

5    there was a case that was decided in 1989 by Judge Spatt in

6    this Court.  It is the Long Island Lighting Company Local V.

7    Brookhaven.  The Local's property was assessed, a nuclear

8    plant, they felt their assessment was discriminatory.  A case

9    was brought in this case in this court.  In that particular

10   case, Judge Spatt said, While TIA prevents federal courts from

11   giving injunctive relief or declaratory relief, it is the

12   principal of comity that prevents a taxpayer from seeking

13   damages.

14             So that seems to be directly in line with what

15   plaintiffs are trying to do in this particular case.  There

16   could again be that issue related to subject matter

17   jurisdiction by way of damages.

18             THE COURT:  I looked at your letter, both of them,

19   you cited a number of my colleagues in various cases, both in

20   the Eastern District of New York and the Northern District of

21   New York.  I think the Coon case was the Northern District of

22   New York.  I will look to those in briefing closely.

23             But I am also curious about what higher courts have

24   said.  Because, obviously, I have the ability to disagree with

25   my colleagues; less so that of the Circuit.  I am curious what

PREMOTION CONFERENCE

1    the Second Circuit has said on these issues, to the extent

2    that they have.

3           And if we don't have authority in the Second Circuit

4    on some of these issues, I would be interested to know what

5    other circuits have said.  This is not one -- the issues that

6    you all present to me, are not issues that could not have been

7    raised in other circuits.

8           MS. CALCATERRA:  Understood.  We'll be sure to

9    include that in our briefing.

10          MR. McNEELA:  With the Court's indulgence, one last

11   quick point I wanted to raise.  The comity issue, I'm not

12   going to belabor the points I already made, but there is one

13   additional factor I think is important.  That is, comity to

14   the extent it is merited it any given case, turns on whether

15   the state remedy would be adequate.  Now, Coleman was

16   previously cited as an example of -- Coleman was a case where

17   there was no monetary damages sought, purely injunctive

18   relief.  We believe, there is a particular rule that we

19   believe raises serious questions about whether or not damages

20   could be sought on a class-wide basis, called the Government

21   Operations Rule.  That rule generally precludes individuals

22   from banning together as a class to ask for damages when the

23   point of disagreement is the Government operation or

24   Government entity itself.

25          So I'm not saying -- the law is a little unclear

PREMOTION CONFERENCE

1  whether it would apply here.  It's out there, it's a rule

2  that's been invoked before.  We will address it in the

3  briefing.  But the point being, because of the way the taxes

4  are apportioned, because of the damages at issue, we think

5  they have to be sought on a class-wide basis.  We think there

6  could be a serious impediment in doing so in state court,

7  which would render comity inappropriate.

8          THE COURT:  It's interesting.  The defendants have

9  raised the issue of damages, specifically as one implicating

10  comity in the last case that you cited.  And now here the

11  plaintiffs say it is because of the damages that comity may

12  actually not prevent the Court from proceeding.  It's

13  interesting.

14          MR. McNEELA:  It would be an interesting twist.

15  Again, I don't want to call it the tail wagging the dog, I

16  believe there are for more poignant issues that prevent

17  comity.  But it is an issue that we think also is relevant as

18  a consideration.

19          THE COURT:  In terms of the plaintiffs' arguments

20  concerning the fairly unique history of this case, not the one

21  specifically brought here but in light of the prior

22  proceedings, in light of the fact that there was a consent

23  order that was entered, that that consent order, the terms of

24  that remedied the discriminatory impact of the scheme, then

25  the reversion back -- which is where I started when I got on

PREMOTION CONFERENCE

1    the bench -- to a scheme that is reminiscent of the very

2    scheme that was deemed discriminatory.  And that the parties

3    over many years, at taxpayers' expense, worked to resolve.  I

4    mean, that argument resonates with me.  What do you say about

5    that?

6           MS. CALCATERRA:  I understand, your Honor.  The

7    policies that were put in place by the prior administration,

8    which is what triggered this particular thing, can be

9    explained as both the freeze policy and settlement policy.

10   What they intended to do is change what they allege was --

11          THE COURT:  Who is the "they?"

12          MS. CALCATERRA:  The defendants.  The defendants at

13   that time who are in office were attempting to, wanted to

14   change what they deemed to be a broken assessment system.  And

15   they put these two policies in place, which ultimately did

16   revert it back.

17          THE COURT:  Right, revert it back to a scheme that

18   the county was on full notice was problematic and problematic

19   in terms of discriminatory impact.  I understand that's what

20   they want to do.  That's the problem.  That's the problem that

21   the plaintiff is identifying, that that's what they wanted to

22   do; discrimination be damned is effectively the way it seems.

23   It doesn't like you're disagreeing with that.

24          Your colleague is like, really, oh, really don't say

25   yes to that.

PREMOTION CONFERENCE

1    MS. CALCATERRA:  No, understanding how Government

2  works and different administrations.  What happened with the

3  Coleman stipulation and that agreement, and then you have a

4  new administration that comes in about ten years later, they

5  may not have been aware of it, may not have focused on it.

6    THE COURT:  That's a bad argument.

7    MS. CALCATERRA:  No, but it's true.  With the

8  transition of different Governments --

9    THE COURT:  Then --

10    MS. CALCATERRA:  And --

11    THE COURT:  Stop for a second.  It just reenforces

12  the argument that the plaintiff is making, that we could end

13  up here over and over and over again.

14    If on the one hand the argument is they didn't care

15  about the discriminatory impact, although a prior court had

16  determined that the tax scheme in fact had a discriminatory

17  impact.  Or they were too ignorant, in the literal sense, as

18  they proceed to be able to protect against an unintentional

19  reversion back.

20    It's not a good answer on it in terms of the problem

21  that the plaintiff identifies of, listen, we've been here,

22  there was a determination, yet we are still here again.

23  Either still here again because they don't care; or because,

24  as you say, they didn't know, so they were ignorant.  But

25  their ignorance doesn't excuse it.  It doesn't change what

PREMOTION CONFERENCE

1    seems to be a real problem.

2              I don't know what that means in terms of comity I

3    haven't.  It's got to be briefed.

4              But I will tell you, when you do brief it,

5    understand that I believe that there was something persuasive

6    about the argument that the plaintiff made in that regard.  I

7    want to have these motions so people know where my concerns

8    are.

9              I hope that the plaintiffs can see where my concerns

10   are with respect to subject matter jurisdiction.  As I said, I

11   got on the bench expecting that I was going to tell you, you

12   should really refile in state court, save everybody time and

13   energy.  But I don't know if I agree that on the facts, the

14   unique facts, of this case that comity would be the obstacle

15   that the defendants argue that it is, on the unique facts of

16   this case.  I believe the facts here are unique.

17             MS. CALCATERRA:  Understood.  And we will brief it

18   in our motion papers.

19             But now that you brought up motion papers, we had an

20   earlier discussion of several weeks ago hoping for the

21   opportunity that we could get more pages to respond.

22             THE COURT:  You know what I normally say no to that

23   request because I typically believe that people just fill up

24   pages necessarily.  I'll give you more pages, but understand I

25   like concise and cogent arguments.  When people start rambling

PREMOTION CONFERENCE

1   on, I stop paying attention.  So it doesn't help you.  If you

2   want the extra pages, I'll give them to you.  Use them wisely.

3   How many more are you asking for?

4            MS. CALCATERRA:  Up to 40.

5            THE COURT:  Lord have mercy.  Forty each.

6            MS. CALCATERRA:  We've got TIA.  We have standing.

7   We have underlying factual allegations.  And you want to be

8   well-briefed in it.  We will be concise.

9            THE COURT:  You agree you need that many pages?

10            MR. McNEELA:  I do.  I think the issues are very

11   interesting, as the Court mentioned intellectually.  I think

12   they could be a little thorny.  I think there is interesting

13   authority on both sides that are cited and analyzed.  I think

14   that number of pages are appropriate given the issues at hand.

15   I don't want to take the Court's time with this, but obviously

16   the reply brief would not be 40 pages.

17            THE COURT:  No, it wouldn't.

18            MR. McNEELA:  Would the Court prefer us to, with the

19   Court's permission, submit a pro-stipulation including the

20   timing of when the briefing would occur.  I do know that right

21   now, I don't know how long the defendants need, I know they've

22   had the complaint for a long time.

23            THE COURT:  I typically set the briefing schedule

24   out now.  Let's do it.

25            What do you need?  I've given you more time -- I've

PREMOTION CONFERENCE

1    given you more pages.  If I'm going to give you more pages

2    what I expect well-written submissions.

3              MS. CALCATERRA:  Three weeks.

4              THE COURT:  All right.

5              MS. CALCATERRA:  Because plaintiffs are correct,

6    we've had it for a while.  We've been working on the draft.

7    It exceeds 40 now, so we know what our goal is.

8              THE COURT:  Opposition.

9              MR. McNEELA:  I'd have to ask at least 45 days.  As

10   far as their letter did an excellent job putting forth the

11   arguments, it obviously held some back.  Given the time.

12             THE COURT:  Do you have a problem with that?

13             MS. CALCATERRA:  Giving them 45 days to respond to

14   ours?  No.

15             THE COURT:  Okay.

16             MR. McNEELA:  Thank you.

17             THE COURT:  Let's count that out.

18             COURTROOM DEPUTY:  October 3rd for defense

19   paperwork, and November 14.

20             THE COURT:  Does that sound right?

21             MR. McNEELA:  Yes.

22             THE COURT:  Two weeks on reply.

23             MS. CALCATERRA:  Yes.

24             COURTROOM DEPUTY:  November 28 for reply.

25             THE COURT:  That's around Thanksgiving.

PREMOTION CONFERENCE

1          MR. McNEELA:  That is Thanksgiving.

2          THE COURT:  Go to the following week.

3          COURTROOM DEPUTY:  December.

4          THE COURT:  An extra week from whatever that

5    Thursday is.

6          COURTROOM DEPUTY:  December 5.

7          THE COURT:  That makes more sense.  Those are reply

8    dates.  Fifteen pages on a reply.

9          Can I just tell you some pet peeves of mine.  Don't

10   cite cases without a parenthetical.  If I don't have an idea

11   why you cite a case, it will irritate me.  I guess that's it.

12          You guys know what I care about.  I think some of

13   the other issues that were raised are less problematic for me.

14   I'm going to be honest, I didn't think that your standing

15   argument was persuasive.  Again, I'm here for it, I'll read

16   it.  The comity issue and the subject matter jurisdiction

17   issue.  There was another though, am I missing one?

18          MR. McNEELA:  And standing.

19          THE COURT:  That was it.  Please don't spend forever

20   on standing.

21          MS. CALCATERRA:  We did reserve an opportunity to

22   respond to the factual allegations as well.

23          THE COURT:  Responding to the factual allegations

24   for the purposes of -- I'm going to accept them as true.

25   Except for the subject matter jurisdiction issue, on that I

PREMOTION CONFERENCE

1   don't have to.

2           MS. CALCATERRA:  That's helpful, your Honor.  Thank

3   you.

4           THE COURT:  For the rest of it, I've got it.

5           Obviously for subject matter jurisdiction, I'm

6   curious what is it that you are disagreeing?  Much of what you

7   said here today sounded like you weren't in that much

8   disagreement about it, at least the background of the facts

9   here.

10          MS. CALCATERRA:  The way that the complaint is

11  drafted is that it was intentional discrimination and the

12  county went out of their way to try to prevent people who live

13  within minority districts from filing their tax appeals.

14  That's not true.  Because there were community forms,

15  educational opportunities they had.  Many people did file for

16  tax appeals, specifically the Village of Hempstead, where the

17  three plaintiffs reside.

18          And so they laid out this out with such intent and

19  obstruction by the county that was specifically targeted

20  towards minority communities, when you have plenty of people

21  who live in white census tracks.  I wanted to flush out a

22  little bit I felt as if --

23          THE COURT:  Out of curiosity, putting aside any

24  allegations concerning obstructionist conduct by the county to

25  prevent people of color from making tax appeals, if we're just

PREMOTION CONFERENCE

1   talking about the tax scheme by itself, and we talk about the

2   history of this case, which again I deem to be unique, does it

3   even matter, right?  That's kind of like the alleged

4   obstruction conduct is almost belt and suspenders to the

5   issues of intent, as I see it, as based on the prior case, the

6   prior consent order.

7           You say this administration may not have known.

8   Again, I don't really think that is a persuasive argument.  It

9   almost seems to me that I can stop right there and never even

10  get to whether or not there were additional obstruction.

11          You can disagree with that, and I could say okay

12  that didn't happen.  But we know the other part did.  We know

13  the consent decree was issued.  We know the subsequent

14  administration reverted back to, I said to the scheme that was

15  reminiscent because I don't know how identical, but

16  reminiscent of the discriminatory issues.  Those are the

17  salient facts.  So don't spend too long is my point.

18          MS. CALCATERRA:  Understood.

19          THE COURT:  And you don't spend too long on that

20  either.

21          MR. McNEELA:  Yes, Judge.

22          THE COURT:  This has been helpful.  I would like to

23  tell you I do appreciate your presentation here today.

24  Clearly you all came prepared to educate me on issues that I

25  had not been presented with before.  I hope that you continue

PREMOTION CONFERENCE

1  to do so in your submissions.

2          MS. CALCATERRA:  Thank you, your Honor.

3          MR. McNEELA:  Thank you.

4

5          (Whereupon, the proceedings concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25