**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WAYNE J. HALL, REINA HERNANDEZ, and FLORIDALMA PORTILLO, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>NASSAU COUNTY, DEPARTMENT OF ASSESSMENT OF NASSAU COUNTY, ASSESSMENT REVIEW COMMISSION OF NASSAU COUNTY, and DOES 1-25,<br><br>    Defendants. | Case No.: 2:19-cv-00893-LDH-CLP<br><br><br>**Served on November 14, 2019** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANTS' MOTION TO DISMISS</u>**

**KIRBY McINERNEY LLP**

Ira M. Press
David A. Bishop
Andrew M. McNeela
Seth M. Shapiro
250 Park Avenue, Suite 820
New York, New York 10177
Tel.: (212) 371-6600

*Counsel to Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

I.      The Parties ................................................................................................................... 3

II.     Nassau County's Property Taxes and Assessments ..................................................... 4

III.    Defendants' Longstanding, Racially Discriminatory, Property Tax Scheme .................. 4

IV.     *Coleman* and Its Fixes to the Property Tax Scheme ...................................................... 5

V.      Defendants' Abandonment of *Coleman* and Their Intentional Reversion to
        Policies that Exacerbated the Pre-*Coleman* Disparities .............................................. 6

VI.     Defendants' Recent, Inadequate Reforms and Additional Admissions of the
        Indefensibleness of Their Tax Scheme During the Class Period .................................... 8

ARGUMENT ......................................................................................................................... 9

I.      STANDARD GOVERNING MOTIONS TO DISMISS .............................................. 9

II.     THE TIA DOES NOT BAR PLAINTIFFS' CLAIMS ................................................ 9

        A.      Overview of the TIA ........................................................................................ 9

        B.      The TIA Is Inapplicable to Plaintiffs' Claims for Monetary Damages ............... 10

        C.      The TIA Does Not Preclude Plaintiffs' Request for Prospective
                Injunctive Relief ............................................................................................. 12

                1.      The TIA Is Inapplicable Because Plaintiffs Do Not Seek to
                        Reduce the Taxes Collected by Nassau County ...................................... 12

                2.      New York State Does Not Provide a Plain, Speedy, and
                        Efficient Remedy ................................................................................... 18

III.    PRINCIPLES OF COMITY DO NOT PRECLUDE PLAINTIFFS' DAMAGES
        CLAIMS ................................................................................................................... 22

        A.      Overview of the Comity Doctrine ................................................................... 22

        B.      Plaintiffs' Claims Are Not Precluded by Comity ............................................. 23

C.     Dismissal on Comity Grounds Is Also Improper Because New York Would Not Provide Plain, Adequate, and Complete Relief.................................. 27

IV.     PLAINTIFFS HAVE STANDING TO ASSERT ALL CLAIMS................................... 27

      A.     The Law Regarding Standing on Motions to Dismiss ........................................... 27

      B.     Plaintiffs' Allegations Establish Standing ........................................................... 28

           1.     Plaintiffs Alleged an Injury in Fact Notwithstanding that Some of Them Received Assessment Reductions or Refunds in Certain Years ............................................................................................................ 28

           2.     Plaintiffs Alleged that They Personally Were Injured ............................. 29

V.     THE COMPLAINT ADEQUATELY PLEADS ALL CLAIMS .................................... 31

      A.     Plaintiffs Stated Fair Housing Act Violations ....................................................... 31

      B.     Plaintiffs Have Pled Equal Protection Violations.................................................. 33

      C.     Plaintiffs Have Pled Procedural Due Process Violations ..................................... 34

      D.     Plaintiffs Stated Claims under 42 U.S.C. § 1981.................................................. 35

      E.     Plaintiffs Stated Claims under § 603 of the Nassau County Charter.................... 39

CONCLUSION.......................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster Cty., W. Va.*,
  488 U.S. 336, 345 (1989) ........................................................................................ 34

*Arkansas v. Farm Credit Servs. of Cent. Ark.*,
  520 U.S. 821 (1997) ................................................................................................ 11

*Bernard v. Vill. of Spring Valley, N.Y.*,
  30 F.3d 294 (2d Cir. 1994) ........................................................... 10, 16, 18, 26

*Brighton Park Neighborhood Council v. Berrios*,
  No. 17 CH 16453, 2019 WL 4178606 (Ill. Cir. Ct. Feb. 7, 2019) .................... 32

*Brushaber v. Union Pac. R. Co.*,
  240 U.S. 1 (1916) .................................................................................................... 35

*California v. Grace Brethren Church*,
  457 U.S. 393 (1982) .................................................................................................. 9

*Chasalow v. Bd. of Assessors of Cty. of Nassau*,
  609 N.Y.S.2d 27 (2d Dept. 1994) ........................................................................ 33

*Chevron Corp. v. Donziger*,
  833 F.3d 74 (2d Cir. 2016) .............................................................................. 27, 30

*Clackamas County v. Airbnb, Inc.*,
  No. 17 Civ. 1611, 2018 WL 3689900 (D. Or. Aug. 3, 2018) ............................ 25

*Coleman v. Seldin*,
  687 N.Y.S.2d 240 (N.Y. Sup. Ct., Nassau Cty. 1999) ............................. *passim*

*Coller v. State Univ. of N.Y.*,
  439 N.Y.S.2d 474 (3d Dept. 1981) ...................................................................... 20

*Conklin v. Town of Southampton*,
  141 A.D.2d 596 (2d Dept. 1988) .......................................................................... 19

*Connor B. ex rel. Vigurs v. Patrick*,
  771 F. Supp. 2d 142 (D. Mass. 2011) ........................................................... 27, 30

*Conrad v. Hackett*,
  584 N.Y.S.2d 241 (3d Dept. 1992) ...................................................................... 19

*Coors Brewing Co. v. Mendez-Torres*,
  678 F.3d 15 (1st Cir. 2012) ............................................................................. 22, 25

*Corvetti v. Town of Lake Pleasant*,
    642 N.Y.S.2d 420 (3d Dept. 1996) ................................................................. 34

*County of Riverside v. McLaughlin*,
    500 U.S. 44 (1991) ......................................................................................... 27

*Dillon v. Mississippi*,
    376 Fed. App'x 421 (5th Cir. 2010) .............................................................. 14

*Direct Mktg. Ass'n v. Brohl*,
    135 S. Ct. 1124 (2015) ...................................................................... 11, 14, 22

*Disability Rights N.Y. v. New York State*,
    No. 17 Civ. 6965, 2019 WL 2497907 (E.D.N.Y. June 14, 2019) .................... 27

*Donahue v. Suffolk Cty. Family Ct.*,
    No. 19 Civ. 3785 (LDH) (LB), 2019 WL 5778076 (E.D.N.Y. Aug. 22, 2019) ................ 9

*Entergy Nuclear Vt. Yankee, LLC v. Shumlin*,
    737 F.3d 228 (2d Cir. 2013) .......................................................................... 20

*Fair Assessment in Real Estate Ass'n, Inc. v. McNary*,
    454 U.S. 100 (1981) ........................................................................ 11, 22, 26, 27

*Ferguson v. Comm'r of Tax and Fin.*,
    739 Fed. App'x 19 (2d Cir. 2018) .................................................................. 15

*Foss v. City of Rochester*,
    65 N.Y.2d 247 (1985) ............................................................................... 33, 34

*Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*,
    493 U.S. 331 (1990) ....................................................................................... 20

*Friarton Estates Corp. v. City of New York*,
    525 F. Supp. 1250 (S.D.N.Y. 1981) ............................................................... 20

*G.R.F. v. Board of Assessors of County of Nassau*,
    41 N.Y.2d 512 (1977) ..................................................................................... 34

*Great Atl. & Pac. Tea Co. v. Kiernan*,
    366 N.E.2d 808 (N.Y. 1977) .......................................................................... 20

*Hellenic Am. Neighborhood Action Comm. v. City of New York*,
    101 F.3d 877 (2d Cir. 1996) ...................................................................... 34-35

*Hibbs v. Winn*,
    542 U.S. 88 (2004) ................................................................ 9, 10, 12, 13, 16

*Hudson v. Palmer*,
    468 U.S. 517 (1984) ....................................................................................... 35

iv

*Incorporated Vill. of Southampton v. Noa*,
824 N.Y.S.2d 754, 2006 N.Y. Slip Op. 51755(U)
(N.Y. Sup. Ct., Suffolk Cty. 2006) .................................................. 19

*Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*,
438 F.3d 195 (2d Cir. 2006) .................................................... 33, 34

*Joseph v. Hyman*,
659 F.3d 215 (2d Cir. 2011) ........................................ 2, 23, 24, 25

*LaCarruba v. Legislature of Cty. of Suffolk*,
225 A.D.2d 671 (2d Dept. 1996) ................................................. 19

*Levin v. Commerce Energy, Inc.*,
560 U.S. 413 (2010) ..................................................... *passim*

*Levy v. Legal Aid Soc'y*,
No. 18 Civ. 3180 (LDH), 2019 WL 5781788 (E.D.N.Y. Sept. 30, 2019) ......................... 9

*Long Island Lighting Co. v. Town of Brookhaven*,
889 F.2d 428 (2d Cir. 1989) .................................................. 10, 18

*Luessenhop v. Clinton County, New York*,
466 F.3d 259 (2d Cir. 2006) ............................................. *passim*

*Lynch by Lynch v. Alabama*,
No. 08-S-450-NE, 2011 WL 13186739 (N.D. Ala. Nov. 7, 2011) .................................. 24

*Metropolitan Hous. Dev. Corp. v. Vill. of Arlington Heights*,
616 F.2d 1006 (7th Cir. 1980) ..................................................... 32

*Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n*,
515 U.S. 582 (1995) ....................................................... 11, 20, 26

*Pyke v. Cuomo*,
567 F.3d 74 (2d Cir. 2009) ....................................................... 34

*Rosewell v. LaSalle Nat'l Bank*,
450 U.S. 503 (1981) ......................................................... 9, 11

*Spokeo, Inc. v. Robins*,
136 S. Ct. 1540 (2016) ........................................................ 27

*Tax Equity Now NY LLC v. City of New York*,
No. 153759/2017, 2018 WL 4599923
(N.Y. Sup. Ct., N.Y. Cty. Sept. 25, 2018) ................................... 32, 35

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmties. Project, Inc.*,
135 S. Ct. 2507 (2015) ......................................................... 32

*Trump v. Chu*,
    65 N.Y.2d 20 (1985) ............................................................................... 33

*Tully v. Griffin, Inc.*,
    429 U.S. 68 (1976) ................................................................................. 11

*United States v. County of Nassau*,
    79 F. Supp. 2d 190 (E.D.N.Y. 2000) ................................................ 15, 16, 26

*United States v. Yonkers Bd. of Educ.*,
    837 F.2d 1181 (2d Cir. 1987) ................................................................ 36

*Wells v. Malloy*,
    510 F.2d 74 (2d Cir. 1975) ................................................................... 14

*Z & R Cab, LLC v. Phila. Parking Auth.*,
    616 Fed. App'x 527 (3d Cir. 2015) ......................................................... 22

**Statutes, Rules, and Other Authorities:**

28 U.S.C. § 1341 ................................................................................... 9

Fed. R. Civ. P. 8(a)(2) ........................................................................... 39

RPTL § 102(2) ...................................................................................... 4

RPTL § 305(2) .................................................................................. 4, 34

RPTL § 730(5) ..................................................................................... 19

S. 1505-C, 242nd Leg., 2019 Sess. (N.Y. 2019) ..................................... 8, 30

S. Rep. No. 75-1035 (1937) ..................................................................... 9

## PRELIMINARY STATEMENT

This case concerns the Defendants' decades-long, racially discriminatory property tax assessment practices in Nassau County (also referred to as the "County"). Defendants' policies shifted the burden for *billions* of dollars of Nassau County's overall property tax levy from mostly wealthier, white homeowners, to predominantly lower income, minority homeowners. This shift occurred for the following reasons. *First*, Nassau County predetermines its total property tax levy based on its budgetary needs, which it then apportions ratably amongst its residents based on their assessed property values. This means that Nassau County's collection of property taxes is a zero-sum game for taxpayers: a decrease in the assessment value and resulting taxes owed by one property owner is offset by an increase in the tax burden on every other property owner, so the County receives the full tax levy. *Second*, Nassau County's assessment values are based on stale data that does not account for the fact that residences in predominately wealthier, white neighborhoods appreciate in value at a much higher rate than residences in less wealthy, predominately minority communities. As a result of these two factors, wealthier, white property owners pay less in property taxes than they should because their residences are underassessed, and that delta is essentially subsidized by the less wealthy, minority homeowners.

This outcome comes as no surprise to Defendants. Indeed, the very same racially discriminatory practices that Plaintiffs complain of here were challenged in *Coleman v. Seldin*, 181 Misc. 2d 219 (N.Y. Sup. Ct. 1999). That action culminated in a consent order (the "Consent Order"), which required Nassau County to take certain corrective action to create a tax assessment roll "that is fair, nondiscriminatory, scientific[,] equitable . . . and [] uses fair market value." November 14, 2019 Declaration of Andrew M. McNeela ("McNeela Decl."), Ex. 1. The Consent Order proved enormously successful in reducing the overassessment of minority homeowners. However, in 2010, after the *Coleman* Consent Order expired, a new County administration sought

to placate wealthier homeowners in white neighborhoods by ending *Coleman*'s reforms and reinstating virtually the same racially discriminatory policies that led to *Coleman* in the first place. As Nassau County well knew would happen, its retrograde changes vitiated all post-*Coleman* gains and shifted more than $1.7 billion in the County's overall property tax burden from wealthier white homeowners back to lower income, minority homeowners.

As a result of the Defendants' blatant recidivism, Plaintiffs are now in federal court seeking: (i) damages owing to violations of, *inter alia*, their constitutional and civil rights; (ii) and prospective injunctive relief to ensure that the *Coleman* policies are reinstated and that Defendants are required to apportion the County's tax levy in an equitable, non-racially discriminatory manner.

In response, Defendants move to dismiss the Complaint, primarily on the grounds that the Court (i) lacks subject matter jurisdiction under the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, or (ii) should voluntarily refrain from hearing this action pursuant to principles of federal-state comity.  Defendants' arguments are meritless.

*First*, the TIA is no impediment to this Court's jurisdiction because, *inter alia*: (i) the TIA does not apply to claims for monetary damages; and (ii) it applies only to claims for equitable relief that would decrease the flow of tax revenues, whereas Plaintiffs' claims here are limited to the apportionment of Nassau County's predetermined tax levy and would not result in the withholding of a single dollar.  Additionally, while Defendants contend that the latter exception applies only where the plaintiff seeks equitable relief in the context of a third-party challenge to a tax credit, the Second Circuit rejected that precise argument in *Luessenhop v. Clinton County, New York*, 466 F.3d 259 (2d Cir. 2006).

*Second*, the Supreme Court in *Levin v. Commerce Energy Inc.*, 560 U.S. 413 (2010), and the Second Circuit in *Joseph v. Hyman*, 659 F.3d 215 (2d Cir. 2011), held that comity is

inappropriate when the challenged policies implicate a suspect classification subject to heightened scrutiny.  The respect that the federal courts normally afford state and local governments in the performance of their operations under the comity doctrine is superseded by the federal government's interest in addressing those operations *when they are used to advance invidious discrimination*.  As such, comity respectfully provides no basis for this Court to elect not to hear this action.

Defendants' remaining arguments are of the blunderbuss variety and merit little attention. For example, Defendants dedicate eight pages of their brief to disputing Plaintiffs' standing despite this Court's admonition at the September 12, 2019 pre-motion conference: "I didn't think that your standing argument was persuasive. . . . Please don't spend forever on standing."  McNeela Decl., Ex. 2, at 32:14-20.  Simply put, that *some* (but not all) of the Plaintiffs grieved their property assessments for *certain* years of the class period and received a refund or assessment reduction that *partially* compensated, them does not mean that they now lack an injury in fact.

For these reasons and other reasons stated herein, the Court respectfully should deny Defendants' motion to dismiss in its entirety.

## STATEMENT OF FACTS

### I.    The Parties

Plaintiffs, who are racial minorities, and the Class Members, are all owners of "Class one" residential property located in nonwhite census tracts in Nassau County.  (¶¶ 1, 16-18, 197);[1] *see also* N.Y. Real Property Tax Law ("RPTL") § 1802(1) (defining "Class one").  Defendant Nassau County is a political subdivision of the State of New York that assesses real property values for taxation on its residents' properties.  (¶¶ 19, 25).  Defendant Department of Assessment of Nassau

---

[1] All citations to "¶__" are to paragraphs in the Complaint filed in this action.

County ("DOA") is Nassau County's administrative agency responsible for maintaining an "equitable and scientific system of assessing property for taxation."  Nassau County Charter §§ 601(a), 603.  Defendant Assessment Review Commission of Nassau County ("ARC") is Nassau County's administrative agency responsible for reviewing all assessment challenges ("grievances"), reducing over-assessments, and managing "AROW," the County's online appeal system.  (¶ 21).

## II.    Nassau County's Property Taxes and Assessments

Nassau County predetermines the total property tax revenue that it will collect each year from Class 1 properties.  (¶ 70).  The total tax levy is apportioned ratably to the properties based on their assessed value.  *Id.*  The assessed value is a uniformly applied percentage of "true market value."  (¶¶ 272-73).  Nassau County conducts assessments to determine true market value.  (¶¶ 175, 272-73); *see also* RPTL §§ 102(2), 305(2).

Because Nassau County's total property tax levy is predetermined, any decrease in the assessment value and corresponding taxes owed by a homeowner or group of homeowners increases the property taxes owed by all other homeowners, so the total tax levy remains constant. (¶¶ 69-71); *see also* Def. Br. at 8 (explaining that "a reduction of assessment on a property" shifts the tax burden "to every other Property Owner . . . to offset Nassau County's responsibility for raising the full tax levy") (emphasis removed).  For this reason, Nassau County informs homeowners that "[a] [tax] reduction based on your administrative appeal does not cost the County anything."  (¶¶ 72, 181-82).

## III.   Defendants' Longstanding, Racially Discriminatory, Property Tax Scheme

For nearly sixty years, if not longer, Nassau County has been using decades-old assessment values for property taxes.   (¶¶ 3, 5, 35).  Outdated assessments do not account for appreciations

in value.  (¶ 69).   Uncaptured, accelerated appreciation is effectively an exemption.   (¶ 73). Because properties in wealthier communities, which are mostly white, appreciate faster than properties in lower-income communities, which are mostly nonwhite, assessment freezes disproportionately benefit whites, which in turn, disproportionately burdens nonwhites.  (¶¶ 69-70, 73).   Specifically, because, as noted above, Nassau County's total property tax levy is predetermined and fixed, if homeowners in wealthier, white areas pay less taxes because their assessed values deviate substantially from their actual market value, then homeowners in lower-income, nonwhite areas pay more than they should.  (¶¶ 71, 73-74).   Courts have warned the County about this unscientific and inequitable practice for decades.  (¶¶ 3, 35, 66, 80).

Defendants have also engaged in an arbitrary practice of awarding assessment reductions as a matter of course to homeowners who file grievances.  (*Id.*; ¶¶ 80, 87-89, 92-95).   That unscientific practice reduces the tax burden of the challengers but raises the burden on everyone else.  (*Id.*; ¶¶ 90, 109-43); *see also* Def. Br. at 8.   Because most challengers are white, and most non-challengers are nonwhite.   The resulting tax-burden shift disproportionately burdens nonwhites, (¶¶ 88-90), a pattern known to the County, (¶¶ 3-5, 35, 145-51, 154).   Courts have previously admonished Defendants for this inequitable practice as well.  (¶ 5).

## IV.   *Coleman* and Its Fixes to the Property Tax Scheme

Years of disparate appreciation and unscientific reductions for challengers led to *Coleman v. Seldin*.  181 Misc. 2d 219 (N.Y. Sup. Ct. 1999).   Despite being on "notice" of the "disparate impact on minority communities" from prior litigation, Nassau County continued its "illegal" practices by not reassessing properties for 35 years and giving reductions in proceedings that constituted "selective reassessments," which are unconstitutional.  *Id.* at 231-32; (¶¶ 35, 283-85).

Defendants argued, as they do now, that they lacked discriminatory intent, so the court put them on notice:

> [I]nsofar as the County is now on notice of the likely disparate impact of its assessment practices, what in the past may have been viewed as "unintentional" discrimination may now be fairly considered intentional. The County's continued failure to act in reliance on "unintentional" discriminatory results can no longer act as a shield for the County's practices.

(¶ 36) (emphases removed) (quoting 181 Misc.2d at 233).

As a result of this litigation, Defendants agreed to a three-year consent order imposing certain procedural and mathematical requirements to improve the accuracy of assessments and to create a tax roll that was "nondiscriminatory, scientific and equitable." (¶¶ 37-46); *see also* McNeela Decl., Ex. 1, at § II ¶¶ 1, 10-11. Within just the first year, Defendants reversed the disparate impacts and exceeded nationally recognized standards for assessment accuracy. (*Id.*; ¶¶ 55-56).

## V.    Defendants' Abandonment of *Coleman* and Their Intentional Reversion to Policies that *Exacerbated* the Pre-*Coleman* Disparities

Homeowners in predominantly wealthier, white neighborhoods backlashed over tax hikes, which resulted from the fact that, post *Coleman*, their previously under-assessed property values were no longer essentially being subsidized by poorer, minority homeowners. (¶¶ 47-51, 57, 61). Soon after the *Coleman* consent order expired, Nassau County's political class responded. (¶¶ 47-51, 55-58). Nassau County enacted executive orders that essentially reverted to its pre-*Coleman* policies. ¶ 62; McNeela Decl., Ex. 2, at 5:4-7 (Counsel for Defendants admitting that the property tax system at issue "is reminiscent of" that in *Coleman*). Specifically, Nassau County declared "a moratorium on property [] assessments," continually extended for eight years (the "Freeze"), and "a policy to settle assessment challenges for a reduced assessment without" regard for market value (the "Settlement Policy"). (¶¶ 62, 75).

6

The "Settlement Policy" was proposed in a report by an assessment reform team that Nassau County appointed in violation of RPTL § 523-B(2)(a) (requiring bipartisan members). (¶ 78). That team lacked policy experience and consisted of owners of Nassau County's largest tax appeal firms, which profit from tax grievances that are filed predominantly by white, wealthier homeowners. (¶¶ 58, 78-80).[2]

Defendants also misrepresented the effectiveness of the post-*Coleman* system, calling it "dysfunctional in every way" and "not the fair market value." (¶¶ 63-66). Defendants posted outdated information online about RPTL proceedings, misled homeowners that they would not receive reductions, and kept Settlement Policy records confidential, so Plaintiffs and the Class were in the dark about the process. (¶¶ 21, 81, 104, 156, 165, 170, 175). Defendants held inadequate workshops, purportedly to inform residents of the Settlement Policy and grievance procedure, but actually "to veil discriminatory intent and ensure a disparate impact."[3] (¶¶ 105-07).

Over the years, County officials and reports, including one on "fair housing impediments," identified the disproportionate tax burdens and segregative effects of the assessment system and proposed solutions, which Defendants never enacted. (Compl. at 1 n.1; ¶¶ 75-77, 86-96, 136-38, 158-63). *Newsday* also published studies on the disparities. (Compl. at 1 n.1; ¶¶ 89, 110-35, 159). Nevertheless, Defendants' actions eventually exceeded the pre-*Coleman* disparities. (¶¶ 109-43).

---

[2] In reverting back to its pre-*Coleman* policies, Nassau County also radically changed the structure of DOA and ARC. Previously, to be considered for the position of County Assessor, a candidate had to possess certain statutory requirements and be confirmed by the legislature. To avoid those requirements, the County newly created the "Acting Assessor" position. (¶¶ 98-100, 101). Nassau County later admitted that the Acting Assessor was unqualified. The County also fired nearly a third of assessment-related employees and *all* ARC members. (¶¶ 101-03, 164, 188).

[3] In their brief, Defendants rely on the "community forums," but admit that they had no impact on the number of grievances filed by property owners in Plaintiffs' community. *See* Def. Br. at 8 (admitting that from 2006-2010 and from 2010-2017, the same percentage of Hempstead Village property owners filed appeals).

By February 2017, Defendants removed $37 billion of taxable property value and shifted $1.7 billion of the tax burden from mostly white to mostly nonwhite homeowners.  (¶¶ 8-9, 94).

## VI.    Defendants' Recent, Inadequate Reforms and Additional Admissions of the Indefensibleness of Their Tax Scheme During the Class Period

In 2018, a new County administration admitted that the system was broken and sought to create a "defensible" one, but it too is indefensible.  (¶ 171).  Nassau County could have reimplemented the terms of the *Coleman* consent order, but it did not.  Nassau County could have immediately ended the Settlement Policy, but it did not, continuing it for at least another year.  (¶¶ 174-75).  Nassau County did end the freeze and ordered annual reassessments, but they took effect the following year.  *Id.*  Nassau County proposed a bill, which passed the state legislature after the Complaint was filed, but *not* to help the Class.  (¶ 175); *See* S. 1505-C, 242nd Leg., 2019 Sess. (N.Y. 2019), Part J (creating RPTL § 485-u).  This "Phase-in" law creates property tax credits for the very properties that have been undertaxed for nearly a decade in order to graduate their taxes over the next five years.  As a result, nonwhite properties would be overtaxed for another five years.  Notably, the act contains a severability clause in case part of it is voided.  2019 N.Y. Laws 55, Part J § 3.

Nassau County has not enacted any measures to compensate the Class or protect its rights in the future.  (¶ 176).  Plaintiffs now challenge Defendants' racially discriminatory policies, practices, and tax exemptions as violations of: 42 U.S.C. §§ 3604(b), 3605, 3617 (the "Fair Housing Act" or "FHA"); the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the U.S. Constitution; and Nassau County Charter § 603.  (¶¶ 1, 15, 350-55).

## ARGUMENT

## I.   STANDARD GOVERNING MOTIONS TO DISMISS

This Court is familiar with the standards governing motions dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  *See Donahue v. Suffolk Cty. Fam. Ct.*, No. 19 Civ. 3785 (LDH) (LB), 2019 WL 5778076, at *1 (E.D.N.Y. Aug. 22, 2019) (discussing Rule 12(b)(1)); *Levy v. Legal Aid Soc'y*, No. 18 Civ. 3180 (LDH), 2019 WL 5781788, at *2 (E.D.N.Y. Sept. 30, 2019) (discussing Rule 12(b)(6)).

## II.   THE TIA DOES NOT BAR PLAINTIFFS' CLAIMS

### A.   Overview of the TIA

The TIA precludes federal court jurisdiction over actions to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  28 U.S.C. § 1341.[4]  As the Supreme Court explained in *Hibbs*, Congress enacted the TIA to advance two closely related state-revenue-protective objectives:

> (1) to eliminate disparities between taxpayers who could seek injunctive relief in federal court – usually out-of-state corporations asserting diversity jurisdiction – and taxpayers with recourse only to state courts, which generally required taxpayers to pay first and litigate later; and (2) to stop taxpayers, with the aid of a federal injunction, from withholding large sums, thereby disrupting state government finances.

*Hibbs v. Winn*, 542 U.S. 88, 104 (2004) (citing S. REP. NO. 75-1035, at 1-2 (1937)).

"Because the TIA was enacted to combat specific evils," the Supreme Court expressly rejected the proposition that "'the TIA totally immunizes from lower federal-court review all

---

[4] "[A] state-court remedy is 'plain, speedy and efficient'" only if it "provides the taxpayers with a 'full hearing and judicial' determination," and permits the taxpayer to "raise any and all constitutional objections to the tax."  *California v. Grace Brethren Church*, 457 U.S. 393, 411 (1982) (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 514 (1981)).

aspects of state tax administration.'" *Luessenhop*, 466 F.3d at 266 (quoting *Hibbs*, 542 U.S. at

105). Rather, the Supreme Court held that "the TIA should be interpreted to preclude jurisdiction

only where 'state taxpayers seek federal-court orders enabling them *to avoid paying state taxes*.'"

*Luessenhop*, 466 F.3d at 267 (quoting *Hibbs*, 542 U.S. at 107) (emphasis added in *Luessenhop*).

### B.     The TIA Is Inapplicable to Plaintiffs' Claims for Monetary Damages

Defendants argue that the TIA encompasses claims seeking monetary damages despite its

clear focus on equitable relief. *See* Def. Br. at 20-21. Defendants' argument – which is

unsupported by a single case barring a claim for damages under the TIA – is foreclosed by the

Second Circuit: "'While it is the Tax Injunction Act that prevents federal courts from giving

injunctive relief or declaratory relief . . . *it is the principle of comity that* [*when applicable*] *prevents

a taxpayer from seeking damages*.'" *Bernard v. Vill. of Spring Valley, N.Y.*, 30 F.3d 294, 297 (2d

Cir. 1994) (quoting *Long Island Lighting Co. v. Town of Brookhaven*, 889 F.2d 428, 431 (2d Cir.

1989) (hereinafter "*LILCO*")) (emphasis added).

Defendants' reliance on *Hibbs* for the proposition that the TIA covers actions for injunctive

relief as well those seeking a tax "refund," Def. Br. at 20-22, is wrong for several reasons.

*First*, *Hibbs* involved only injunctive relief, and therefore, any discussion of the TIA and

"refunds" is *dicta*. In fact, Defendants admit that the Supreme Court *has not* addressed whether

the TIA encompasses claims for monetary damages. *See* Def. Br. at 23 n.40 ("The Supreme Court

has yet to definitively determine whether the TIA . . . precludes a plaintiff from seeking damages

. . . .).

*Second*, and more critically, *Hibbs* premised its *dicta* regarding "refund[s]" on certain of

the Supreme Court's prior holdings, *none of which concerned the TIA and monetary damages*. *See*

542 U.S. at 106 (collecting cases). [5]  Indeed, the only case that *Hibbs* cited that concerned a "refund" is *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100 (1981).[6]  But *McNary* had nothing to do with the TIA and instead, *was decided solely on comity grounds*.  *See id.* at 107 ("Because we decide today that the principle of comity bars federal courts from granting damages relief in such cases, *we do not decide whether [the TIA], standing alone, would require such a result*.") (emphasis added).  This is why Defendants are reduced to relying on *Hibb*'s *dicta* rather than *the holdings* of the cases that *Hibbs* cites.

*Third*, the Supreme Court recently reiterated that the specific remedies that the TIA prohibits are all equitable in nature.  *Direct Mktg. Ass'n v. Brohl*, 135 S. Ct. 1124, 1132-33 (2015) (noting that the words "enjoin," "suspend," and "restrain" should be given their "meaning in equity," which is "consistent with our recognition that the TIA 'has its roots in equity practice'") (quoting *Tully v. Griffin, Inc.*, 429 U.S. 68, 73 (1976)).

At bottom, the Supreme Court has never held that the TIA bars claims seeking monetary damages, and controlling Second Circuit precedent holds that it does not.  Rather, the comity doctrine provides the correct framework for assessing such claims.  And, as discussed, *see infra* Point II.C, that doctrine poses no impediment here.

---

[5] *See, e.g.*, *Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 824 (1997) (holding that plaintiffs did not seek monetary relief but "an injunction against state taxation"); *Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 582 (1995) (action seeking injunction to prevent state from collecting taxes); *Rosewell*, 450 U.S. at 511 (taxpayer brought suit seeking preliminary and permanent injunction to prevent collection of taxes).

[6] In *Nat'l Private Truck Council*, which *Hibbs* also cited, the Oklahoma Supreme Court ordered that the plaintiffs were entitled to a tax refund under state law but declined to award declaratory or injunctive relief under 42 U.S.C. § 1983.  *See* 515 U.S. at 582.  The plaintiffs sought *certiorari* regarding the denial of their request for equitable relief, which was the only issue before the Supreme Court.  *See id.* at 585-86.  Moreover, in addition to not involving damages, the case was not even decided under the TIA.  Rather, the Supreme Court noted that the TIA was inapplicable, and explained that its holding – that 42 U.S.C. § 1983 did not provide a federal grant of authority for state courts to enjoin tax collection – was based on the same general comity concerns that animated *McNary*.  Thus, *Nat'l Private Truck Council* also has nothing to do with the vitality of damages claims under the TIA.

C.     **The TIA Does Not Preclude Plaintiffs' Request for Prospective Injunctive Relief**

1.     **The TIA Is Inapplicable Because Plaintiffs Do Not Seek to Reduce the Taxes Collected by Nassau County**

Nor does the TIA bar Plaintiffs' claims for equitable relief because Plaintiff *does not seek to reduce the total amount of taxes Nassau County collects by a single dollar.* (¶¶ 2, 70, 180-84, 189). Rather, Plaintiffs ask only that once the County determines the total amount of property taxes that it needs to fund its operations, it apportions responsibility for such taxes among its residents in a non-racially discriminatory manner so that poor, minority homeowners are not paying a disproportionate share and essentially subsidizing rich, white homeowners. (¶ 182).

As the Supreme Court explained in *Hibbs*, the TIA was enacted to bar taxpayers from obtaining federal injunctions that prevented state and local governments from collecting taxes. *See* 542 U.S. at 104. Congress's concern was that, by restraining collections, the federal courts were "disrupting state government finances." *Id.*; *see also id.* at 105 ("Nowhere does the legislative history announce a sweeping congressional direction to prevent federal-court interference *with all aspects of state tax administration*.") (emphasis added) (internal quotation marks omitted). Accordingly, the TIA applies only where the relief sought "would have operated to reduce the flow of state tax revenue." *Id.* at 106. Thus, in *Luessenhop*, the Second Circuit relied on *Hibbs* to hold that the TIA did not bar the claims under review because they "do not raise the specter of the federal courts *reducing the flow of money into state coffers* – the evil that the TIA was intended to eradicate." 466 F.3d at 268 (emphasis added).

Here, the Complaint makes clear that the relief that Plaintiffs seek would not reduce the flow of money into Nassau County's coffers. Specifically, for each year, Nassau County predetermines the total amount of property taxes that it will need to raise in order to meet its

budgetary needs.  (¶ 70).  As Defendants admit, that total *is not impacted* by a reduction in the assessment value (and corresponding tax burden) of any particular property or properties because that reduction is offset by increasing the tax burden of "*every* other" residential property in Nassau County, *thereby enabling Nassau County to* "rais[e] *the full tax levy*."  Def. Br. at 8 (first emphasis in original) (second emphasis added); (*see also* ¶¶ 70-73).  In other words, Nassau County's property-tax-assessment-and-challenge regime is a zero-sum game as between property owners, so Nassau County always collects the budgeted amount.

As such, the equitable relief that Plaintiffs seek cannot possibly diminish the size of Nassau County's tax haul.  Plaintiffs *do not* seek an order (i) preventing them from being taxed, (ii) limiting or capping the annual amount of taxes that they owe, (iii) permitting them to withhold a single dollar of assessed taxes now or in the future, or (iv) limiting or capping the overall amount of taxes that Nassau County can budget for and raise.  (¶¶ 2, 180-84, 189); *see also Hibbs*, 542 U.S. at 91 (holding that the TIA applies "only in cases . . . in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes"); Def Br. at 11 (conceding that "the primary objective of the TIA is to stop taxpayers from withholding large sums") (internal quotation marks and ellipses omitted).

Rather, if granted, the relief that Plaintiffs seek would simply require Nassau County to apportion its total tax levy – whether it is one dollar or a trillion dollars – in an equitable manner across all homeowners.[7]  *See Luessenhop*, 466 F.3d at 266 (holding that TIA was inapplicable

---

[7] The fact that Plaintiffs' action is not merely a challenge to their own tax burden, but challenges Nassau County's method of apportionment as it relates to all residential properties, further removes this action from the TIA's ambit.  *See Wells v. Malloy*, 510 F.2d 74, 77 (2d Cir. 1975) (emphasis added) (holding that in enacting the TIA, Congress was concerned with an individual's challenge to his own taxes, not a broad challenge that "once determined, *would be determined for him and all others*"); *Luessenhop*, 466 F.3d at 266  (emphasis added) ("Congress' intent in enacting the TIA was the prevention of a particular evil; namely, using federal courts as a vehicle to bring suits challenging the validity or amount of *a particular tax assessed against an individual person or entity*.").

because plaintiffs "are not seeking to utilize federal courts as a conduit to empty state coffers"). This would require Defendants to do nothing more than simply reinstate and maintain the *Coleman* policies that Nassau County *already had in place* prior to the freeze.  *Cf. Direct Mktg. Ass'n*, 135 S. Ct. at 1133 ("The question [in determining the TIA's applicability] . . . is whether the relief to some degree *stops* 'assessment, levy or collection,' *not whether it merely inhibits them*.") (emphasis added).  Indeed, the fact that Nassau County has begun reinstituting certain of the pre-*Coleman* policies that are the focus of Plaintiffs' claims for equitable relief (¶¶ 11 & n.3, 12-14, 174-78), and *have not claimed* that those policies *will in any way hamper* its tax collection efforts, shows that Nassau County's purported TIA-related concerns are disingenuous at best.

Nonetheless, Defendants' primary argument is that *Hibbs'* rule – that the TIA does not apply where the relief sought *would not* reduce the flow of taxes to the state/municipality – applies only in the context of a third-party challenge to a tax credit.  *See* Def. Br. at 13-14 (citing in *Dillon v. Mississippi*, 376 Fed. App'x 421 (5th Cir. 2010)).  Defendants' argument falls flat, however, because the Second Circuit has already expressly rejected an identical attempt to cabin *Hibb*'s holding to the specific facts of that case.  *See Luessenhop*, 466 F.3d at 267-68.

Specifically, in *Lussenhop*, the Second Circuit noted that the appeal at bar, unlike *Hibbs*, did not involve a third-party challenge to a tax credit: "Indeed, other than the commonality of the ubiquitous section 1983, *the instant appeal could not be more divergent* from the question presented in *Hibbs*."  466 F.3d at 267 (emphasis added).  Nonetheless, the Second Circuit held that "it does not follow that these differences counsel against following *Hibbs*' discussion of congressional intent," which is "controlling . . . *notwithstanding the significant distinguishing characteristics of the two cases*."  *Id.* (emphasis added).  In so ruling, the Second Circuit made clear that "the Supreme Court's discussion of the proper interpretation of [the TIA] in *Hibbs*

14

*transcends that individual case.*"  *Id.* at 268 (emphasis added).  As such, the TIA is inapplicable *whenever* the plaintiff's claims do "not raise the specter of federal courts reducing the flow of money into state coffers."  *Id.*  So too here, the TIA does not bar Plaintiffs' action – regardless of whether Plaintiffs are asserting a third-party challenge to a tax credit – because it would not reduce the flow of tax revenues.[8]

Defendants also cite a number of cases involving the FHA, section 1983, or other constitutional challenges, that were dismissed under the TIA.  *See* Def. Br. at 14-16.  But those cases are wholly uncontroversial and wholly irrelevant: many of them predate *Hibbs*, and none of them expressly addressed the situation in which the equitable relief at issue would *not* reduce the amount of taxes the state or municipality collected.  Thus, for example, Defendants rely heavily on the pre-*Hibbs* decision, *United States v. County of Nassau, N.Y.*, 79 F. Supp. 2d 190, 195 (E.D.N.Y. 2000), which they assert is factually analogous to the instant action.  *See* Def. Br. at 11-12.  But that case did not contain any discussion or analysis of whether the relief that the United States sought would impair the defendant's collection of tax revenues.  Instead, operating under the pre-*Hibb*'s framework, the district court (i) assumed that the TIA applied, and (ii) focused solely on whether certain limited statutory exceptions to the TIA when the United States is the plaintiff were satisfied.  *See* 79 F. Supp. 2d at 196-97.

Defendants also stretch the Second Circuit's holding in *Bernard*, broadly arguing that the TIA precludes federal court jurisdiction over any "action challenging the constitutionality, legality

---

[8] More recently, in *Ferguson v. Comm'r of Tax & Fin.,* the Second Circuit reiterated that *Hibbs* is not limited to third-party challenges where the plaintiff's *own* tax liability is not at issue.  *See* 739 Fed. App'x 19, 20-21 (2d Cir. 2018).  There, the plaintiff "asserted that *he was harmed* because he . . . did not receive a [certain] tax credit" despite engaging in economic activity similar to the kind of activity that qualifies for the credit.  *Id.* at 20 (emphasis added).  As a result, the plaintiff "sought to enjoin enforcement" of the credit. *Id.*  The Court ruled that the TIA did not prohibit the plaintiffs' action because the relief he sought would not diminish tax revenues.  *Id.* at 21.

or propriety of an assessment or tax collection." Def. Br. at 12-13. But *Bernard* was not decided under the TIA. Because the plaintiff in *Bernard* asserted claims for only monetary damages, *see* 30 F.3d at 296-97, the Second Circuit agreed with the plaintiff that the TIA did not preclude his action. *See id.* at 297 ("[Plaintiff] correctly asserts that the Tax Injunction Act does *not* bar his claims . . . ."). Rather, the plaintiffs' damages claims were dismissed under the principle of comity, which, as explained below in Point III.B, does not counsel in favor of abstention here.

In any event, the *Bernard* Court's *dicta* – that an action seeking "a federal-court ruling on [the constitutionality] of a local tax matter [is] precisely the type of suit the [TIA] was designed to limit," *id.* – cannot survive *Hibbs*. Indeed, in *Hibbs*, the Supreme Court held that the TIA did not bar the plaintiffs' action, despite the fact that they "brought an action in federal court challenging" the tax policy at issue as unconstitutional under the Establishment Clause and "seeking to enjoin its operation." 542 U.S. at 93. As such, the mere fact that an action asks a district court to pass on the constitutionality of a local tax matter does not require dismissal under the TIA.

Finally, Defendants seek to avoid *Hibbs* on the ground that, because Plaintiffs seek monetary damages in connection with *past* overpayments as a result of Defendants' racially discriminatory practices, Plaintiffs' action would reduce the taxes *currently* flowing to Nassau County. *See* Def. Br. at 22. As an initial matter, Defendants do not explain how Plaintiffs' claims *for monetary damages*, which are outside of the TIA's ambit, *see supra* Point II.B, can somehow render Plaintiffs' claims *for prospective equitable relief*, which Defendants *do not* contend would reduce tax revenues, violative of the TIA. *See* Def. Br. at 22 (arguing only that damages claims would purportedly reduce tax revenues). In any event, the Court need not attempt to square that circle because Defendants' argument is contrary to the facts and the law.

On the facts, Defendants simply assume that a damages award would result in an "*effective net decrease*" in Nassau County's tax haul pursuant to the "County Guarantee."  Def. Br. at 22 (emphasis added).[9]  This argument is meritless.

As an initial matter, if a "refund" would deplete Nassau County's coffers due to the "County Guaranty" as Defendants contend, then the County's grievance and settlement procedures during the Class Period similarly should have depleted the flow of taxes to Nassau County.  But Defendants do not make this argument.  *See id.*

In any event, regardless of whether Nassau County's subdivisions would contribute to tax refunds as a result of the County Guaranty, a damages award would not reduce Nassau County's incoming tax revenues because Nassau County predetermines its overall property tax levy based on its current budgetary needs.  (¶¶ 2, 70, 181-82, 189).  As such, any future judgment awarding damages would simply be factored into the budget at that time and, in turn, be offset by raising the total amount of property taxes to account for a damages award, over and above what Nassau County and its subdivisions need to fund their operations.

On the law, Defendants' argument proves too much.  As the Court recognized at the pre-motion conference, almost *any* award of damages against a governmental defendant – regardless of the nature of the action – will result in an outflow of tax revenues to satisfy a judgement because governments are generally funded through taxation.  *See* McNeela Decl., Ex. 2 at 19:10-18 (questioning why a damages award would impermissibly impact a "taxation scheme" and noting

---

[9] According to Defendants, Nassau County retains only a fraction of the property taxes it collects, because it distributes a portion of those revenues to various of its subdivisions.  *See id.* at 4.  Despite this arrangement, the "County Guaranty" purportedly requires that Nassau County alone pay any tax refunds. *See id.*  Thus, Defendants contend that a "refund" for past overpayments would decrease Nassau County's tax revenues because Nassau County would not receive any contribution from its subdivisions.  *See id.*

that "[a]ny time a county has to come up with money from its budget to pay damages in any case, it has an impact on its budget").

Moreover, Defendants' argument cannot possibly be correct because it would have meant that the plaintiffs' damages claims in *LILCO* and *Bernard* were barred under the TIA – as they too would have been paid with tax revenues – yet the Second Circuit expressly held that it was the doctrine of comity, *not the TIA*, that determined whether the claims were properly in district court. *See Bernard*, 30 F.3d at 297-98; *see also LILCO*, 889 F.2d at 431.  Consequently, even if Plaintiffs' *damages* claims would negatively impact Nassau County's tax revenues, which they would not, the TIA is no impediment to this Court's jurisdiction because: (i) the TIA does not apply to damages claims; and (ii) Plaintiffs' claims for prospective equitable relief would not reduce the flow of taxes to Nassau County.

## 2. New York State Does Not Provide a Plain, Speedy, and Efficient Remedy

The TIA is also inapplicable for the independent reason that New York does not provide a plain, speedy, and efficient remedy because those courts cannot grant the relief necessary to remedy the wrongs at issue in this action.

Specifically, in order to address Defendants' misconduct and award both the monetary and equitable relief sought, a court will be required to address Nassau County's property taxation scheme across all members of the class, as well as all non-class members.  This is necessary because, as Defendants admit, any reduction in the amount of taxes paid by a given homeowner *increases the burden paid by all other homeowners*.  *See* Def. Br. at 8.  Under such circumstances, if homeowners are required to challenge their assessments individually and in piecemeal fashion, they will never be able to receive an adequate remedy because any reduction a grieving homeowner receives is literally passed on to everyone else as a tax increase, including the very next grieving

homeowner awaiting his or her day in court. *Id.* Moreover, because Nassau County's over-taxation of the Class was due to its under-taxation of the non-class members (i.e., the wealthy, white homeowners), the only way to apportion Nassau County's predetermined tax levy and award damages in a nondiscriminatory manner is to assess the Class members' tax burden collectively *vis-à-vis* all non-class members. For this reason, the ability to proceed as a class is imperative.

But class relief *is not* available in any of the state court proceedings that Defendants contend are adequate. *See* Def. Br. at 17-19. Defendants argue that Plaintiffs can challenge their assessments in a small claims proceeding pursuant to RPTL § 730. *See id.* But those proceedings cannot possibly provide the necessary class-wide relief because they expressly provide that "[n]o petition for small claims assessment review shall relate to *more than parcel of real property.*" RPTL § 730(5) (emphasis added).

Defendants also claim that Plaintiffs can obtain adequate relief via tax *certiorari* actions under RPTL Articles 5 and 7, or via an Article 78 action. *See* Def. Br. at 17-19. But those proceedings are limited by the so-called "governmental operations rule," which holds that class action status is inappropriate for challenges to government operations because "the doctrine of stare decisis would render the determination of an action binding on the governmental body and would automatically benefit all persons sought to be represented in the class." *LaCarruba v. Legislature of Cty. of Suffolk*, 225 A.D.2d 671, 672 (2d Dept. 1996).[10]

---

[10] *See also Conklin v. Town of Southampton*, 141 A.D.2d 596, 597-98 (2d Dep't 1988) ("class action certification was inappropriate . . . where governmental actions are involved" and noting that "nonprotesting taxpayers may not enhance their refund claims through the use of a class action"); *Incorporated Vill. of Southampton v. Noa*, 824 N.Y.S.2d 754, 2006 N.Y. Slip Op. 51755(U), at *1 (N.Y. Sup. Ct., Suffolk Cty. 2006) ("Generally, class actions are not favored as a vehicle for relief in real property tax certiorari proceedings unless unusual circumstances are present."); *Conrad v. Hackett*, 584 N.Y.S.2d 241, 241 (3d Dept. 1992) (applying government operations rule to Article 78 action); *Coller v. State Univ. of N.Y.*, 439 N.Y.S.2d 474, 475 (3d Dep't 1981) (government operations rule especially appropriate in Article 78 proceedings).

Moreover, even if it is possible that a state court would conclude that the government operations rule is inapplicable to Plaintiffs' claims and would permit class action status, the fact that such relief is uncertain is sufficient to render the state forum inadequate under the TIA.  *See Franchise Tax Bd. of Cal. v. Alcan Aluminium Ltd.*, 493 U.S. 331, 340 (1990) ("[A] remedy that is uncertain or speculative is not adequate to bar federal jurisdiction[.]"); *Entergy Nuclear Vt. Yankee, LLC v. Shumlin*, 737 F.3d 228, 234 (2d Cir. 2013) ("The condition that lifts the bar to federal jurisdiction is 'uncertainty' that the remedy offers the opportunity to seek adequate relief."); *Friarton Estates Corp. v. City of New York*, 525 F. Supp. 1250, 1259 (S.D.N.Y. 1981) ("When the existence or adequacy of a state remedy is doubtful or uncertain, the state remedy is not plain, speedy or efficient, and the bar of the Act is lifted."), *rev'd on other grounds*, 681 F.2d 150 (2d Cir. 1982).[11]

New York courts are further inadequate because there is a substantial risk that they would preclude Plaintiffs from introducing the evidence necessary to establish the full extent to which their properties were improperly assessed.  Specifically, New York courts typically limit evidence of comparable properties to those in the petitioner's "immediate vicinity," with the ultimate decision to deviate from that rule left to the reviewing court's discretion.  *See Great Atl. & Pac. Tea Co. v. Kiernan*, 366 N.E.2d 808, 812 (N.Y. 1977).  Here, Plaintiffs cannot possibly obtain full relief if the benchmark for assessment purposes is limited to other properties in their "immediate

---

[11] It should be noted that even if class action status were not required to afford Plaintiffs full relief (which it is), there risk that Plaintiffs and the Class would have to proceed in a multitude of individual actions in state court, in and of itself renders that forum inadequate.  *See Nat'l Private Truck Council, Inc. v. Oklahoma Tax Comm'n*, 515 U.S. 582, 591 n.6 (1995) ("[Under t]he multiplicity-of-suits rationale for permitting equitable relief [in federal court] . . . , if a state court awards a refund to a taxpayer on the ground that the tax violates the Federal Constitution, but state tax authorities continue to impose the unconstitutional tax, injunctive and declaratory relief might then be appropriate. In such circumstances, the remedy might be thought to be 'inadequate.'"); *Matthews v. Rodgers*, 284 U.S. 521, 529 (1932) (recognizing that rationale).

vicinity" because those properties too have been over-assessed due to the Defendants' racially discriminatory practices.  (¶¶ 7-8, 35-36, 69-71, 73-74, 88, 90, 109-35, 139).  Indeed, such a limitation would literally *perpetuate* the very harm that this action seeks to remedy.  Rather, it is imperative that Plaintiffs also be permitted to present evidence on the undervaluation of properties in the non-Class members' wealthier, white neighborhoods, which are *outside* of Plaintiffs immediate vicinities.  While this risk exists even in the highly unlikely event that Plaintiffs would be permitted to proceed as a class in state court, that risk would greatly increase in the event that Plaintiffs were required to proceed individually in numerous state court proceedings since it would be within the discretion of each individual judge hearing those cases to determine whether to deviate from the general rule.

Against this backdrop, none of the cases that Defendants cite – which concern individual tax challenges that did not require consideration of the assessments levied against all other homeowners on a program-wide basis – speak to the adequacy of the state forum given the unique facts of this case.  *See* Def. Br. at 17-19.  In this connection, Defendants' contention that the *Coleman* consent order establishes the adequacy of state remedies completely misses the mark.  *Coleman* did not include any claims for monetary damages.  *See Coleman*, 687 N.Y.S.2d at 242.  And, as noted above, class-wide consideration of Nassau County's taxation scheme is necessary to properly compensate Plaintiffs and the Class, yet the availability of such procedures in state court is dubious at best.

Accordingly, because New York does not provide a plain, speedy, and effective remedy, the TIA is also inapplicable on this basis.

## III.   PRINCIPLES OF COMITY DO NOT PRECLUDE PLAINTIFFS' DAMAGES CLAIMS

### A.   Overview of the Comity Doctrine

The doctrine of federal-state comity seeks to limit federal court interference in quintessentially state functions and is animated largely by principals of federalism. *See Levin*, 560 U.S. at 421 (citing *McNary*, 454 U.S. at 112) (holding that comity stems from "a proper respect for state functions"). Comity is a prudential doctrine rather than a jurisdictional bar: "The comity doctrine counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction" that concern "state functions." *Levin*, 560 U.S. at 421; *Direct Mktg. Ass'n*, 135 S. Ct. at 1134 ("[T]he comity doctrine is nonjurisdictional.").

One state function over which federal courts have generally declined to exercise jurisdiction, depending on the circumstances, is taxation. In *Levin*, the Supreme Court identified the following factors as supporting an exercise of comity: (i) the challenged law concerns "'commercial matters over which' the state 'enjoys wide regulatory latitude'"; (ii) the action does not implicate "'any fundamental right or classification' to which heightened scrutiny applies"; (iii) the state courts are "'better positioned than their federal counterparts to correct any violation'"; and (iv) more than "one potential remedy could adequately address the alleged constitutional defect." *Z & R Cab, LLC v. Phila. Parking Auth.*, 616 Fed. App'x 527, 531 n.8 (3d Cir. 2015) (quoting *Levin*, 560 U.S. at 431-32). "The [*Levin*] Court held that while individually any one of these considerations might not compel dismissal, 'in combination' they require it." *Coors Brewing Co. v. Mendez-Torres*, 678 F.3d 15, 24 (1st Cir. 2012) (quoting *Levin*, 560 U.S. at 432).

However, even where the *Levin* factors collectively favor invoking comity, a district court may not dismiss an action on such grounds unless the state courts provide relief that is "plain, adequate and complete." *Mendez-Torres*, 678 F.3d at 24 (quoting *McNary*, 454 U.S. at 108-09).

### B.       Plaintiffs' Claims Are Not Precluded by Comity

Defendant argues that this Court "lacks subject matter jurisdiction over this action pursuant to the principles of judicial comity." Def. Br. at 23.  Putting aside that comity has nothing to do with the Court's subject matter jurisdiction, *see supra* Point III.A, an examination of the *Levin* factors readily demonstrates that comity is inappropriate here.

*First,* and most critically, dismissal on comity grounds is inappropriate because this case involves suspect classifications subject to "heightened scrutiny," which "*counsel[s] in favor of federal court adjudication despite the general rule of comity*."  *See Joseph v. Hyman*, 659 F.3d 215, 219 (2d Cir. 2011) (emphasis added) (discussing *Levin* and *Hibbs*); *see also Levin*, 560 U.S. at 431-32 (holding that comity was properly invoked because, *inter alia*, the tax scheme *did not* implicate "heightened judicial scrutiny," and explaining that comity was inappropriate in *Hibbs* because the tax implicated a fundamental right).

Specifically, Plaintiffs assert that the Defendants – in crafting Nassau County's residential property tax scheme and related policies – intentionally discriminated against them on the basis of their race.  (¶¶ 3-7, 144-70).  The goal and result of Defendants' policies were to shift a disproportionate share of Nassau County taxpayers' overall tax burden from affluent white homeowners to lower-income, minority homeowners.  (¶¶ *Id.*).

Under such circumstances, the "proper respect for state functions" that animates comity, *Levin*, 560 U.S. at 421, is trumped by the federal government's and judiciary's strong interest in addressing state functions that advance invidious discrimination, *see Joseph*, 659 F.3d at 219; *see also Levin*, 560 U.S. at 431-32 (holding that comity prevents undue interference in the "*legitimate activities* of the State" and may be invoked where "the[] suit *does not* involve any fundamental right or classification that attracts heightened judicial scrutiny") (emphasis added internal

quotation marks omitted); *Lynch by Lynch v. Alabama*, No. 08-S-450-NE, 2011 WL 13186739, at *57 (N.D. Ala. Nov. 7, 2011) ("[When] plaintiffs have asserted claims for discrimination based on race, . . . [w]eighing the vital constitutional issues at stake . . . *is a task the federal courts are uniquely qualified to perform.*") (emphasis added), *aff'd in part and vac. in part on other grounds sub nom.*, *I.L. v. Alabama*, 739 F.3d 1273 (11th Cir. 2014).

Thus, in *Lynch v. Alabama*, the district court concluded that comity did not bar a challenge to Alabama's property tax scheme, primarily because "plaintiffs have asserted claims for discrimination based on race, a suspect class that triggers heightened constitutional review." 2011 WL 13186739, at *57. In so ruling, the district court stressed that federal judiciary's already-strong interest in remedying racial discrimination was especially compelling when the challenged practices were longstanding. *See id.* So too here, Nassau County's racially discriminatory practices *have persisted for decades* despite prior remedial efforts in New York state courts, which weighs heavily against dismissing this case on comity grounds. (¶¶ 3-5, 35, 145-59).

*Second*, and relatedly, comity is inappropriate because this case does not concern "*commercial matters* over which [the states] enjoy[] wide regulatory latitude." *Levin*, 560 U.S. at 431 (emphasis added); *see also Joseph*, 659 F.3d at 219 ("*Levin* explained that '[c]omity's constraint has particular force when lower federal courts are asked to pass on the constitutionality of state taxation *of commercial activity*.'") (quoting *Levin*, 560 U.S. at 421) (emphasis added) (bracketing by *Joseph*). Rather, this case concerns discriminatory taxation of residential property.

This distinction is particularly meaningful here. Generally, the federal government and courts do not have a pressing interest in a state's regulation of local commercial matters, and comity serves the salutary purpose of preventing local businesses from using the federal courts in

a bid to gain a competitive advantage via tax challenges.[12]  Conversely, the federal government and courts have long been concerned with rooting out and addressing housing-related discrimination, as exemplified by Congresses' enactment, and the courts' enforcement, of the Fair Housing Act and related civil rights statutes.

*Third*, comity is inappropriate here because the state courts are not in a better position than this Court to remedy Defendants' violations.  This factor is primarily concerned with the situation where a federal court's ability to fashion equitable remedies would be constrained by the TIA, unlike the state courts.[13]  Here, Defendants raise comity only in response to Plaintiffs' claims for monetary damages, *see* Def. Br. at 23-25.  Thus, the TIA's potential limitation on the Court's ability to fashion equitable relief is irrelevant.  But even if Defendants had raised comity as a basis for dismissing Plaintiffs' claims for equitable relief, the TIA would still not constrain the Court's options because Plaintiffs do not seek to limit the amount of taxes that Nassau County can raise. *See supra* Point II.C.1; *cf. Joseph*, 659 F.3d at 215 ("[B]ecause the TIA prevents federal courts *from eliminating a source of tax revenue*, federal courts are limited in the remedies they may grant when deciding a challenge to a state taxation scheme [that would have that effect].") (emphasis added).

---

[12] *See Levin*, 560 U.S. at 431 (comity precluded businesses' challenge to local regulation "to improve their competitive position"); *Mendez-Torres*, 678 F.3d at 24 (invoking comity where plaintiff "is explicitly seeking to improve its competitive position" and has "framed its arguments around the competitive advantage that the tax differential bestows").

[13] *See Levin*, 560 U.S. at 431-432 ("[T]he Ohio courts are better positioned than their federal counterparts to correct any violation . . . because the TIA does not constrain their remedial options."); *Mendez-Torres*, 678 F.3d at 24 (holding that issue of whether TIA would constrain a federal court's remedial options is relevant to determination of whether state courts are better positioned to fashion a suitable remedy); *Clackamas County v. Airbnb, Inc.*, No. 17 Civ. 1611, 2018 WL 3689900, at *2 (D. Or. Aug. 3, 2018) (citing *Levin* for the proposition "that cases need not be remanded if 'state courts would have no greater leeway than federal courts to cure the alleged violation'").

*Fourth*, there is not more than one potential remedy that could adequately address the alleged constitutional defect. *Levin*, 560 U.S. at 431. While it might be possible to imagine potential variations at the margins, in the instant scenario, there is only one satisfactory remedy: monetary damages for Plaintiffs' past over-taxation and an injunction reinstating the *Coleman* policies. For this reason, it is unsurprising that Defendants do not contend that there are multiple, substantively different measures available to Nassau County to redress Plaintiffs' claims and therefore, have waived that argument. *See* Def. Br. at 23-25.

*Finally*, none of the cases that Defendants' cite support invoking comity here because they involved fundamentally different challenges. *See id.* Indeed, none of the cases concerned the claim that a tax was intentionally applied to disadvantage a suspect class, thereby giving rise to heightened scrutiny. *See id.*[14] In fact, certain of the cases on which Defendants rely do not even involve comity or monetary damages. *See, e.g.*, Def. Br. at 25 (citing *County of Nassau*, 79 F. Supp. 2d at 193) (holding that federal government, which sought certain injunctive relief, did not satisfy exemptions to TIA permitting government to challenge state taxes in certain situations)).

At bottom, Defendants' comity argument is perverse. Defendants ask this Court to refrain from hearing this matter out of *respect* for Nassau County's property tax scheme, which has a long, sordid and well-documented history of not just *disrespecting*, but outright discriminating against, Nassau County's most vulnerable citizens. Because comity is a prudential and not a jurisdictional

---

[14] *See, e.g.*, *Levin*, 560 U.S. at 434-35 (addressing challenge by marketers of natural gas to state tax exemptions offered to competing local distribution companies); *McNary*, 454 U.S. at 181 (concerning an association's challenge to property tax practices that were not claimed to be racially discriminatory); *Bernard*, 30 F.3d at 294-95 (concerning an individual's challenge to decision denying him two separate tax designations for property that straddled two lots); *Nat'l Private Truck Council*, 515 U.S. at 590-91 (addressing claim that § 1983 authorizes *state courts* to enjoin state taxes levied against motor carriers from certain other states, even if there is an adequate remedy at law).

consideration, and because the *Levin* factors weigh heavily against Defendants, the Court respectfully should not dismiss this action on the basis of comity.

### C.     Dismissal on Comity Grounds Is Also Improper Because New York Would Not Provide Plain, Adequate, and Complete Relief

As previously noted, a district court may not properly invoke comity as a basis for dismissal unless the state forum provides relief that is "plain, adequate, and complete." *See McNary*, 454 U.S. at 127.  According to the Supreme Court, that standard is substantively indistinguishable from the TIA's "plain, speedy and efficient" requirement.  *See id.* at 123 n.8.  As such, comity is inappropriate because New York State does not afford "plain, adequate and complete" remedy for the same reasons stated above in Point II.C.2.

## IV.    PLAINTIFFS HAVE STANDING TO ASSERT ALL CLAIMS

### A.     The Law Regarding Standing on Motions to Dismiss

"[A]t the pleading stage, standing allegations need not be crafted with precise detail, *nor must the plaintiff prove* his allegations of injury."  *Disability Rights N.Y. v. New York State*, No. 17 Civ. 6965, 2019 WL 2497907, at \*3 (E.D.N.Y. June 14, 2019) ("*DRNY*") (emphasis added).  Where a plaintiff seeks "to vindicate a statutorily created private right," he or she "need not allege actual harm beyond the invasion of that private right."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1553 (2016).

As for prospective injunctive relief, it is well-established that a plaintiff will have Article III standing where "there is a substantial risk that the harm will occur" again in the future.  *Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (internal quotations marks omitted).  "[A]llegations of ongoing harm satisfy" this requirement.  *See Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 153 (D. Mass. 2011) (citing *County of Riverside v. McLaughlin*, 500 U.S. 44, 51 (1991)).

**B.      Plaintiffs' Allegations Establish Standing**

Defendants contend that Plaintiffs lack standing to assert any of their claims because they: (i) did not suffer an actual injury because they "grieved their assessments and received reductions and refunds," Def. Br. at 25-26; and (ii) at most, alleged abstract injuries suffered by other class members that were not personal them, *see id.* at 28-32.   As discussed below, Defendants' arguments are meritless and easily rejected.

**1.      Plaintiffs Alleged an Injury in Fact Notwithstanding that Some of Them Received Assessment Reductions or Refunds in Certain Years**

The Complaint alleges that, during the Class Period, Plaintiffs were injured by Defendants' racially discriminatory practices, which systematically over-assessed and over-taxed minority homeowners.  (¶¶ 1, 67-108).  That should be the beginning and end of the standing analysis. *Cf.* McNeela Decl., Ex. 2 at 32:14-20 (Court to Defendants: "I didn't think that your standing argument was persuasive. . . . Please don't spend forever on standing.").   Nonetheless, Defendants assert, *without citation to any authority*, that "Plaintiffs cannot [] be injured by the County's assessment and grievance process because each of them successfully used th[at] very process . . . to obtain reductions to their own property assessments."  Def. Br. at 25.

As an initial matter, Defendants' argument is nonsensical.  Defendants acknowledge that a plaintiff can seek judicial review of their assessment (including any allegedly insufficient reduction obtained via the grievance procedure). *See* Def. Br. at 5-7, 9-10.  Such judicial review would not be possible if a homeowner's participation in the grievance process vitiated standing.

In any event, Defendants' argument is based on the *false* assumption that the grievance process provided the Plaintiffs with complete relief. *First*, Defendants concede that at least one of the Plaintiffs, Mr. Hall, did not receive any reductions during the years that "the County discriminated against minority census tract Property Owners," and therefore, his injuries remain

wholly unabated.  Def. Br. at 26.  *Second*, the two Plaintiffs that utilized the grievance procedure did so only for certain years during the Class Period, so for the remaining years, their injuries too remain wholly unabated.  *See id.*  *Third*, the fact that two of Plaintiffs received "reductions and refunds" for certain years means only that their injuries have been lessened, not eliminated. Notably, with respect to the last point, the Complaint makes clear that the Freeze and Settlement policies *exacerbated* the problems that existed prior to the implementation of the *Coleman* consent order.  (¶¶ 75-77, 91).[15]

Finally, it is worth noting that Defendants' reliance on Nassau County's grievance process and Settlement Policy to argue that Plaintiffs have not suffered an actual injury strains credulity, considering that Defendants have described those same processes as indefensible and requiring corrective action.  (¶¶ 11, 171, 174, 177).

### 2.     Plaintiffs Alleged that They Personally Were Injured

Defendants also argue that even if some Class Members might have been injured, Plaintiffs have failed to specifically allege that they individually were injured by Defendants policies and therefore, lack standing.  *See*, *e.g.*, Def. Br. at 27 ("Plaintiffs . . . refer only to the harm allegedly caused to the putative class.").  Defendants' argument is meritless and should be rejected.

*First*, the Complaint does allege that "Plaintiffs" were directly injured by Defendants' policies.  (¶ 143 ("Defendants caused '[a] broad perversion of the entire process' that 'result[ed in a] deterioration of the tax base [of $37 billion] and [an] imposition on [Plaintiffs] of a hugely disproportionate share of municipal expenses' that now exceeds $1.7 billion."), ¶ 218 ("The County adopted these practices intentionally and with reckless disregard for the discriminatory

---

[15] For this reason, Defendants' argument that Plaintiffs lack standing because they are "no worse off" and "actually *benefitted* from the challenged action," Def. Br. at 30-31 (emphasis in original), badly misses the mark.

injuries that they would cause to Plaintiffs[.]"), ¶ 240 (same), ¶ 219 ("violating the rights of Plaintiffs")).

*Second*, because Defendants have admitted that any "reduction of assessment" shifts the burden "to *every* other Property Owner," Def. Br. at 8 (emphasis added), this means that Nassau County's systematic underassessment of properties in wealthy white neighborhoods necessarily injured property owners in minority census tracts, including Plaintiffs.

*Third*, the fact that Plaintiffs received *some* compensation via the grievance process *proves* that they had been over-assessed and that they had been individually injured.[16]

*Fourth*, the Complaint explains, in great detail, the mechanics of Defendants' discriminatory policies and how they injured not just some *but all members* of the Class, including Plaintiffs.  (¶¶ 7-10, 67-77, 87-143); *see also Patrick*, 771 F. Supp. 2d at 152 (citing *Lewis*, 518 U.S. at 357) ("Plaintiffs need not prove with specificity at this stage how every harm suffered by every [] Plaintiff relates to a particular defect in the system.").[17]

*Finally*, Plaintiffs have standing to seek prospective injunctive relief because Defendants' misconduct is ongoing (¶¶ 3, 14, 96), and there is "substantial risk that the harm will [continue to] occur." *Donziger*, 833 F.3d at 121 (citation omitted).  Specifically, after the Complaint was filed, the New York legislature passed a bill proposed by Nassau County, which permits the County to give tax credits to the same homeowners who have benefited from a near-decade of underassessments, in order to "phase in" the tax increases.  *See* S. 1505-C, 242nd Leg., 2019 Sess.

---

[16] As noted above, *see supra* Point IV.B.1, the reduction and/or refunds that Plaintiffs received for certain of the years during the Class Period did not provide them with complete relief.

[17] Defendants' related contention that "[Plaintiffs] do not claim that they paid more in property taxes than other Nassau County Property Owners with similar properties," Def. Br. at 26, willfully ignores the Complaint's allegations. (*See, e.g.*, ¶ 175 ("The Anti-*Coleman* Policies [] caused different assessment ratios to be applied to similarly valued properties[.]"), ¶ 269 ("[P]roperties  .  .  .  with similar values have disparate assessments and tax burdens[.]")).

(N.Y. 2019), Part J (codifying RPTL § 485-u); (¶¶ 11 & n.3, 177).[18]  The credits decrease annually to zero after five years, at which point, homeowners would *finally* be accurately assessed and taxed.  In other words, the County seeks to perpetuate the "[in]defensible" tax distribution for five more years.  (¶ 171).  In addition, the County's history of recidivism – such as its decision to terminate the *Coleman* policies in 2010 – similarly creates a substantial risk that Defendants will again institute racially discriminatory tax policies when politically expedient.  (¶¶ 3-6, 176-78).

In sum, Plaintiffs have alleged that they personally suffered concrete injuries traceable directly to Defendants' racially discriminatory policies sufficient to confer standing.

## V.   THE COMPLAINT ADEQUATELY PLEADS ALL CLAIMS

### A.   Plaintiffs Stated Fair Housing Act Violations

Defendants *do not* argue that Plaintiffs failed to plead any of the elements of their FHA claims.  *See* Def Br. at 33-34.  Nor could they: Plaintiffs' theories of liability fit squarely within the FHA's ambit.  (¶¶ 32-34, 62).  In fact, *Coleman* held that virtually identical allegations stated cognizable FHA violations.  *See* 687 N.Y.S.2d at 250 (denying motion to dismiss FHA claims based on racially disparate impacts of Defendants' Freeze and Settlement Policy).[19]

Instead, Defendants conclude that "the FHA does not encompass challenges to state and local tax structures" simply because: (i) there are no *federal* court cases that are *exactly* on point; and (ii) the three FHA provisions that Plaintiffs allege Defendants violated do not *expressly* "reference the levying, enforcement, or collection of a tax on real property."  Def. Br. at 33-34.  Defendants' arguments are meritless.

---

[18] In addition, the County admits in its own press release, "The five-year phase[-]in was created at the urging of County Executive Laura Curran, to slowly phase in any new assessment tax increases caused by the recent reassessment in Nassau County."  McNeela Decl., Ex. 4, at 1.

[19] Moreover, Nassau County itself admitted in a 2016 Report that the "High Property Tax Burden" was among the "fair housing impediments" in Nassau County.  McNeela Decl., Ex. 3, at 83, 1.

As to the first point, Defendants concede that there *is not a single federal case* holding that the FHA is inapplicable to discriminatory tax policies that impact housing.  *See id.* at 33. Moreover, Defendants ignore analogous cases, such as the Supreme Court's seminal decision in *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmties. Project, Inc.*, 135 S. Ct. 2507, 2524 (2015), which recognized disparate-impact claims under the FHA *in the context of challenges to low-income housing tax credits*.  In any event, Defendants limit their gaze to federal cases because several state cases, in addition to *Coleman*, have held that the FHA applies to similar property tax policies.  *See, e.g.*, *Tax Equity Now NY LLC v. City of New York*, No. 153759/2017, 2018 WL 4599923, at *8 (N.Y. Sup. Ct., N.Y. Cty. Sept. 25, 2018) ("[S]o too should this court allow [the] FHA claim against the City's property-tax-assessment system move forward."); *Brighton Park Neighborhood Council v. Berrios*, No. 17 CH 16453, 2019 WL 4178606, at *8 (Ill. Cir. Ct. Feb. 7, 2019) ("[T]hey have stated a cause of action under Section 3604(a) [regarding property assessments] to withstand [the] motion to dismiss.").

As to the second point, Defendants' "magic words" argument is not supported by any caselaw, and instead relies on "congressional silence," which "lacks persuasive significance." *Brown v. Gardner*, 513 U.S. 115, 121 (1994).  Moreover, Defendants' manufactured requirement that the FHA expressly state that it applies to the instant context would contradict the FHA's "broad and inclusive" remedial purpose.[20]

---

[20] *Metropolitan Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006, 1011 (7th Cir. 1980) (adding that the FHA "is subject to 'generous construction'"); *see also Coleman*, 687 N.Y.S.2d at 234-36 (collecting cases broadly applying the FHA to claims of exclusionary zoning, lack of reasonable accommodations for the handicapped, and redlining).

**B.      Plaintiffs Have Pled Equal Protection Violations**

In arguing that Plaintiffs have failed to state an Equal Protection violation, Defendants literally ignore the allegations that Nassau County intentionally applied racially discriminatory policies, which is subject to strict scrutiny.  *See* Def. Br. at 34-36; (*see also* ¶¶ 35-36, 144-70); *see also Jana-Rock Constr., Inc. v. New York State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) (applying strict scrutiny to an equal protection claim if the plaintiff "allege[s] that a government actor intentionally discriminated against him or her on the basis of race").  For this reason, Defendants' argument that Nassau County's tax policies should be upheld under the rational basis standard of review fails to make contact with the Complaint.  *See* Def. Br. at 34-36. Indeed, not only do the cases that Defendants cite not concern racial discrimination[21] but they also make clear that their holdings are inapplicable where the policies differentiate "on the basis of a suspect class."  *Trump*, 65 N.Y.2d at 25; *Foss*, 65 N.Y.2d at 257 (stating that tax classification will be upheld if it is reasonable, uniformly applied within the class, and "not invidious"); *Chasalow*, 609 N.Y.S.2d at 29 ("[I]f a classification between taxpayers is palpably arbitrary or involves an invidious discrimination, an equal protection violation will be found.").[22]

Applying the correct framework, it is clear that Plaintiffs have stated an equal protection violation.  Specifically, "[a] law which is facially neutral violates equal protection if it is applied

---

[21] *See Trump v. Chu*, 65 N.Y.2d 20, 24 (1985) (challenging classifications between (i) "transferors who sell their real property for one million dollars or more and those who sell property for less than one million dollars," (ii) developers of condominiums versus developers of subdivide residential plots, and (iii) transferors of real property versus transferors of other property); *Foss v. City of Rochester*, 65 N.Y.2d 247, 251 (1985) (challenging classification based on whether property was homestead); *Chasalow v. Bd. of Assessors of Cty. of Nassau*, 609 N.Y.S.2d 27, 28-29 (2d Dept. 1994) (concerning alleged equal protection violation on ground that there was too much variation in assessment values for similar properties *vis-à-vis* aspirational standards set by the New York State Board of Equalization and Assessment).

[22] Additionally, Plaintiffs have stated an equal protection violation on the *alternative* ground that the gross disparities in taxation at issue in this case are based on palpably arbitrary classifications.  (¶¶ 109-43 (concerning gross disparities); ¶¶ 266, 309, 311 (palpably arbitrary classifications)).  First, reductions that are essentially granted automatically based solely on the filing of a grievance, rather than requisite standard

in a discriminatory fashion" or "if it was motivated by discriminatory animus and its application results in a discriminatory effect." *Jana-Rock Const., Inc.*, 438 F.3d at 204. Plaintiffs challenging a facially neutral law on such grounds bear the burden of making out a "*prima facie* case of discriminatory purpose." *Id.* When that showing is made, the burden flips to Defendants to "satisfy strict scrutiny": that the racial classification is "narrowly tailored to accomplish" "a compelling state interest." *Pyke v. Cuomo*, 567 F.3d 74, 77 (2d Cir. 2009).

Because Plaintiffs have adequately pled discriminatory intent, *see supra* Part V.B, and because Defendants have not even attempted to argue that their policies satisfy strict scrutiny, Defendants' motion to dismiss Plaintiffs' equal protection claims must be denied.

## C.   Plaintiffs Have Pled Procedural Due Process Violations

Defendants are incorrect that Plaintiffs fail to allege a Due Process Violation. *See* Def. Br. at 36-37. Defendants' sole argument is that Plaintiffs were afforded due process because they "can redress [their] grievances in a meaningful post-deprivation procedure." *Id.* at 36. However, the "defense that plaintiffs have adequate State postdeprivation remedies, i.e., a RPTL article 7 proceeding or a CPLR article 78 proceeding, *lacks substance* because such defense applies only *where the deprivation* is random and unauthorized and not, as here, where it *is a product of governmental policy*." *Corvetti v. Town of Lake Pleasant*, 642 N.Y.S.2d 420, 422-23 (3d Dept. 1996) (emphases added); *see also Hellenic Am. Neighborhood Action Comm. v. City of New York*,

---

of "true market value," are arbitrary. *See G.R.F. v. Board of Assessors of County of Nassau*, 41 N.Y.2d 512, 515 (1977). Second, New York law requires uniform assessment ratios within each class, so reassessing only certain properties is arbitrary and violates equal protection. RPTL § 305(2); *Foss*, 65 N.Y.2d at 257, 259 (holding that "the imposition of different tax rates" on "owners of similar properties" "result[s] in invidious discrimination"); *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster Cty., W. Va.*, 488 U.S. 336, 345 (1989) ("The equal protection clause . . . protects the individual from state action which selects him out for discriminatory treatment by subjecting him to taxes not imposed on others of the same class.") (alteration in original) (citation omitted). Indeed, *Coleman* expressly held that a virtually identical Settlement Policy resulted in selective reassessments. *See* 687 N.Y.S.2d at 247-48.

101 F.3d 877, 880 (2d Cir. 1996) *Hudson v. Palmer*, 468 U.S. 517, 532 (1984) ("When [the] deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, ipso facto, satisfy due process.").

Here, Plaintiffs' allegations establish that Defendants' official policy has produced "'such a gross and patent inequality' as to be an 'arbitrary' use of the taxing power," which is sufficient to state a due process violation. *Tax Equity Now NY*, 2018 WL 4599923, at *7 (quoting *Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 25 (1916)) (denying Defendants motion to dismiss plaintiffs' due process claims).[23]

### D.    Plaintiffs Stated Claims under 42 U.S.C. § 1981

Defendants challenge Plaintiffs' 42 U.S.C. § 1981 claims solely on the ground that Plaintiffs purportedly did not allege intentional discrimination. *See* Def. Br. at 39 ("Plaintiffs allege only that the Freeze had a disparate impact on minority Property Owners."). Defendants are mistaken: the Complaint repeatedly alleges that Defendants engaged in intentional discrimination. (¶¶ 6-7, 30, 35-36, 86, 90, 104-05, 109, 129). In fact, there is a specific section of the Complaint dedicated to the issue of intent. (¶¶ 144-70). Those allegations, as well as the materials incorporated by reference in the Complaint, raise a powerful inference of racial animus, and Defendants address none of them.

---

[23] Specifically, Plaintiffs alleged that Defendants (1) tax properties within the same class at different percentages of assessment value in violation of RPTL § 305(2) and (2) admitted to "an unfair shift in the tax burden" because properties "sink further and further away from fair market value," rendering the tax system "[in]defensible." (¶¶ 10-11, 171, 282-95, 302-17). These policies produce gross and patent inequalities. (¶¶ 8, 12, 86-96, 109-4). In addition, Plaintiffs alleged that Defendants hamstrung the assessment process by installing an unqualified assessor, terminating qualified employees and officials, providing misinformation online, and keeping residents uninformed via a confidentiality provision and inadequate workshops. (¶¶ 81-84, 105-07, 167-70).

As the Second Circuit explained in *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1226-27 (2d Cir. 1987), an "intent to discriminate may be inferred from evidence of such facts as the segregative impact of the decision, historical background, specific sequences of events, departures from the normal procedural or substantive standards, contemporary statements by members of the decision-making body, and the totality of the circumstances."  As part of that calculus, the "foreseeability of a segregative effect, or adherence to a particular policy or practice, with full knowledge of the predictable effects of such adherence upon racial imbalance, is a factor that may be taken into account in determining whether acts were undertaken with segregative intent." *Id.* (internal quotation marks and alterations omitted).  All of these considerations strongly support Plaintiffs' claim.

*First*, Defendants have a long history of racially discriminatory property taxes.  Before implementing the policies at issue, Defendants knew – from  studies, warnings from a state official, and prior litigations – that the policies (1) were "highly imprudent if not illegal," and (2) will, to "a statistical certainty," "have a discriminatory effect on nonwhite, elderly, disabled, and lower-income property owners" because those persons "complain less and therefore will end up being over-assessed." (¶¶ 35, 66, 147-51).  Nevertheless, Defendants implemented the policies anyway in order to use "the filing of a grievance [] as a proxy for race" and "reduce[] the assessments of those who filed []to intentionally discriminate against nonwhites" and favor wealthy, white constituents. (¶ 152).

*Second*, *Coleman* establishes Defendants' intent.  (¶¶ 32-36).  There, the court discussed Defendants' decades-long knowledge and recurring litigation of the racially disparate nature of their policies and put them on notice that they could no longer claim that the result of its discriminatory practices was unintentional:

> [I]nsofar as the County is now on notice of the likely disparate impact of its assessment practices, what in the past may have been viewed as "unintentional" discrimination may now be fairly considered intentional. The County's continued failure to act in reliance on "unintentional" discriminatory results can no longer act as a shield for the County's practices.

*Coleman*, 687 N.Y.S.2d at 248 (emphasis added).

*Third*, pursuant to *Coleman*, Defendants agreed to a consent order, which imposed assessment requirements that completely reversed the discriminatory impact that gave rise to *Coleman*. Thus, they know how to fix and prevent racially discriminatory property taxes when its politically expedient to do so.

*Fourth*, in a brazen act of recidivism, Defendants reverted to the policies that gave rise to *Coleman* soon after the Consent Order expired. Indeed, under questioning from the Court, Defendants *admitted* the challenged policies were "reminiscent of" the policies at issue in *Coleman*. *See* McNeela Decl., Ex. 2 at 5:1-7. Compounding their malfeasance, Defendants knew that the *Coleman* Consent Order was successful (¶¶ 37-46) but refused to voluntarily continue those policies after wealthy, white homeowners rebelled. (¶¶ 38-46, 63-65). Thus, pursuant to *Coleman*, "discrimination may now be fairly considered intentional." *Id.*

*Fifth*, the evidence establishes that the then-current administration was aware of *Coleman* at the time when it reinstated Nassau County's old discriminatory practices. Specifically, a 2011 County report discussing the "2010 Assessment System Changes," including the Freeze, specifically mentions *Coleman*. *See* McNeela Decl., Ex. 3, at i, ii n.2, v.[24]

*Sixth*, Defendants knew *throughout* the Class period that their policies were shifting the tax burden to minorities and lower-income communities and worsening racial segregation, yet

---

[24] This document, which is titled, "Limited Review of the Department of Assessment," is incorporated in the Complaint at 1 n.1 and ¶¶ 136-38, 160, 162.

Defendants persisted.  They were warned: (1) in 2010 by the County Comptroller (¶ 158); (2) in 2012 by *Newsday*'s report (¶ 159); and (3) in 2016 by the County's own report on "impediments [] to compliance with . . . the Fair Housing Act," McNeela Decl., Ex. 3 at 18 (the "2016 Report"). Notably, the 2016 Report identified the "High Property Tax Burden" as an impediment because: (i) it "reduce[s] the net income a family has to spend toward mortgage principal and interest" and "often result[s] in higher area rents," causing "families [] to limit their choices of housing, especially low- and moderate-income working families, and seniors on fixed incomes," McNeela Decl., Ex. 3 at 83; and (ii) "low-income households of Long Island are disproportionately racial minorities," *id.* at 9.  To their discredit, Defendants "failed to take any of th[e] actions" recommended in the County's 2016 Report on FHA impediments.  (¶ 161).

*Seventh*, Defendants intentionally engaged in a disinformation campaign via AROW: "Defendants (a) provided false information on their own Policies (b) on their own website that they are officially tasked with managing (c) for several years despite complaints and warnings[, and] these failures cannot be accidental."  (¶ 168).  Defendants further "planned and executed intentionally inadequate workshops that failed to even partially counteract their [renewed policies] discriminatory effects."  (¶ 167).

*Eighth*, the County concealed information to continue its unlawful practices.  The County made the details of its arbitrary Settlement Policy confidential and refused to make FOIA disclosures.  (¶¶ 81, 156-57).

*Finally*, after admitting that its post-*Coleman* policies created an "[in]defensible" tax system, Defendants continue to perpetuate the disparities by proposing a bill, which passed, *giving tax credits to the very white homeowners who have been under-taxed for nearly a decade*.  (¶¶ 11 & n.3, 171, 174-77).

### E.      Plaintiffs Stated Claims under § 603 of the Nassau County Charter

Finally, Defendants are incorrect that Plaintiffs failed to plead a § 603 claim.  *See* Def. Br. at 39-40.  Defendants concede that "the *Coleman* plaintiffs' claim for violation of § 603 was not dismissed." Def Br. 40; *see also Coleman*, 687 N.Y.S.2d at 251-53.  Given the factual similarities between *Coleman* and the instant action, the same result should apply here.  Defendants' arguments for deviating from *Coleman* are meritless and should be rejected.

Defendants contend that Plaintiffs have not stated a claim because they purportedly did not allege that the Freeze policy was inequitable.  *See* Def. Br. at 39.  Defendants ignore, however, that § 603 requires an "equitable *and* scientific system," and Plaintiffs have alleged that the Freeze and Settlement policies were anything but scientific, which is sufficient to state a claim.  (*See, e.g.*, ¶¶ 8-11, 61-62).  Defendants have no response.  *See* Def. Br. at 39-40.

Defendants also argue that because the *Coleman* plaintiffs purportedly alleged the precise dollar amounts by which they were over-assessed, the Plaintiffs here were required, but failed, to do so.  Defendants fail to cite a single case holding that a § 603 claim requires a plaintiff to reduce his damages to exact dollars and cents prior to discovery, especially where, as here, the plaintiff has plausibly alleged that the Assessor adopted an "[un]scientific system of assessing properties." Section 603.  Nor do Defendants explain why this nonexistent requirement would be necessary to provide them with notice of the claims being asserted against them.  *See* Fed. R. Civ. P. 8(a)(2) (requiring only a "short and plain statement of the claim").[25]

---

[25] Defendants also contend that Plaintiffs failed to state a § 603 claim because they do not allege that they were barred from grieving their assessments or that County failed to publish its assessment systems' rules and procedures.  Def. Br. at 39-40.  Beyond Defendants' *ipse dixit*, Plaintiffs were not required to raise such allegations, which have nothing to do with whether the assessment system was scientific.

**CONCLUSION**

Neither the TIA nor comity apply, Plaintiffs have standing to assert all claims, and all claims are adequately pled.  Accordingly, Defendants' motion to dismiss should be dismissed in its entirety.

Dated: November 14, 2019
    New York, New York                    **KIRBY McINERNEY**

                                          */s/ Andrew M. McNeela*
                                          Andrew M. McNeela
                                          Ira M. Press
                                          David A. Bishop
                                          Seth M. Shapiro
                                          250 Park Avenue, Suite 820
                                          New York, New York 10177
                                          Tel.: (212) 371-6600
                                          Email:  amcneela@kmllp.com
                                                  ipress@kmllp.com
                                                  dbishop@kmllp.com
                                                  sshapiro@kmllp.com

                                          *Counsel to Plaintiffs*