# EXHIBIT C

2021 WL 1600496
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Sander SABA, Plaintiff,
v.
Andrew M. CUOMO, in his official capacity as Governor of the State of New York; and Mark J. F. Shroeder, in his official capacity as Commissioner of the New York State Department of Motor Vehicles, Defendants.

20-cv-5859 (LJL)
|
Signed 04/23/2021

**Synopsis**
**Background:** New York resident, who sought to replace their Pennsylvania driver's license, which accurately included an "X" gender marker to reflect resident's non-binary gender identity, with a New York driver's license, brought action under the First and Fourteenth Amendments to the United States Constitution, § 1983, and the New York State Human Rights Law (NYSHRL) against the Governor of the State of New York and the Commissioner of the New York State Department of Motor Vehicles (DMV), alleging that the gender marker policy for New York driver's licenses, which only allowed gender markers of either "M" for male or "F" for female, violated resident's rights by predicating access to a driver's license on misidentifying their own gender to the state and to anyone who would examine their driver's license, and seeking declaratory judgment, a permanent injunction enjoining enforcement of the policy, and damages. Defendants moved to dismiss for lack of subject matter jurisdiction.

**Holdings:** The District Court, Lewis J. Liman, J., held that:

[1] DMV's alleged plan to update its computer system to facilitate a non-binary gender selection option on driver's license application did not render resident's case moot;

[2] DMV's offer to create a driver's license with an "X" gender marker for resident through a manual process qualified as cessation of the policy, as element of determining whether case was moot;

[3] alleged system update plan, along with offer to manually create resident's license, did not establish a reasonable expectation that alleged violation of resident's rights would not recur and thus did not render case moot;

[4] alleged system update plan, along with offer to manually create resident's license, did not establish that effects of policy had been completely and irrevocably eradicated and thus did not render case moot;

[5] resident's claim for money damages under § 1983 and the NYSHRL was barred by the Eleventh Amendment; and

[6] as a matter of first impression, if threat that a state officer that has voluntarily ceased challenged policy might enforce policy in future may be remedied by prospective relief, ongoing and continuous violation of federal law required for *Ex parte Young* exception to Eleventh Amendment immunity to apply has been satisfied.

Motion granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Lack of Subject Matter Jurisdiction.

West Headnotes (23)

[1]  **Federal Courts**  Case or Controversy Requirement
**Federal Courts**  Nature of dispute; concreteness

Article III of the United States Constitution limits jurisdiction of federal courts to cases and controversies, which restricts the authority of federal courts to resolving the legal rights of litigants in actual controversies. U.S. Const. art. 3, § 2.

[2]  **Federal Courts**  Rights and interests at stake; adverseness

In order to invoke a federal court's jurisdiction, a plaintiff must demonstrate that he possesses a legally cognizable interest, or personal stake, in the outcome of the action. U.S. Const. art. 3, § 2.

[3] Federal Courts  Nature of dispute; concreteness

Federal Courts  Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

For a federal court to have subject matter jurisdiction over a case under Article III of the United States Constitution, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed. U.S. Const. art. 3, § 2.

[4] Federal Courts  Available and effective relief

A case is moot when interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur. U.S. Const. art. 3, § 2.

[5] Federal Courts  Presumptions and burden of proof

The burden of establishing mootness falls on defendant.

[6] Federal Courts  Motor vehicles

Alleged plan of the Department of Motor Vehicles (DMV) to update its computer system to facilitate a non-binary gender selection option on driver's license application did not render moot non-binary resident's case alleging that DMV's driver's license gender marker policy, which only allowed gender markers of either "M" for male or "F" for female, violated resident's rights; there was still no non-binary option for driver's licenses, and, even if the remedy for any alleged violation of resident's rights would be the same as DMV's system update plans, court still had power to order a remedy that would be redundant with DMV's plans, and it could order that DMV's legal obligation be discharged in a particular manner or on a particular timeframe.

[7] Federal Courts  Available and effective relief

A case becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.

[8] Federal Courts  Equity jurisdiction in general

A court has the equitable power to order an appropriate remedy to redress an established legal violation.

[9] Federal Courts  Power to Grant Relief

A court may order that a legal obligation be discharged in a particular manner or on a particular timeframe.

[10] Federal Courts  Available and effective relief

Remedy does not become unavailable, as would make a case moot, merely because defendant has already volunteered to adhere to course of conduct such remedy would require.

[11] Federal Courts  Voluntary cessation of challenged conduct

While defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine legality of the practice, it is nonetheless an important factor bearing on question of whether the court should exercise its power to entertain a request for injunctive relief or declare it moot.

[12] Federal Courts  Voluntary cessation of challenged conduct

Voluntary cessation of allegedly illegal conduct usually will render case moot if defendants can demonstrate that (1) there is no reasonable expectation that alleged violation will recur and (2) interim relief or events have completely

and irrevocably eradicated effects of alleged violation.

[13] **Federal Courts** 🔑 Weight and sufficiency

Defendant claiming that its voluntary compliance moots case bears formidable burden of showing that it is absolutely clear allegedly wrongful behavior could not reasonably be expected to recur.

[14] **Federal Courts** 🔑 Motor vehicles

Offer by Department of Motor Vehicles (DMV) to create driver's license with "X" gender marker for non-binary resident through a manual process, in which resident could apply for license without selecting a binary gender, qualified as cessation of challenged license gender marker policy that only allowed gender markers of either "M" for male or "F" for female, as element of determining whether resident's challenge was moot; although manual process still required DMV to input binary gender to generate motorist identification number, which would be used by DMV and communicated to third parties, this issue was different from that in complaint, which focused on resident's having to misgender themselves in application and on inability to have valid driver's license with correct gender marker.

[15] **Federal Courts** 🔑 Motor vehicles

Alleged plan of the Department of Motor Vehicles (DMV) to update its computer system to facilitate a non-binary gender selection option on driver's license application, along with offer to grant non-binary resident a license with a non-binary gender marker, did not establish a reasonable expectation that alleged violation of resident's rights arising from active license gender marker policy, which only allowed binary gender markers, would not recur, and thus DMV's plan did not render resident's challenge to policy moot; DMV had not yet made changes to its system, without changes, DMV could not accommodate resident's demand not to have to elect a binary gender, and, if offered license were

to expire, there was no assurance that resident would not be confronted with same issue.

[16] **Federal Courts** 🔑 Voluntary cessation of challenged conduct

When a governmental entity has formally rescinded an allegedly unlawful policy, representations that a violation will not recur are owed some deference in a mootness analysis.

[17] **Federal Courts** 🔑 Inception and duration of dispute; recurrence; "capable of repetition yet evading review"

Deference owed to a government entity's representation that an alleged violation has ceased, as an element of finding that a case alleging the violation is moot, does not equal unquestioned acceptance.

[18] **Federal Courts** 🔑 Motor vehicles

Alleged plan of Department of Motor Vehicles (DMV) to update computer system to facilitate non-binary gender selection option on driver's license application, along with offer to grant non-binary resident a license with non-binary gender marker, did not establish that effects of active license gender marker policy, which only allowed binary gender markers, had been completely and irrevocably eradicated, and thus plan did not render resident's challenge to policy moot; to generate resident's motorist identification number, DMV still had to assign resident a binary gender selection, and, as a result, there remained a risk that a police officer or other third party presented with resident's license would access DMV records and see a binary gender different from non-binary marker on license.

[19] **Federal Courts** 🔑 Suits Against States; Eleventh Amendment and Sovereign Immunity

The Eleventh Amendment bars suits in federal courts against states and state officials acting in their official capacities by their own citizens,

citizens of another state, and foreign sovereigns. U.S. Const. Amend. 11.

[20] **Federal Courts** Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** Agencies, officers, and public employees

Under the Ex parte Young exception to the Eleventh Amendment's bar to suits in federal courts against states and state officials acting in their official capacities, a plaintiff may sue a state official acting in his official capacity for prospective, injunctive relief from violations of federal law. U.S. Const. Amend. 11.

[21] **Federal Courts** Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** Agencies, officers, and public employees

In determining the applicability of the Ex parte Young exception to the Eleventh Amendment's bar to suits in federal courts against states and state officials acting in their official capacities, a court need only conduct a straightforward inquiry into whether a complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective. U.S. Const. Amend. 11.

[22] **Federal Courts** Other particular entities and individuals

Non-binary resident's claim for money damages against Governor of the State of New York and the Commissioner of the New York State Department of Motor Vehicles (DMV) pursuant to § 1983 and the New York State Human Rights Law (NYSHRL), arising from resident's challenge to DMV's driver's license gender marker policy, which only allowed binary gender markers on licenses, was barred by the Eleventh Amendment; claim sought damages for past conduct, which was not the prospective relief required for the Ex parte Young exception to the Eleventh Amendment bar to suits to apply, and New York had not specifically waived its Eleventh Amendment immunity. U.S. Const. Amend. 11; 42 U.S.C.A. § 1983; N.Y. Executive Law § 296.

[23] **Federal Courts** Suits for injunctive or other prospective or equitable relief; Ex parte Young doctrine

**Federal Courts** Agencies, officers, and public employees

Where there is a threat that a state officer that has voluntarily ceased enforcement of a policy that allegedly violates federal law might enforce that policy in the future, and that threat may be remedied by prospective relief, the ongoing and continuous violation of federal law required for the Ex parte Young exception to Eleventh Amendment immunity to apply has been satisfied. U.S. Const. Amend. 11.

**Attorneys and Law Firms**

Amanda Lyn Genovese, Shane Hunt, Hannah Yael Shay Chanoine, O'Melveny & Myers LLP, Omar Gonzalez-Pagan, Carl Solomon Charles, Lambda Legal Defense and Education Fund, Inc., New York, NY, Dimitri Portnoi, O'Melveny & Meyers LLP, Los Angeles, CA, for Plaintiff.

Andrew Stuart Amer, New York State Department of Law, New York, NY, for Defendants.

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

**\*1** Defendants Andrew M. Cuomo ("Cuomo"), sued in his official capacity as Governor of the State of New York, and Mark J. F. Shroeder ("Shroeder") (together with Cuomo, "Defendants"), sued in his capacity as Commissioner of the New York State Department of Motor Vehicles, move to dismiss the complaint brought against them by Sander Saba

("Saba") pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction. For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

Saba is a nonbinary transgender New York resident who seeks to obtain a New York driver's license that accurately reflects their [1] nonbinary gender identity by using the gender marker "X". Dkt. No. 1 ("Compl." Or "Complaint") ¶ 1. [2] Saba, who was born in New York City, has a birth certificate reflecting their gender as "X", which denotes that their identity is neither exclusively female or exclusively male. Saba currently has a driver's license from the Commonwealth of Pennsylvania that reflects their nonbinary gender with an "X" gender marker. *Id.* ¶ 2. Because Saba is a New York resident, they are required by New York law to exchange their Pennsylvania driver's license for a New York license. *Id.* ¶¶ 3, 98-99; *see* N.Y. Veh. & Traf. L. §§ 250(2), 250(5), 509(1), 509(11) (New York residents must obtain a New York driver's license within 30 days of becoming a resident in order to lawfully drive in the state of New York). Saba claims, however, that the New York State Department of Motor Vehicles ("DMV"), which is responsible for the issuance of New York driver's licenses, does not issue driver's licenses with a gender marker other than "M" for male or "F" for female (herein after the "Gender Marker Policy"). *Id.* ¶¶ 4, 81. In particular, a New York resident seeking a first-time New York driver's license must complete Form MV-44, a three-page Application for Permit, Driver License, or Non-Driver ID Card (the "Application"). *Id.* ¶ 84. The Application requires applicants to fill out fields requesting various identification. One field requires applicants to indicate their "GENDER" by checking one of two boxes marked "Male" and "Female." *Id.* ¶ 85. An applicant is further required to sign the Application, which certifies that "the information [an applicant has] given on this application and on any documentation provided in support of this application is true and complete." *Id.* ¶ 86. [3] Thus, by operation of the Gender Marker Policy, notwithstanding Plaintiff's gender identity and the nonbinary gender designation listed on their other government identification documents, they would not be able, by the ordinary application process, to obtain a New York driver's license with the gender identifier "X." *See id.* ¶ 107. Plaintiff also alleges the policy makes it impossible for Plaintiff to comply with New York law, as they must "either falsely attest that they are male or female in the Application ... or else must use a Pennsylvania driver's license rather than a New York driver's license." *Id.* ¶ 108.

**\*2** On May 26, 2020, Saba sent a letter to Schroeder's office, requesting that the DMV "advise [them] on how [they] can obtain a New York driver's license with an X gender marker, or please confirm that the DMV's current policy prohibits nonbinary residents from having a New York driver's license that accurately reflects their gender identity." *Id.* ¶ 101. In response, on July 7, 2020, Saba received a telephone call from Brandon Flynn ("Flynn"), who identified himself as an employee of the DMV within the New York licensing Bureau tasked with responding to Saba's May 26, 2020 letter. Mr. Flynn confirmed that the DMV would deny Saba's request to issue a New York driver's license because the issuance computer system was set up to require either an "M" or an "F" gender marker on New York driver's licenses. *Id.* ¶¶ 102-03. Flynn stated that the DMV was in the process of updating its computer system, but could not state whether this process would result in an option for an "X" gender marker for New York issued licenses.

Plaintiff alleges the Gender Marker Policy violates their civil rights and causes them injury by predicating access to a driver's license—and the myriad benefits, privileges, and conveniences associated therewith—on misidentifying their own gender to the state and to anyone who would examine their driver's license. [4] Plaintiff alleges:

> For many nonbinary people, the gender designation on their identification documents is often inaccurate, because the sex they were assigned at birth ..., typically the binary options of male or female, does not match their gender identity, which is neither exclusively female nor exclusively male. Correcting the gender marker designation on identity documents is thus critically important for nonbinary people. Accurately identifying one's own gender to the world is essential to one's personhood and ability to navigate the world.

*Id.* ¶ 6; *see also id.* ¶¶ 11-12; 52-54 (aligning identity documents with gender identity is important for mental health, is a "crucial milestone in social gender affirmation," and is important for safety, as reflected in one survey finding that "32 percent of respondents who had presented an identification that did not match their gender presentation had a negative experience, including verbal harassment (25 percent), denial of service (16 percent), and assault (2 percent)") (citation omitted), *id.* ¶¶ 109-130.

"By requiring applicants to submit documentation that they are either female or male," Plaintiff alleges, "the DMV excludes nonbinary residents from driver's licenses that accurately reflect their gender identity," and "[f]or a nonbinary resident like [ ] Saba whose out-of-state license, birth certificate, and social security card all accurately reflect their nonbinary gender identity, selecting either female or male would be an inaccurate designation that is inconsistent with their identity." *Id.* ¶¶ 89, 91. Injury follows, inter alia, because "possessing a driver's license that fails to accurately reflect their gender increases the chance that [Plaintiff] will be subjected to prejudice, discrimination, harassment, humiliation, and violence," *id.* ¶ 110, and because "[t]hrough the Gender Marker Policy, the DMV has announced that it does not recognize [ ] Saba for who they are and does not acknowledge their personhood," which violates "their dignity and autonomy," *id.* ¶ 114. Plaintiff notes that "to the extent the Gender Marker Policy requires [ ] Saba to disclose their birth-assigned sex, it requires [ ] Saba to disclose it not only to the DMV, but to every public or private person to whom they show their driver's license." *Id.* ¶ 116.

Plaintiff claims the Gender Marker Policy violates their constitutional rights under the First and Fourteenth Amendments to the United States Constitution and brings suit under those Amendments and 42 U.S.C. § 1983 and under New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 296. Plaintiff seeks declaratory judgment, a permanent injunction enjoining enforcement of the Gender Marker Policy, and damages.

**\*3** For purposes of this motion, Defendants do not challenge Plaintiff's claims on the merits. Defendants make two procedural arguments that the Complaint should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction: (1) Plaintiffs claims are moot because New York State has begun a process to overhaul its computer system to permit residents to apply for a driver's license with an "X" gender marker and, in the meantime, has consented to produce such a license for Plaintiff through a manual process, and (2) the Eleventh Amendment to the United States Constitution bars relief against a state official based on past conduct.

## LEGAL STANDARD

[1] [2] [3] [4] [5] "Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' which restricts the authority of federal courts to resolving 'the legal rights of litigants in actual controversies.' " *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71, 133 S.Ct. 1523, 185 L.Ed.2d 636 (2013) (quoting *Valley Forge Christian College v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982)) (internal quotation marks and citation omitted). In order to invoke a federal court's jurisdiction, a plaintiff "must demonstrate that he possesses a legally cognizable interest, or 'personal stake,' in the outcome of the action." *Id.* (quoting *Camreta v. Greene*, 563 U.S. 692, 701, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011)). "A corollary to this case-or-controversy requirement is that 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.' " *Id.* (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)); *accord In re Zarnel*, 619 F.3d 156, 162 (2d Cir. 2010) ("Mootness is a doctrinal restriction stemming from the Article III requirement that federal courts decide only live cases or controversies; a case is moot if the parties lack a legally cognizable interest in the outcome of the case.") (internal quotation marks and citation omitted). A case is thus moot when "interim relief or events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur." *In re Zarnel*, 619 F.3d at 162 (quoting *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 647 (2d Cir. 1998)). The burden of establishing mootness falls on Defendant. *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016).

## DISCUSSION

Defendant argues that Plaintiff's claims are moot because DMV has already begun a process to modify its computer system that would permit New York residents to apply for driver's licenses with an "X" gender marker, and, in the interim, has invited Plaintiff to apply for such a license through a manual process that would bypass the gender question on the Application.

Defendants aver that the requirement on the Application to indicate one's gender as "Female" or "Male" is the result of "DMV's decades-old legacy computer system" which requires such an input in order to generate a motorist identification number ("MI") which, in turn, "serves as the principal means of internally identifying the driver record within DMV's computer systems." Dkt. No. 19 ("Kline Decl.") ¶ 3.[5] The MI number is generated by an algorithm that requires as input various data specific to the applicant, including the applicant's gender, which is coded by the algorithm as either "0" or "1", corresponding to the applicant's selection of gender as either "male" or "female" on the Application. "The existing system cannot create an MI number without the data input of either '0' or '1' for the applicant's gender." Id. ¶ 4. The MI is the "foundational core of the DMV legacy computer system" and without it DMV "cannot issue a driver's license to an applicant" through the automated process "or create and maintain a DMV database record for the licensee that is required for the multitude of back-end applications used by DMV and third parties." Id. ¶ 5. For example, "[f]or internal purposes, the MI number is critical for associating key information with the correct driver's DMV record, including traffic tickets, convictions, points and fines, and for linking vehicle registration and automobile insurance status and tracking lapses that would require license suspension." Id. "For purposes of third party applications, the MI number is essential for maintaining records that are accessed by law enforcement, the U.S. Selective Service System, organ donor registries, county boards of election (for voter registration), credit card companies, and insurance companies." Id.

**\*4** In late 2019, several months before this lawsuit was initiated, New York State authorized DMV to undertake a $180 million project to replace DMV's legacy computer system with a new system. Kline declared the new system would "among other things, permit DMV to create a license record without reference to an MI number, and thus without the need for the applicant to make a binary 'male' or 'female' gender selection." Kline Decl. ¶ 6. He further declared "[o]nce the new system is operational, DMV will be able to offer and issue to self-certifying nonbinary applicants an 'X' gender driver's license through an automated application procedure." Id. ¶ 7. In declarations in connection with this motion, Kline declared that DMV anticipated the new system would "likely not be operational until the fourth quarter of 2021, or later." Id. ¶ 7. In a supplemental declaration filed November 10, 2020, Kline declares that DMV's plan has changed and that it has now "resolved to modify its existing system" (the "System Modification Project"), rather than replace the existing system, "in order to enable DMV to simultaneously focus efforts on expanding the availability of certain remote services that will eliminate the need for in-person DMV office visits for various transactions" in response to the COVID-19 pandemic. Dkt. N0. 27 ("Kline Supp. Decl.") ¶ 3. He avers that "[t]his change to [the project] will not negatively impact DMV's goal to allow [it] to create a license record without the need for an applicant to make a binary 'male' or 'female' gender selection" and that such goal "will still be accomplished through this new modification approach, and on substantially the same timeline," Kline Supp. Decl. ¶ 4, as reported in his initial declaration—that is, in "the fourth quarter of 2021, or later," Kline Decl. ¶ 7. However, at oral argument, Defense counsel admitted that a representative of DMV indicated at deposition that the System Modification Project would not be completed until second quarter 2022. Defense counsel represented at argument that DMV is "on schedule to have the 'X' gender license automated process go live ... in May 2022." Hearing Transcript ("Tr.") at 3 (Apr. 19, 2021).

In addition to Kline's representation about the authorization of funds for the System Modification Project, New York State's 2021 State of the State indicated that Cuomo had directed DHS to make available a non-binary gender marker on driver's licenses. *See* New York State, *State of the State 2021*, available at: https://www.governor.ny.gov/sites/default/files/atoms/files/SOTS2021Book_Final.pdf ("State of the State") at 255-56.[6] In particular, the State of the State included the passage:

> Governor Cuomo believes that transgender non-conforming New Yorkers must be treated in a respectful and affirming manner in their interactions with State agencies. In February 2020, the New York State Department of Health reduced barriers for transgender individuals to correct the gender marker on their birth certificate, and in June, DOH made a nonbinary "X" gender designation available on birth certificates, giving those New Yorkers who do not identify as male or female another

option. In July, DOH took steps to ensure that a transgender parent could correct their own name on their child's birth certificate if the parent has already obtained a court ordered name change. And in November 2020, Governor Cuomo announced the release of the first-ever Gender Identity Toolkit to all State agencies, which will serve as a key training resource to ensure transgender, gender non-conforming, and non-binary New Yorkers receive non-discriminatory, high quality services when interacting with or being employed by the State.

Still more needs to be done to remove the barriers that transgender, gender non-conforming, and non-binary New Yorkers face to obtaining identity documents, such as marriage certificates and driver's licenses, that reflect who they are.

...

To further New York's success in comprehensive improvements to identity document policies for transgender communities, **Governor Cuomo has directed [DMV] to implement a policy change for correcting gender makers on New York State driver's licenses consistent with DOH's policy, including making available a non-binary gender marker on driver's licenses.**

*Id.* at 243-55 ("Policy Statement") (emphasis added).

In the interim, and since the initiation of this lawsuit, DMV has offered for Plaintiff to apply for a New York State driver's license through a manual process that would not require Plaintiff to indicate a gender on the Application and that will permit DMV to issue a license to Plaintiff that would bear an "X" gender marker. Dkt. No. 20 at 3-4; Kline Decl. ¶ 8; Dkt. No. 30 ¶ 5. To complete the manual process "DMV advised Plaintiff ... that they needed to submit a completed new license application except for the gender question, which Plaintiff was instructed to leave blank." Kline Decl. ¶¶ 9, 10. Once the Application was received and other requirements met, *see id.* ¶¶ 10-11, DMV would "make the necessary binary gender selection required to create an MI number and [would] cause a license to be manually created for Plaintiff by the DMV's license production vendor that bears an 'X' gender identification marker and that [would] remain valid for up to a five year term from Plaintiff's birth date, consistent with a new license of this type." *Id.* ¶ 12. However, the binary gender selection made by DMV in order to generate an MI number would be incorporated into DMV records for Plaintiff, which would in turn be accessible to certain third parties, for example banks and insurance companies that are able to access DMV records. *See* Tr. at 17-18. Because Plaintiff's "X" gender license would be unique, and because it would differ from DMV records about Plaintiff, "[t]o avoid any confusion [it] might cause for third parties who may need to view the license, such as law enforcement, DMV also offered to provide Plaintiff with a letter that confirms the license is genuine and has not been altered." *Id.* ¶ 12.

**\*5** Defendants thus argue that this case is moot, both because of DMV's plan to modify its system so as to permit it to offer a license application process that does not require a binary gender selection, and because of its offer, in the interim, to accommodate Plaintiff with an "X" gendered driver's license produced through a manual process that would not require Plaintiff to represent their own gender as either "male" or "female." The Court considers those arguments in turn.

**A. DMV's purported System Modification Project does not moot the case**

[6] To the extent Defendants argue that DMV's alleged plan to update its computer system to facilitate a non-binary gender selection option on the Application, by itself, renders any aspect of this case moot, that argument is rejected for the straightforward reason that the Application has not already changed. Although Defendants may have committed to undertake a process that, *at some future date*, will accommodate applicants who do not identify as either "male" or "female," Defendants do not dispute that such accommodation is not *now* available. Defendants' prospective intentions do not "eradicate[ ] the effects" of the alleged constitutional infirmity of the Application. *In re Zarnel*, 619 F.3d at 162.

Defendants argue that, combined with DMV's offer to accommodate Plaintiff with a unique "X" gender license through a manual process (discussed *infra*), its commitment and ongoing process to change the DMV computer system means that "all the prospective injunctive relief that Plaintiff [seeks] in this lawsuit ... has already been obtained." Dkt. No. 20 at 6. Insofar as Plaintiff seeks to be provided with a license through an automated (not manual) process, Defendants argue they are already taking all possible steps, via the System Modification Project, toward granting that relief. *See id.* at 8-9. ("Defendants have established that it is not possible for DMV to make the necessary modifications to issue 'X' gender licenses through an automated process

without substantial, time-consuming and expensive work ... Because it is impossible for the courts, though the exercise of their remedial powers[,] to compel DMV to issue 'X' gender licenses through an automated process before the necessary system modifications will be complete, Plaintiff's ... demand for such relief does not create a justiciable case or controversy.") (internal quotation marks and citation omitted).

[7] [8] [9] [10] However, Defendants have not carried their burden to establish that DMV's System Modification Project, by itself, eradicates any harm allegedly caused by the Gender Marker Policy in the present—even if it may eradicate such harm in the future. Moreover, even if Defendants are already undertaking activities the Court would ultimately mandate in a judgment for Plaintiff, that does not obviate Plaintiff's entitlement to seek a court order granting such relief or strip the Court of its authority to grant it. "A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307, 132 S.Ct. 2277, 183 L.Ed.2d 281 (2012) (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000)); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 124 (2d Cir. 2016). It is fundamental that the Court has the equitable power to order an appropriate remedy to redress an established legal violation. *See Rizzo v. Goode*, 423 U.S. 362, 376–77, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.") (quoting *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 91, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971)); *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944) ("The essence of equity jurisdiction has been the power ... to mould each decree to the necessities of the particular case"); *Springs Mills, Inc. v. Ultracashmere House, Ltd.*, 724 F.2d 352, 355 (2d Cir. 1983) ("A district court has a wide range of discretion in framing an injunction in terms it deems reasonable to prevent wrongful conduct."); *see also Forschner Grp., Inc. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997). For example, a court may order that a legal obligation be discharged in a particular manner or on a particular timeframe. *See, e.g., Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955). A remedy does not become unavailable merely because a defendant has already volunteered to adhere to the course of conduct such remedy would require. Thus, even crediting Defendants' argument that it would be impossible for them to change the Gender Marker Policy more quickly than the System Modification Plan contemplates, *see* Dkt. No. 35 at 6-8,—a proposition not established on the instant record—Defendants have cited no authority for the proposition that the Court lacks the power to order a remedy that is redundant with Defendants' present intentions.

*6 The cases Defendants cite, each of which held that a claim was moot where the policy or law being challenged was amended as to cure its alleged defect, are thus inapposite. In each of those cases, the operative amendment instantaneously changed the status quo and eradicated the harm complained of. *See, e.g., Holland v. Goord*, 758 F.3d 215, 224 (2d Cir. 2014) (claim for injunctive relief related to a New York Department of Correctional Services Directive rendered moot by amendment to the Directive at issue which "specifically prohibit[ed] conduct of which [Plaintiff] complain[ed]"); *Am. Freedom Def. Initiative v. Metro. Transp. Auth.*, 109 F. Supp. 3d 626, 630 (S.D.N.Y. 2015), *aff'd*, 815 F.3d 105 (2d Cir. 2016) (claim rendered moot where policy at issue ceased to be applied to plaintiff's conduct); *Lamar Advert. of Penn, LLC v. Town of Orchard Park, N.Y.*, 356 F.3d 365, 377 (2d Cir. 2004) (Sotomayor, J.) (challenge to an ordinance moot where amendments "sufficiently altered the ordinance to render [plaintiff's] claims nugatory."). The System Modification Project thus has no effect on the mootness of this case except insofar as it affects the Court's analysis of the likelihood that the alleged violation will recur pursuant to the voluntary cessation doctrine, discussed in the following section.

**B. DMV's voluntary cessation, by its offer to create a manual license for Plaintiff, does not moot the case**

[11] [12] [13] DMV's offer to produce a license with an "X" gender marker for Plaintiff, which it made after Plaintiff filed this action, also does not render the current pleading moot. "While a defendant's 'voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice,' it is nonetheless 'an important factor bearing on the question whether a court should exercise its power' to entertain a request for injunctive relief or declare it moot." *Holland, 758 F.3d at 223* (quoting *City of Mesquite v. Aladdin's*

*Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). "The voluntary cessation of allegedly illegal conduct usually will render a case moot if the defendant[s] can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Am. Freedom Def. Initiative.*, 109 F. Supp. 3d at 630 (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange, Conn.*, 303 F.3d 450, 451 (2d Cir. 2002) (per curiam)). In establishing these elements, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Holland*, 758 F.3d at 223–24 (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S.Ct. 721, 184 L.Ed.2d 553 (2013)); *see Am. Freedom Def. Initiative*, 815 F.3d at 110 (a defendant bears a "heavy burden of persuasion" with respect to the two prongs of the voluntary cessation doctrine) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968)); *see also Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). In this case, Defendants have not met their burden to establish either that there is no reasonable expectation the alleged violation will recur or that the effects of the alleged violation are completely eradicated.

**[14]** At the outset, the Court "must determine whether the challenged conduct has, in fact, ceased." *Am. Freedom Def. Initiative*, 815 F.3d at 109. Defendants have carried their burden on that score with the offer to create an "X" gender license for Plaintiff through a manual process. In their briefs, Plaintiff argues that Defendants' offer does not cure the infirmities of the Gender Marker Policy because the manual process will still require DMV to assign Plaintiff a binary gender marker in order to produce an MI number for Plaintiff. Plaintiff points out that according to Defendants' own submissions, the MI number is both used internally by DMV and communicated to third parties. Defendants' response that these issues are not justiciable because Defendant is already addressing these concerns through the System Modification Project is not alone sufficient to defeat federal jurisdiction for the reasons stated in the previous section; the future change does nothing to sufficiently address the current alleged harm. However, Plaintiff's argument fails for the independent reason that the practice they argue is unlawful in their briefs—DMV making a binary gender selection for Plaintiff for the sole purpose of creating an MI number and then distributing records which include that binary selection to third parties—is fundamentally different from the unlawful practice alleged in the Complaint. The gravamen of the Complaint is that (1) as a consequence of the current application process, Plaintiff cannot obtain a New York driver's license accurately reflecting their gender identity, (2) to obtain a New York driver's license at all Plaintiff would have to make a false certification that their gender is either "male" or "female", and (3) even if Plaintiff were to certify to a gender that did not describe them, they would then be forced to carry and present to others a state-issued license that inaccurately stated their gender identity. With the benefit of Defendants' offer, the Gender Marker Policy is no longer applicable to Plaintiff, and Plaintiff will receive precisely what they asked for: a valid New York driver's license with an "X" gender marker, and relief from the requirement to attest, untruthfully, that they are of either "male" or "female" gender.

Defendants' offer thus grants the relief requested. *Cf. Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993) (claim not moot where the "gravamen" of the complaint was that "[petitioner's] members [were] disadvantaged in their efforts to obtain city contracts" by a city ordinance that was repealed but replaced by a new ordinance that "may disadvantage [petitioner's] to a lesser degree than the old one ... [but] disadvantages them in the same fundamental way.").

**\*7** The claim posited in Plaintiff's opposition brief is fundamentally different. It argues that Defendants' internal practice of assigning a binary "M" or "F" gender to Plaintiff, and then making records which contain that gender selection available to third parties, impairs Plaintiff's rights. Without passing on the legal sufficiency of that argument, it is fundamentally different from the injury presented in the Complaint, which is the injury that arises when Plaintiff is required to certify in a state-published form that they have a binary gender identity, which they do not, and to present to the outside world a driver's license reflecting such identity.

This case is thus similar to cases in this Circuit holding that the challenged conduct has ceased where an amendment to a challenged policy or law redresses the harm alleged, even though the policy or law may be unlawful in other respects. *See Am. Freedom Def. Initiative*, 815 F.3d at 110; *Lamar Advert.*, 356 F.3d at 377 ("A plaintiff's claims will not be

found moot where the defendant's amendments are merely superficial or the law, after amendment, suffers from similar infirmities as it did at the outset," but a claim is moot where an amendment renders a challenged provision " 'sufficiently altered as to present a substantially different controversy from the one' that existed when [the] suit was filed") (quoting City of Jacksonville, 508 U.S. at 671, 113 S.Ct. 2297 (1993)).

In *American Freedom Defense Initiative*, a pro-Israeli advocacy organization "known for its criticism of Islam" sought to display an advertisement on the back of Metropolitan Transit Authority ("MTA") busses that the MTA refused to display, invoking a policy barring the display of any advertisement reasonably likely to incite violence. 815 F.3d at 108. [7] The district court entered a preliminary injunction enjoining enforcement of the incitement policy as against the advertisement in question, whereupon MTA amended its advertising standards, in part to prohibit any advertisement that is "political in nature," and proceeded to reject the advertisement at issue not under its anti-incitement provision but under the new anti-political provision. *Id.* The Second Circuit affirmed the district court's holding that the plaintiff's claim was moot by voluntary cessation, over plaintiff's objection that MTA's amended policy prohibiting political advertisements was also unconstitutional. *Id.* at 109-10. Those "new attacks on MTA's conduct [were] 'qualitatively different' from those contained in [the plaintiff's] complaint," *id.* at 110, and Defendant's conduct had been "sufficiently altered so as to present a substantially different controversy from the one that existed when the suit was filed." *Id.* at 109 (quoting Lamar Advert., 356 F.3d at 378). Similarly, here, the constitutionality of DMV's internal record-keeping and -dissemination practices is not challenged in the Complaint. Nor does the Complaint allege that producing a license for a particular group by a manual rather than automated process is unlawful. As in *American Freedom Defense Initiative* and Lamar Advertising, at least as applied to Plaintiff, the Gender Marker Policy has been "sufficiently altered so as to present a substantially different controversy from the one that existed when the suit was filed." *Id.* at 109 (quoting Lamar, 356 F.3d at 378).

**\*8** However, Defendants have not carried their burden of persuasion with respect to the two prongs of the voluntary cessation doctrine.

**1. Likelihood of recurrence**

**[15] [16]** Defendants have not established that there is no reasonable expectation that the alleged violation will recur. *See* Mhany Mgmt., 819 F.3d at 603-04 ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."). Defendants cite a series of cases in which, after a governmental entity has formally rescinded an allegedly unlawful policy, courts have credited a representation by a government entity that a violation would not recur. In each of those cases, the defendant entity had adopted a formal policy, regulation, or law which, by its adoption, redressed the harm alleged. *See* N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York, ––– U.S. ––––, 140 S. Ct. 1525, 1526, 206 L.Ed.2d 798 (2020) (New York State's amendment to its firearm licensing statute rendered case moot); Holland, 758 F.3d at 224 (claims rendered partially moot by amendment to New York State Department of Correctional Service's written policies); Am. Freedom Defense Initiative, 109 F. Supp. 3d at 630 (case rendered moot by Metropolitan Transit Authority's amendment to its regulations); Lamar Advertising, 356 F.3d at 375-77 (claims rendered moot by amendment of a town ordinance); Amato v. Elicker, 460 F. Supp. 3d 202, 212 (D. Conn. 2020) (claims rendered moot by executive order that superseded prior challenged order). In that circumstance, representations that a violation will not recur are owed "some deference" in the mootness analysis. Lamar Advert., 356 F.3d at 377; *see* Harrison & Burrowes Bridge Constructors, Inc. v. Cuomo, 981 F.2d 50, 59 (2d Cir. 1992) ("Some deference must be accorded to a state's representations that certain conduct *has been discontinued.*") (emphasis added). The fact that the government has taken official action to rescind the unlawful policy means that under current law the violation cannot occur and lends force to the representation that in the future the violation will not recur. *See* Granite State Outdoor Advert., 303 F.3d at 451-52 ("[T]here is no reason to think that, *having completely revised its regulations through proper procedures*, the Town has any intention of returning to the prior regulatory regime.") (emphasis added). The fear of a recurrence in

that circumstance is pure speculation; it would require governmental action for the dispute to again become live.[8]

In this case, by contrast, the policy and practice that led to the alleged constitutional violation is still in place. DMV has not made any changes to its system. By Defendants' own representations the system currently in place will not permit DMV, through the automated process, to accommodate Plaintiff's demand not to have to elect a binary gender. If the license DMV has offered Plaintiff were to expire tomorrow, DMV could not and has not offered any assurance that Plaintiff would not again be confronted with the allegedly unconstitutional Application. Of course, Defendants have represented that DMV intends to change its policy and that "[l]ong before the expiration date on Plaintiff's "X" gender license, DMV's new system will be operational, allowing nonbinary New Yorkers such as Plaintiff to apply for an 'X' gender license through the automated license application and renewal process." Dkt. No. 20 at 8. But, leaving aside the inconsistent nature of Defendants' representations about the implementation date of the new policy—first, end of 2021 and now, mid 2022—the representation that the State will in the future change a policy that today allegedly violates the Constitution is far afield from a representation that a policy and practice that has already been changed will not be changed back. In the latter circumstance, it would require some governmental action for the violation to recur—courts ordinarily presume that the Government does not set out to violate the Constitution. *Cf. Granite State Outdoor Advert.*, 303 F.3d at 451-52. In the former circumstance, the Court can rely only on a promise, which carries no legal effect, that authorities will in the future exercise the political will to change their practices to conform to the Constitution; there is no assurance the violation cannot recur. *See Trinity Lutheran Church of Columbia, Inc. v. Comer*, ––– U.S. ––––, 137 S. Ct. 2012, 2019 n.1, 198 L.Ed.2d 551 (2017) (governor's announcement that "he had directed the Department to begin allowing religious organizations to compete for and receive Department grants on the same terms as secular organizations" did not moot action absent assurance that governor "*could not* revert to its policy of excluding religious organizations") (emphasis added); *Conn. Citizens Def. League, Inc. v. Lamont*, 465 F. Supp. 3d 56, 69 (D. Conn. 2020) (citing *Comer*, 137 S.Ct. at 2019 n.1); *cf. Am. Council of Blind of N.Y., Inc. v. City of New York*, 495 F.Supp.3d 211, 248 (S.D.N.Y. 2020) (a two page memo stating an agency policy consistent with what Plaintiffs were seeking did not moot the case in part because defendants had not "pointed to any safeguards that would prevent the new policy from being changed, rescinded, or honored in the breach"). In that circumstance, provided there is no other bar to the Court's jurisdiction, it remains emphatically the obligation of the Courts, the branch of government immune from political influence, to say what the law is. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

**\*9** [17] This conclusion follows logically from the nature of the voluntary cessation doctrine and the well-established principle that the deference owed to a government entity's representation that an alleged violation has ceased "does not equal unquestioned acceptance." *Am. Council of Blind*, 495 F.Supp.3d at 249–50 (quoting *Mhany Mgmt.*, 819 F.3d at 604); *see Nat. Res. Def. Council v. U.S. Dep't of Energy*, 362 F. Supp. 3d 126, 142 (S.D.N.Y. 2019) ("Any deference owed because DOE as a government entity is limited, as illustrated by the countless cases finding an executive actor's voluntary cessation insufficient to moot ongoing litigation.") (collecting cases). The voluntary cessation doctrine "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior." *Mhany Mgmt.*, 819 F.3d at 603 (quoting *City News & Novelty, Inc. v. City of Waukesha*, 531 U.S. 278, 284 n.1, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001)). Were it otherwise, a crafty party could always evade review of a questionable policy, undermine the authority of the courts, and impose impossible burdens on the party who would challenge it by altering the policy the moment a lawsuit is filed only to reinstate it the moment it is dismissed. *See supra* n.8 (citing *City of Mesquite*, 455 U.S. at 289, 102 S.Ct. 1070). For that reason, the Court does not just uncritically accept that the current violation has been redressed and the government's representation that it will not recur, but must examine the circumstances of the voluntary cessation and of the representations on which Defendants rely. *See Mhany Mgmt.*, 819 F.3d at 604.

Thus, while there is no reason to doubt the seriousness of the Governor's representation in the State of the State, it also is not sufficient in these circumstances to render the lawsuit moot. Defendants have offered no evidence or argument that the Policy Statement reflects anything other than the future plans of the government. It provides no assurance that a subsequent administration, or even this one, no longer faced with this

lawsuit, would not and could not immediately reverse course. It would be easy, as the system which generates the violation remains in place today. Maintaining that status quo merely requires inaction on the part of DMV; there is nothing formal in place that would make a recurrence of the alleged constitutional violation unlikely. Nor has there been any official act by the government to establish a policy whereby gender non-binary New York residents can avail themselves of the manual option now being offered to Plaintiff, or guaranteeing that the same option will be available to Plaintiff when their license expires. The circumstances here are thus are far different from those where a Governor has issued an executive order or some official action has been taken that would have to be reversed in order to reinstate the allegedly unconstitutional policy. Defendants here have fallen short of making it "absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Holland*, 758 F.3d at 223-24.

Finally, while the authorized expenditure of funds to complete the System Modification Project might have force to establish that the violation would not recur in a different case on a different record, it lacks sufficient force in this case and on this record. The ability to offer and issue to nonbinary applicants an 'X' gender driver's license through an automated application procedure is stated just to be one benefit of the System Modification Project. It is not stated to be the reason why New York is modifying its legacy computer system. Nor is it stated that the State is expending any incremental funds to obtain that functionality or, put another way, that if it were not changing the Gender Marker Policy it would not have still decided to engage in the same System Modification Project and expended exactly the same sum of money on it. Further, it is not stated that the State, having engaged in the System Modification Project, could not easily (and without cost) either eliminate the functionality to generate an "X" gender driver's license through the new system or simply decide not to use the functionality even if it were available to stop what Plaintiff claims to be an illegal policy. Whatever force there might be to a demonstration that the government is expending money to ensure that an illegal policy will not recur is entirely undermined in the absence of evidence addressing any of those issues. In short, accepting that the current government's intentions are genuine, there is nothing before the Court that would demonstrate that it will be able to make good on those intentions or that it will not in the future, and with no political cost, simply decide that it will not even try.

### 2. Continuing effects

**\*10** **[18]** Defendants have also not established that the effects of alleged violation have been "completely and irrevocably eradicated." *Am. Freedom Def. Initiative*, 109 F. Supp. 3d at 630 (quoting *Granite State Outdoor Adver.*, 303 F.3d at 451). As described above, even after providing Plaintiff an "X" gender driver's license, DMV still will assign to Plaintiff binary gender selection in order to generate an MI number. At oral argument Defendants confirmed that the profile that is generated for Plaintiff, including the binary gender designation, will reside in the DMV system and will be accessible to certain third parties. Thus, as Defendant conceded at oral argument, Plaintiff —possessing an "X" gender driver's license—would still bear the risk that a police officer or another third party presented with that driver's license would access the DMV's records and see in those official records a designation of a gender not reflective of Plaintiff's gender and different from the non-binary designation on Plaintiff's license. As stated above, Plaintiff does not by the instant pleading challenge DMV's internal record keeping or communications policies insofar as they implicate Plaintiff's gender. However, the discrepancy between the license and DMV's online records, and the ensuing confusion caused by DMV's continued practice of designating a binary gender for Plaintiff in its online records, is itself alleged to be a lingering effect of the claimed constitutional violation. *See Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d 1260, 1275 (9th Cir. 1998) ("Even if the continued storage, against plaintiffs' wishes, of intimate medical information that was allegedly taken from them by unconstitutional means does not itself constitute a violation of law, it is clearly an ongoing 'effect' of the allegedly unconstitutional and discriminatory testing, and expungement of the test results would be an appropriate remedy for the alleged violation."); *cf Am. Freedom Def. Initiative*, 815 F.3d at 110 ("[Plaintiff] suffers no ongoing harm from or lingering effect of the [alleged violation]") (quoting *Norman-Bloodsaw v. Lawrence Berkeley Lab'y*, 135 F.3d at 1275).

Defendant thus has not, on this record, carried its heavy burden to show that those effects are completely eradicated. The offer that Defendant has made to provide Plaintiff with a letter authenticating the driver's license does not address the brunt of Plaintiff's argument—that it is not Plaintiff who

should shoulder the responsibility of disabusing a third party of the reasonable notion that the State of New York has accurately recorded Plaintiff's gender identity in its records. Plaintiff argues the State of New York should be responsible for not mis-recording their gender in the first place. It may be that with a different policy—one that did not put the burden on Plaintiff to explain the inaccuracy in the State's records—this effect would be mitigated or even "completely eradicated." *Am. Freedom Def. Initiative*, 109 F. Supp. 3d at 630 (internal quotation marks and citation omitted). But on this record, Defendants have not carried their "heavy burden of persuasion" with respect to either prong of the voluntary cessation doctrine. *Am. Freedom Def. Initiative*, 815 F.3d at 110 (quoting *Concentrated Phosphate Exp. Ass'n*, 393 U.S. at 203, 89 S.Ct. 361).

Accordingly, because Defendants have not established that its voluntary cessation is sufficient to moot the case, its motion to dismiss on mootness grounds is denied.

### C. Plaintiff's claims are partially barred by the Eleventh Amendment

 **[19]**  **[20]**  **[21]** Finally, Defendants argue that Plaintiff's claims are barred by the Eleventh Amendment. "The Eleventh Amendment bars suits in federal courts against states and state officials acting in their official capacities by their own citizens, citizens of another state, and foreign sovereigns." *Doe v. Annucci*, 2015 WL 4393012, at *15 (S.D.N.Y. July 15, 2015) (citations omitted). However, "[u]nder the well-known exception to this rule first set forth in *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), a plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for prospective, injunctive relief from violations of federal law." *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 95 (2d Cir. 2007). "[I]n determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 254, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011) (quoting *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645, 122 S.Ct. 1753, 152 L.Ed.2d 871 (2002)).

 **[22]** Plaintiff's claim for money damages pursuant to the NYSHRL and 42 U.S.C. § 1983 is retrospective, as it seeks damages for past conduct, *see supra*, and is therefore barred by the Eleventh Amendment. *See Hauff v. State Univ. of N.Y.*, 425 F. Supp. 3d 116, 128 (E.D.N.Y. 2019) ("New York State has not waived its Eleventh Amendment immunity and consented to suit in federal court under the NYSHRL."); *Roniger v. McCall*, 22 F. Supp. 2d 156, 161 (S.D.N.Y. 1998) ("Money damages are available under § 1983 only in suits brought against officials in their personal capacities, since money damages against a state are barred by the Eleventh Amendment.") (citations omitted); *Fedele v. Harris*, 69 F. Supp. 3d 313, 318-19 (N.D.N.Y. 2014) ("Suits for damages arising under 42 U.S.C. § 1983 are barred by the Eleventh Amendment unless the state has specifically waived its immunity."); *Mamot v. Bd. of Regents*, 367 F. App'x. 191, 192 (2d Cir. 2010) ("It is well-established that New York has not consented to § 1983 suits in federal court, and that § 1983 was not intended to override a state's sovereign immunity."); *see also Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

 ***11**  **[23]** The remaining relief Plaintiff seeks, however, for declaratory and injunctive relief, is prospective. As elaborated above, the constitutional violation alleged in the instant pleadings has in fact ceased. However, the Court has found that there is a possibility such conduct will recur, and that the effects are not completely eradicated. "Neither the Supreme Court nor the Second Circuit has squarely addressed" the question whether "the possibility of a future violation suffices to render that violation 'ongoing' " for purposes of Eleventh Amendment. *Annucci*, 2015 WL 4393012, at *15-16 (S.D.N.Y. July 15, 2015). The weight of authority, however, supports the conclusion that "where there is a threat of future enforcement that may be remedied by prospective relief, the ongoing and continuous requirement [of the Eleventh Amendment] has been satisfied." *Id.* at *16 (quoting *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1338 (11th Cir. 1999)). That conclusion has been reached by other courts of appeals. *See id.* (citing cases); *Pryor*, 180 F.3d at 1338; *K.P. v. LeBlanc*, 729 F.3d 427, 439 (5th Cir. 2013) (rejecting the argument that voluntary cessation established an Eleventh Amendment bar and noting that a different conclusion "would work an end-run around the

voluntary-cessation exception to mootness where a state actor is involved."); *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 330 (4th Cir. 2001) ("The requirement that the violation of federal law be ongoing is satisfied when a state officer's enforcement of an allegedly unconstitutional state law is threatened, even if the threat is not yet imminent."); *Han v. U.S. Dep't of Just.*, 45 F.3d 333, 338 (9th Cir. 1995) (Eleventh Amendment bars suits where "[t]here is no allegation that the state defendants are likely to approve third party agreements in the future or that plaintiffs otherwise face a threat of harm from the state defendants' future actions."). "Consistent with these cases, the Second Circuit has stated that 'alleged injuries stemming only from past conduct *with no plausible threat of future violations* ... do not fall within the *Young* exception to Eleventh Amendment immunity.' " *Annucci*, 2015 WL 4393012, at *16 (quoting *Clark v. DiNapoli*, 510 F. App'x 49, 51 (2d Cir. 2013)) (summary order) (emphasis added by *Annucci*); *cf. KM Enters., Inc. v. McDonald*, 518 F. App'x 12, 13 n.1 (2d Cir. 2013) ("Eleventh Amendment prevents federal courts from providing any relief that is 'not the type of remedy designed to prevent ongoing violations of federal law,' including declaratory judgments that past acts were unlawful.") (quoting *Green v. Mansour*, 474 U.S. 64, 71-73, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985)). "This conclusion is, furthermore, consistent with the Supreme Court's admonition that *Young* distinguishes between cases 'in which the relief against the state official directly ends the violation of federal law as opposed to cases in which that relief is intended indirectly to encourage compliance with federal law through deterrence or directly to meet third-party interests such as compensation.' " *Annucci*, 2015 WL 4393012, at *16 (quoting *Papasan v. Allain*, 478 U.S. 265, 277–78, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

The relief Plaintiff seeks is prospective. Plaintiff aims by this lawsuit to enjoin and declare unconstitutional a policy that has not been amended, which will possibly be enforced against them in the future, and the effects of which are experienced in the present. Plaintiff's claims for declaratory and injunctive relief are thus not barred by the Eleventh Amendment.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to Plaintiff's claim for monetary damages but is otherwise DENIED.

SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2021 WL 1600496

## Footnotes

| | |
|---|---|
| 1 | The Court adopts Plaintiff's preferred use of the pronouns "they, them, their" to refer to them. |
| 2 | "The idea that there are only two genders is sometimes called a 'gender binary.' Therefore, 'nonbinary' is a term people use to describe genders that do not fall into one of these two categories." *Id.* ¶ 30; *see generally id.* ¶¶ 31-51. |
| 3 | New York also provides a process for individuals to correct a designation on a previously-issued driver's license by submitting an Application, their current driver's license, and proof of a "gender change." *Id.* ¶ 89; DMV, *How to change information on DMV documents*, https://tinyurl.com/y3qsr2py (last accessed April 22, 2021). Pursuant to DMV policy, however, proof of a "gender change," which can take the form of "a written statement from a physician, psychologist, psychiatrist or other appropriate professional that is printed on letterhead," must "certify that *one gender is [the applicant's] main gender* and that [the applicant] *identif[ies] as male or female.*" *Id.* (emphasis added); *see also* Compl. ¶ 89. |
| 4 | New York City, since 2019, and New York State, since June 2020, have permitted nonbinary people born within each respective jurisdiction to obtain a birth certificate with an "X" gender marker. *Id.* ¶ 9; *see also id.* ¶¶ 92-97. Saba themself has a birth certificate reflecting their gender as "X." *Id.* ¶ 2. |

| | |
|---|---|
| 5 | Defendants submit the declaration of Gregory Kline, Deputy Commissioner for Administration of the DMV from 1996 to present. *Id.* ¶ 1. |
| 6 | The State of the State is a publicly available document published annually that documents "the progress of the State" and that "lay[s] out a series of priorities for the year," constituting "the first step in defining the Governor's agenda in 2021." *Id.* at 1. |
| 7 | "The advertisement portrayed a menacing-looking man whose head and face are mostly covered by a head scarf. The ad includes a quote from 'Hamas MTV': 'Killing Jews is Worship that draws us close to Allah.' Underneath the quote, the ad stated: 'That's His Jihad. What's yours?' The bottom of the ad included a disclaimer, stating that it was sponsored by AFDI, and did not imply the MTA's endorsement of the views expressed by the ad." *Am. Freedom Defense Initiative*, 815 F.3d at 108 (internal quotation marks and citation omitted). |
| 8 | *Cf.* *City of Mesquite*, 455 U.S. at 289 & n.10, 102 S.Ct. 1070 (1982) (voluntary cessation did not moot a case where defendant city had amended its ordinance numerous times in response to court rulings and had expressed an intent to reenact the offending provisions were the litigation to be dismissed for lack of jurisdiction); *see also* *Lamar Advert.*, 356 F.3d at 376 (Aladdin's castle was "unusual" in respect of the evidence that the city intended to reenact the challenged provision if the case was dismissed). |

---

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.