UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WAYNE J. HALL, REINA HERNANDEZ, and
FLORIDALMA PORTILLA, individually and on behalf
of others similarly situated,

                              Plaintiffs,

                           v.

NASSAU COUNTY, DEPARTMENT OF
ASSESSMENT OF NASSAU COUNTY,
ASSESSMENT REVIEW COMMISSION OF
NASSAU COUNTY, and JOHN DOES 1–25,

                              Defendants.

**MEMORANDUM AND ORDER**
19-CV-893 (LDH) (CLP)

LASHANN DEARCY HALL, United States District Judge:

      Wayne J. Hall, Reina Hernandez, and Floridalma Portilla (collectively "Plaintiffs"), individually and on behalf of others similarly situated, bring the instant putative class action against Nassau County, Department of Assessment of Nassau County, Assessment Review Commission of Nassau County, and 25 unnamed John Does (collectively "Defendants"), asserting claims for discrimination in the provision of services or facilities, discrimination in residential real estate related transactions, and interference with the exercise and enjoyment of rights pursuant to the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604(b), 3605, and 3617. Plaintiffs also assert claims pursuant to 42 U.S.C. § 1983 for violations of their Fourteenth Amendment rights to equal protection and due process of law, and their rights guaranteed by 42 U.S.C. §1981; and pursuant to Section 603 of the Nassau County Charter for violations of that statue. Defendants move pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil

Procedure to dismiss the complaint in its entirety for lack of subject-matter jurisdiction, and failure to state a claim, respectively.[1]

## BACKGROUND[2]

Plaintiffs are "nonwhite" owners of residential properties in a "nonwhite community" in the Village of Hempstead, New York. (Compl. ¶¶ 16–18, ECF No. 1.) Nassau County (the "County") is a political subdivision of the State of New York. (*Id.* ¶ 19.) The Department of Assessment of Nassau County (the "DOA") is an administrative agency of the County that is responsible for developing annual, fair, and equitable assessments of all residential and commercial properties in the County. (*Id.* ¶ 20.) The Assessment Review Commission of Nassau County (the "ARC") is an independent agency of Nassau County, separate from DOA, that is responsible for annually reviewing all applications for assessment corrections filed in the County. (*Id.* ¶ 21.) Defendant Does 1–25 are governmental entities of the County and private entities that contracted with at least one named Defendant in this case. (*Id.* ¶ 22.)

By way of background, between 1970 and 2000, property assessments were conducted based on "decades-old building costs and land valuations," rather than on current market value. (*Id.* ¶¶ 27–31.) Under that scheme, residential properties were assessed at only 0.25% of their full market value.[3] (*Id.* ¶ 27.) Thus, according to the complaint, the "assessment process failed to recognize that high-priced properties increased in value exponentially faster than less expensive properties," and "produced significant, racially disparate impacts on County residents, which the County intended." (*Id.* ¶¶ 29–30.)

---

[1] Defendants assert that this case presents a jurisdictional issue. It does not. Nevertheless, their claims are ripe for consideration on other grounds, as discussed herein.

[2] The following facts are taken from the complaint (ECF No. 1) and are assumed to be true for purpose of deciding the instant motion.

[3] For example, a home valued at $500,000 would be assessed as though it were valued $1,250. (Compl. ¶ 27.)

In 1997, a group of minority residential property owners filed a lawsuit against the County in New York Supreme Court of Nassau County, alleging, among other things, that the County's property tax assessment process was discriminatory. (*Id.* ¶ 32.) That lawsuit was ultimately settled by a consent order (the "Consent Order") requiring the County to take specific actions to undo the discriminatory inequities in its property assessment system. (*Id.* ¶ 37.) The Consent Order indicated that property reassessment was mandatory, and that the reassessment process must be "fair, nondiscriminatory, scientific, and equitable," and establish the "fair market value" of, and account for real-time changes in value, for all properties. (*Id.* ¶ 39.) To comply with the Consent Order, the County implemented new policies for property tax assessment and taxation. (*Id.* ¶ 41.) One such policy included annual updates and revisions of property tax assessments to accurately reflect the actual market value of residential properties in the County. (*Id.* ¶ 41.)

The policies implemented pursuant to the Consent Order closed racial disparities in the County's tax system. (*Id.* ¶ 45.) Within one year of the first reassessment under the Consent Order, the overassessment of properties in predominantly "nonwhite" school districts fell from 27% to 5% or less. (*Id.*) According to Plaintiffs, "[t]he reduction in the racialized tax disparity was achieved in part by increasing the assessed value of undervalued properties in "white" communities and decreasing the assessed value of the overvalued properties in nonwhite communities." (*Id.* ¶ 47.) During this time, property values, especially those in the County's wealthier communities, were increasing substantially. (*Id.* ¶ 48.) As a result, many property owners, particularly those in "white" communities, experienced increased property value assessments and corresponding property tax increases. (*Id.* ¶ 49.)

The increased assessment accuracy resulted in higher taxes on properties in wealthy communities, and lower taxes on properties in lower-income communities. (*Id*. ¶ 57.) "As a result, property taxes became a hot-button issue for wealthier, white voters in the 2009 election for Nassau County Executive." (*Id*.) While campaigning for Nassau County Executive, then-candidate Edward Mangano promised to reverse the policies implemented pursuant to the Consent Order. (*Id*. ¶ 61.) Mangano was elected in November 2009 and assumed office on January 1, 2010. (*Id*.)

Beginning on January 7, 2010, the Mangano Administration imposed a "freeze," which ended the annual property assessments that the Consent Order required for the purposes of reflecting fair market value. (*Id*. ¶ 67.) Under the freeze, changes in property value were unaccounted for in annual property assessments. (*Id*. ¶ 69.) This policy, therefore, "benefit[ted] the owners of wealthier properties, which are predominately located in white communities, because the appreciated property value is disregarded from their tax burden." (*Id*. ¶ 73.) According to Plaintiffs, because the County predetermines the amount of property tax revenue needed for its budget, and that revenue is divided pro rata among properties based on property value, any tax increases avoided by the wealthier property owners were borne by the owners of less expensive properties. (*Id*. ¶¶ 70, 73.) In effect, the property assessment freeze shifted the tax burden in the County from the wealthy to the less affluent, or from "white" communities to "nonwhite" communities. (*Id.*)

Although Mangano had promised during his campaign that the freeze on annual property assessments would be in effect for only two years, Defendants extended the policy to four years. (*Id*. ¶ 75.) Ultimately, the policy remained in effect for seven years until the Mangano administration was replaced in January 2018. (*Id*.) According to the complaint, as property

appreciation increased during that time in wealthy, "white" communities, so too did the "inequities and discriminatory impact" of the freeze in "nonwhite" communities—that is, "properties in wealthier, white communities became substantially undertaxed, and properties in nonwhite, lower-income communities were overtaxed." (*Id*. ¶ 77.) In 2018, however, the County "instituted reforms, effective in 2019, that . . . create[d] a nondiscriminatory, scientific, equitable, and rational property tax system going forward." (*Id*. ¶¶ 171–72). The reforms "require property reassessments in 2019 and subsequent, annual reassessments." (*Id*. ¶ 172.) According to Plaintiffs, "the new system includes sufficiently reduced assessments such that all residential property appreciation would be taxed." (*Id*. ¶ 11.)

Plaintiffs allege that Defendants continued to persist in their discriminatory conduct throughout the remainder of 2018, before the reforms could take effect. (*Id*. ¶ 174.) For example, Defendants granted tax reductions to a majority of the 200,000 property owners who submitted grievances that year, most of whom were "white and wealthy." (*Id*.) This, according to Plaintiffs, has exacerbated a $1.7 billion tax burden that the previous system shifted from properties in "wealthier, white communities in [the County] to lower income, nonwhite communities." (*Id*. ¶ 1.) Plaintiffs also allege that the prospective nature of the reforms do nothing to compensate for the "grossly disproportionate taxes that Defendants imposed in prior years." (*Id*. ¶ 12.) On this basis, Plaintiffs maintain that the reforms actually perpetuate, rather than inhibit, the discriminatory tax disparities at issue. (*Id.*)

## DISCUSSION

### I. Comity

Comity "serves to ensure that 'the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.'" *Levin v. Com. Energy,*

*Inc.*, 560 U.S. 413, 431 (2010) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)). Accordingly, the comity doctrine counsels lower federal courts to resist engagement in certain cases falling within their jurisdiction. *Id*. at 421. As Plaintiffs acknowledge, one state function over which federal courts have generally declined to exercise jurisdiction pursuant to the principle of comity is taxation. *See id*. at 424. Indeed, "federal courts generally abstain from cases that challenge state taxation schemes on the basis that those claims are more appropriately resolved in state court." *Joseph v. Hyman*, 659 F.3d 215, 218 (2d Cir. 2011). This, as the Supreme Court has noted, is because "[s]tates survive best when state tax systems are not subject to scrutiny in federal courts." *Fair Assessment in Real Estate Ass'n, Inc. v. McNary*, 454 U.S. 100, 103 (1981). Nevertheless, the fact that Plaintiffs challenge a tax scheme is not on its own dispositive of the issue of comity. Rather, the Second Circuit has set forth the following three factors that, where present, counsel in favor of federal court adjudication despite the general rule of comity: (1) the legislation at issue employs classifications subject to heightened scrutiny or impinges on fundamental rights; (2) the plaintiffs are true third parties whose own tax liability was not a relevant factor; and (3) both federal and state courts have access to identical remedies. *Hyman*, 659 F.3d at 219 (citing *Levin*, 560 U.S. at 426–27.)

Plaintiffs are correct that the first factor—whether the challenged conduct employs classifications subject to heightened scrutiny or impinges on fundamental rights—weighs in favor of federal adjudication of Plaintiffs' claims. Plaintiffs allege that Defendants' conduct has had a racially disparate impact. (*See, e.g.*, Compl. ¶ 31.) There can be no question that this conduct plainly employs a classification that is subject to heightened scrutiny. However, this fact, standing alone, does not necessarily constrain the Court to adjudicate Plaintiffs' claims. *Cf. Levin*, 560 U.S. at 432 ("Individually, these considerations may not compel forbearance on the

6

part of federal district courts; in combination, however, they demand deference to the state adjudicative process.").

On this point, the Court is persuaded by the holding in *Global Leadership Foundation v. City of New York*, No. 21-CV-10942, 2022 WL 2788398 (S.D.N.Y. July 15, 2022). There, the district court dismissed the underlying action on comity grounds, notwithstanding that the challenged tax regime implicated fundamental rights. *Id*. at *3. The court reasoned that:

> Consideration of the three comity factors confirms this conclusion. Only the first factor weighs in [plaintiff's] favor, as its claims implicate fundamental rights under the Free Speech and Establishment Clauses. The latter two factors, however, both weigh against a federal forum. This is not a case in which the only possible remedy is the one that [plaintiff] requests. [Plaintiff's] Establishment Clause and Equal Protection Clause claims present the kind of equal treatment claim that can be remedied in more than one way. And, most importantly, [plaintiff] does not present a general challenge to an allegedly unconstitutional government program—its claims all arise out of its own tax liability.

*Id.* (internal citations and quotation marks omitted.) The same is true here. While the first factor counsels in favor of federal adjudication, the second factor—whether plaintiffs are true third parties whose own taxes are not at issue—weighs against it.[4] Plaintiffs purport to challenge Defendants' tax scheme at large, but the complaint makes clear that they also challenge their own tax assessments. Plaintiffs allege, for example, that Defendants' tax reforms fail to compensate them for their "prior, grossly disproportionate [] property tax payments," thereby "perpetuat[ing] and compound[ing] the losses already caused to [them]." (Compl. ¶ 176.) Moreover, Plaintiffs specifically assert in opposition to Defendants' motion that they "were directly injured by Defendants' policies." (Pls.' Opp'n to Defs.' Mot. Dismiss ("Pls.' Opp'n") at 29, ECF No. 31.) Thus, Plaintiffs are not true outsiders to the tax expenditure under the comity

---

[4] The Court notes that Plaintiffs did not address this factor in their brief and instead employed tests used outside this circuit.

analysis. *See Levin*, 560 U.S. at 430 (finding comity to be appropriate where the "very premise of respondents' suit is that they are taxed differently from LDCs . . . . respondents do object to their own tax situation, measured by the allegedly more favorable treatment accorded LDCs.").

Finally, the third factor—regarding the adequacy of a state court remedy—weighs decisively against the federal adjudication of Plaintiffs' claims. The remedies available in a state court need not be identical to those available in federal court to be deemed adequate, rather, they need only be "plain, speedy, and efficient." *Long Island Lighting Co. v. Town of Brookhaven*, 889 F.2d 428, 431 (2d Cir. 1989) ("*LILCO*"). That is, a state court "need only provide a full hearing and judicial determination at which [a taxpayer] may raise any and all constitutional objections to the tax." *Id*. (quoting *Rosewell v. LaSalle Nat'l Bank*, 450 U.S. 503, 514, 515 n.19 (1981)); *see also Matthews v. Rodgers*, 284 U.S. 521, 525–526 (1932) (if a taxpayer "may maintain a suit at law for [] recovery on the ground that [a state tax] was exacted in violation of the Constitution of the United States," there is no federal jurisdiction). Of particular relevance here, the Second Circuit has long recognized that "New York provides several remedies which afford [plaintiffs] an opportunity to raise all constitutional objections to the real property taxes imposed." *LILCO*, 889 F.2d at 431;[5] *see also Hickmann v. Wujick*, 488 F.2d 875, 876 (2d Cir. 1973) (New York remedies for taxpayers "are adequate" because plaintiffs "may seek judicial review of their assessment . . . and adverse determinations may be appealed"); *Piedmont Gardens, LLC v. LeBlanc*, 733 F. App'x 576, 578–79 (dismissing tax challenge on comity

---

[5] In *Long Island Lighting Co. v. Town of Brookhaven* (*"LILCO"*), the Second Circuit affirmed the dismissal of the plaintiff's claim on grounds similar to those present here. *See* 889 F.2d 428 (2d Cir. 1989). There, the plaintiff challenged the constitutionality of the defendants' tax scheme which, according to the plaintiff, "systematically and intentionally" assessed its property at a higher percentage of fair market value than other property in the same town based on "*de facto* classifications of property by use and geography." *Id*. at 430. The court held that "[b]ecause New York provides several remedies which afford [the plaintiffs] an opportunity to raise all constitutional objections to the real property taxes imposed, [ ] comity . . . bar[s] access to federal court." *Id*. at 431.

8

grounds where Connecticut state law afforded plaintiffs a full hearing and judicial determination of their claims, and the state-law remedies for constitutional deprivations were coextensive with their counterparts under federal law). This is sufficient for the Court to find, as it does, that state court remedies are adequate.

Plaintiffs resist this conclusion by raising two arguments, which purport to demonstrate the inability of state courts to vindicate their claims. *First,* Plaintiffs contend that New York courts are inadequate because Plaintiffs may not proceed on a class-wide basis in a state court. (Pls.' Opp'n at 18.) To be clear, Plaintiffs assert that certain remedies proposed by Defendants do not allow Plaintiffs to proceed as a class. (*See id*. at 19.) But, they do not argue that they are prevented from challenging Defendants' tax scheme on a class-wide basis in New York State court altogether, nor do they argue that class-wide *relief* is unavailable in state court. *Second*, Plaintiffs contend that New York courts are inadequate because there is a substantial risk that a state court would preclude Plaintiffs from introducing evidence necessary to make their case. (*Id*. at 20.) In support of this argument, Plaintiffs state that New York courts limit evidence of comparable properties to those in petitioner's immediate vicinity. (*Id*. at 20–21.) This is not necessarily so. As Defendants correctly argue, the decision to receive evidence of property sales beyond the immediate vicinity of a subject property is wholly within the trial court's discretion. *See Great Atl. & Pac. Tea Co. v. Kiernan*, 42 N.Y.2d 236, 241 (1977) ("Receiving evidence of sales of property beyond the immediate vicinity of the subject property is a matter resting in the sound discretion of the trial judge"). Put simply, Plaintiffs' arguments regarding the inadequacy of New York state courts are unavailing.[6]

---

[6] Plaintiffs propose that under *Levin*, comity may not be invoked where the suit involves a fundamental right or classification that attracts heightened judicial scrutiny. (*See* Pls.' Opp'n at 23). Not so. *See Levin,* 560 U.S. at 413 (citing the absence of a fundamental right or protected classification as only one of the "*confluence of factors*" controlling the analysis (emphasis added)).

Indeed, Plaintiffs' contention that New York courts provide inadequate relief is in sharp tension with their repeated references to *Coleman v. Sledin*, 181 Misc. 2d 219 (N.Y. Sup. Ct. 1999). In that case, a New York state court entered the Consent Order that Plaintiffs contend "proved enormously successful in reducing the overassessment of minority homeowners." (Pls.' Opp'n at 1.) Tellingly, Plaintiffs request that this Court enter injunctive relief to reinstate the "*Coleman* policies" so that taxes are levied in an equitable manner. (*Id.* at 2.) Put another way, Plaintiffs ask this Court to reinstate the Consent Decree, enacted by a New York state court, that Plaintiffs contend largely remedied the complained-of conduct in this suit—all while simultaneously complaining that New York courts are not equipped to hear Plaintiffs' claims. Contrary to Plaintiffs' urging, New York courts provide an adequate state remedy for Plaintiffs' claims.

\*     \*     \*

Consistent with the doctrine of comity, the Court declines to adjudicate this case.[7]

## I.     Supplemental Jurisdiction

Having dismissed all of the federal claims in this action, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claim for violation of the Nassau County Charter. *See Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010) ("We have said that if a plaintiff's federal claims are dismissed before trial, 'the state claims should be dismissed as well.'" (quoting *Cave v. E. Meadow Union Free Sch. Dist.,* 514 F.3d 240, 250 (2d Cr. 2008)); *see also First Capital Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) ("The exercise of supplemental jurisdiction is left to the discretion of the district court[.]").

---

[7] Defendants raise a number of additional grounds for dismissal, which the Court need not reach in light of its dismissal of the complaint on comity grounds. *See, e.g.*, *Levin v. Com. Energy, Inc.,* 560 U.S. 413, 432 (2010) ("Because we conclude that the comity doctrine justifies dismissal of respondents' federal-court action, we need not decide whether the TIA would itself block the suit.").

## CONCLUSION

For the foregoing reasons, Plaintiffs' complaint is dismissed in its entirety.

SO ORDERED.

Dated: March 23, 2023
     Brooklyn, New York

/s/ LDH
L<small>A</small>SHANN D<small>E</small>ARCY HALL
United States District Judge